**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

DIVERSIFIED BUILDERS INC.,

Plaintiff,

v.

KRISTINA ROSETT, in her official capacity as Director of the Division of Labor Standards and Statistics of the Colorado Department of Labor and Employment;
PHIL WEISER, in his official capacity as Attorney General of the State of Colorado; and
JOE BARELA, in his official capacity as Executive Director of the Colorado Department of Labor and Employment,

Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff Diversified Builders Inc. ("DBI"), through its attorneys, Fisher & Phillips LLP, for its Complaint against Defendants KRISTINA ROSETT, in her official capacity as Director of the Division of Labor Standards and Statistics (the "Director" and the "Division") of the Colorado Department of Labor and Employment ("CDLE"); PHIL WEISER, in his official capacity as Attorney General of the State of Colorado; and JOE BARELA, in his official capacity as Executive Director of CDLE; (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1. This lawsuit is the result of a power struggle between the Governor of Colorado and the Colorado Department of Labor regarding Colorado law, with the Attorney General

ignoring the Governor's directives and vetoes and siding with the Department of Labor. Stuck in the middle is a 40-year old Colorado based, family owned, company on the brink of closure.

2. This action arises out of a Direct Investigation commenced by the Direct Investigation Unit on November 23, 2020, Case Number 20-0027, and the Citation issued in that investigation. **Exhibit 1.** The investigation is still ongoing.

3. The investigation was started by union representatives who supplied the Division with a list of non-union drywall contractors that the union recommended the Division target for investigation due to their "good financial solvency."

4. The original Notice of Investigation indicated the Division had "received a credible allegation or suggestion of a systemic violation of Colorado labor law," identified the possible violations, and demanded production of documents and information. **Exhibit 2.**

5. The Direct Investigation was subject to the Wage and Hour Direct Investigation Rules, promulgated by the Division and approved by the Attorney General on June 11, 2020, provided that: ***"****The direct investigation shall be limited to potential violations that occurred no more than two years prior to the commencement of the investigation, except that the direct investigation may include potential violations that occurred no more than three years prior to the commencement of the investigation if the division receives a credible allegation or suggestion that the employer willfully violated Colorado wage and hour law."*

6. For the first three and a half years of the investigation, not much happened.

7. On March 21, 2024, years into the Investigation, the Division sent a letter ostensibly expanding time period of the Investigation to be "January 1, 2018 to May 17, 2022." **Exhibit 3.** but applied to the "same violations" and offered an opportunity to provide additional documents.

8. The Citation was issued a few months later on June 6, 2024. **Exhibit 1.** In addition to the alleged violations found and fines and penalties assessed, the Citation expanded the temporal scope of the Investigation to be "January 1, 2018 to June 6, 2024" though the "same violations" from the original Notice applied. *Id*. The Citation required DBI to respond to the demands in the original Notice for this time period, and included new demands for documents and information "to confirm their effectuation of the above Compliance Orders, and to facilitate further Division investigation and enforcement to remedy and prevent continuation or recurrence of the employer's violations." *Id*.

9. The Citation indicated it had to be appealed to the Division or it would be considered a final decision. DBI timely requested an appeal hearing on the Citation with the Division. *Id*.

10. On February 19, 2026, the ALJ issued a Decision and Order affirming the Division's determination as set forth in the Citation. **Exhibit 4.** The Order represented that it could be appealed though judicial review. DBI timely filed a Complaint for Judicial Review on March 24, 2026. *Id*. That appeal is pending before the district court in Denver, Case no. 2026-CV-34045.

11. On July 16, 2026, the Division issued a Second Notice of Expanded Investigation. **Exhibit 5.** It indicated the temporal scope of the Investigation was "January 1, 2018 to July 16, 2026." *Id*. The Second Notice indicated the "same violations" identified in the original Notice of Investigation applied, but asserted that the current Direct Investigation rules applied. *Id*; see **Exhibit 6** (2020 Direct Investigation Rules). It required DBI to update its responses to the demands propounded in the original Notice, and included new demands for documents and information, including identification and valuation of DBI's real estate, vehicles, physical property, ownership

interests, financial accounts, monies owed, contracts, and labor relationships. **Ex. 5**.

12. On September 15, 2026, while DBI's Complaint for Judicial Review remained pending and before any court had reviewed the merits of the Citation, the Office of the Attorney General, acting on behalf of the Division, filed a lien against DBI to collect the fines and penalties assessed in the Citation. **Exhibit 7.** DBI received no notice of, and no opportunity to be heard before, the filing of the lien.

13. DBI brings this action under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, to redress ongoing violations of its rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendants have (a) filed a lien against DBI's assets, without notice or an opportunity to be heard, to collect more than $1 million in fines and penalties that remain under judicial review; (b) adjudicated the Division's own charges against DBI before a hearing officer designated by and answerable to the Director of the Division, whose agency retains the fines it assesses; (c) imposed fines grossly disproportional to the alleged violations; (d) demanded, on pain of further penalties, sweeping disclosure of DBI's financial accounts, assets, receivables, and business relationships bearing no relationship to any alleged wage violation; and (e) imposed on DBI, by citation issued twenty days after Governor Polis vetoed the bill that would have authorized it, liability for the wages, records, and notices of workers employed by DBI's subcontractors. DBI seeks prospective declaratory and injunctive relief.

## PARTIES, JURISDICTION, AND VENUE

14. Plaintiff DBI is a corporation incorporated under the laws of the State of Colorado with its principal place of business at 8360 W 48th Ave., Wheat Ridge, Colorado 80033-3121.

15. Defendant Kristina Rosett is the Director of the Division (the "Director"). The

Division is the agency within CDLE that administers and enforces Colorado's wage and hour laws, including the Colorado Wage Act, the HFWA, and the COMPS Order; conducts direct investigations; issues citations; designates hearing officers under C.R.S. § 8-4-111.5(2); and issues administrative liens and levies under C.R.S. § 8-4-113(4). The Director is sued in his official capacity only, for prospective declaratory and injunctive relief.

16. Defendant Joe Barela is the Executive Director of CDLE, which houses the Division and to which the Director reports. He is sued in his official capacity only, for prospective declaratory and injunctive relief.

17. Defendant Phil Weiser is the Attorney General of the State of Colorado. The Office of the Attorney General filed, and is responsible for enforcing, the September 15, 2026 lien against DBI, and represents the Division in enforcement and collection matters. He is sued in his official capacity only, for prospective relief.

18. The Office of the Attorney General is also responsible for approving the Division's Rules.

19. Each Defendant acted, and continues to act, under color of state law. The Division and CDLE are not named as defendants because state agencies are immune from suit in federal court under the Eleventh Amendment. DBI's claims are brought against the responsible state officials, in their official capacities, for prospective relief to end ongoing violations of federal law. References in this Complaint to acts of "the Division" or "CDLE" refer to acts of Defendants and those acting under their direction.

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because DBI's claims arise under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3)

because DBI seeks redress for the deprivation, under color of state law, of rights secured by the Constitution. DBI's claims are brought under 42 U.S.C. § 1983.

21. This Court may grant declaratory relief under 28 U.S.C. §§ 2201–2202, Fed. R. Civ. P. 57, and injunctive relief under Fed. R. Civ. P. 65.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside and perform their official duties in Colorado and a substantial part of the events giving rise to DBI's claims occurred in this District.

23. DBI's claims are not barred by the Eleventh Amendment because they seek only prospective declaratory and injunctive relief against state officials in their official capacities to end ongoing violations of federal law.

24. No abstention doctrine counsels against the exercise of this Court's jurisdiction as the Division's Investigation is an open-ended investigatory process, not a pending judicial or quasi-judicial proceeding; the Division itself maintains that no proceeding has concluded, while treating the Citation as final for collection purposes. The September 15, 2026 lien was filed unilaterally, without any proceeding in which DBI could be heard.

25. To the extent any state proceeding is deemed ongoing, abstention is nonetheless inappropriate because (a) the Investigation and Citation were initiated in bad faith and for purposes of harassment, at the suggestion of a union representative who targeted DBI because it had "enough work" and "good financial solvency," have been prosecuted in disregard of the Division's own rules, and were used to impose a liability that the Governor had vetoed three weeks before the Citation issued; (b) DBI's structural challenge to the Division's adjudicative process and its challenge to the pre-deprivation lien cannot be adequately raised in, or remedied by, deferential

on-the-record review of the hearing officer's decision; and (c) being subjected to adjudication before a structurally biased tribunal, and to a lien without a hearing, are "here-and-now" injuries that cannot be remedied after the fact.

## FACTUAL ALLEGATIONS

### A. DBI

26. DBI operates as one of Colorado's premier contractors, specializing in metal stud framing, light gauge and load-bearing stud framing, prefabrication, drywall, insulation, and acoustical ceilings.

27. DBI has operated in Colorado for forty-six (46) years and was founded by one of the State's pioneering metal stud carpenters. DBI originated with modest tenant improvement projects and has since expanded to performing large-scale work across the Mountain West. As is common in the construction industry, at times, DBI engages with subcontractors.

28. DBI is committed to providing a stable work environment with equal opportunity for learning and personal growth for its employees. DBI is also committed to providing its employees with the same concern, respect, and caring attitude within the DBI organization that employees are expected to share externally with every DBI Customer.

### B. The Division's Direct Investigation

29. On October 15, 2020, Gustavo Maldonado forwarded an email to Antonio Anduaga Bocanegra, Bilingual Compliance Investigator, Colorado Department of Labor, Division of Labor Standards and Statistics ("Division").

30. Mr. Maldonado publicly holds himself out to be a Business Agent for the United Brotherhood of Carpenters & Joiners of America (the "Carpenters Union").

31. Mr. Maldonado was acting on behalf of Carpenters/Contractors Cooperation Committee ("QuadC"), an organization affiliated with the Carpenters Union.

32. In that email, Mr. Maldonado suggested that QuadC target DBI and other non-union drywall companies for investigation, as "they have enough work, good financial solvency, they would be good cases."

33. Unbeknownst to DBI, Mr. Bocanegra directed Mr. Maldonado to gather information, including reports from "confidential informants" to "investigate" DBI on behalf of the Division.

34. On November 23, 2020, the Division sent DBI a Notice of Investigation ("NOI"), initiating the Case and notifying DBI that the Division was investigating whether DBI allegedly committed violations of: the Colorado Wage Act ("CWA"), Colo. Rev. Stat. §§ 8-4-101, *et seq.*; the Colorado Healthy Family and Workplaces Act ("HFWA"), Colo. Rev. Stat. §§ 8-13.3-401, *et seq.*; the Public Health Emergency Whistleblower Act ("PHEW"), Colo. Rev. Stat. §§ 8-14.4-101, *et seq.*; rules promulgated under or applicable to the HFWA or PHEW, including the Colorado Whistleblower, Anti-Retaliation, Non-Interference, and Notice-Giving Rules (the "WARNING Rules"), 7 Colo. Code Regs. 1103-11 (2020); the Colorado Overtime and Minimum Pay Standards Order ("COMPS Order"), 7 Colo. Code Regs. 1103-1 (2020); and penalties provide by article 1 of Title 8 of the Colorado Revised Statutes.

35. On February 16, 2021, Mr. Maldanado e-mailed the Division with a list of possible individuals to interview.

36. On February 22, 2021, DBI submitted its response to the NOI, including more than 15,000 pages of responsive documents.

37. On April 29, 2021, the Division e-mailed Mr. Maldonado and directed him "as discussed on the phone" to facilitate a declaration being created for an individual.

38. The Division asked Mr. Maldonado to collect "[a]ny other detail or information in regards to the Friday April 30th 2021 offering to pay and previous instances" despite the fact April 30, 2021 had yet to occur.

39. The Division also asked Mr. Maldonado, a Carpenters Union representative, to try and set up an interview with a DBI foreman.

40. On May 3, 2021, DBI informed the Division that representatives of the Carpenters Union Local #555 union had been sending copies of the Notice of Investigation to DBI clients and customers and declaring that the Carpenters Union was in a "labor dispute" with DBI. It also indicated there will be a public campaign against both DBI and those doing business with them.

41. DBI requested that the Division provide clarification on why the Notice of Investigation would have been sent to a third-party given the investigation was considered confidential, was ongoing, and had not been filed by the Carpenters Union.

42. On May 10, 2021, the Division confirmed that it had provided the Carpenters Local #555 union a copy of the Notice of Investigation, without requiring the Carpenters Local #555 to submit any request. The Division attempted to justify providing the Notice of Investigation to the union by arguing that: "*The Notice of Investigation, which is generated by the Division, may be shared by the Division with other individuals or entities (including unions) for purposes of gathering evidence in the investigation. DI Rules, 7 CCR 1103-8, Rule 3.8 (providing that the Division's investigatory methods include, but are not limited to, obtaining documents through document requests; obtaining information through requests for written statements; "information*

*gathering" and "fact-finding"; and "[a]ny other lawful technique that enables the Division to assess the employer's compliance with labor standards law*.").

43. The Division's response indicated that the Division believed the Carpenters Union's intentional acts of interfering with DBI's business to simply be part of the fact-finding process.

44. On May 17, 2021, DBI submitted Colorado Open Records Act ("CORA") requests related to the Citation and communications between the Division and any unions or third parties regarding the NOI in response to defamatory communications being sent to companies that DBI contracted with.

45. On May 19, 2021, the Division denied the CORA based on the Division's position that the responsive records related to an "ongoing civil or administrative investigation."

46. Between May 2021 and May 2022, the Division did not contact DBI regarding the investigation.

47. During that same time period, the Director of the Direct Investigations Unit, Mary Donachy, was litigating her own personal lawsuit, while purporting to represent an individual as their attorney, despite having previously closed her own law firm.

48. The lawsuit the Director of the Direct Investigations Unit was bringing was against a construction contractor at her home residence.

49. A year later, in May 2022, the Division issued a Notice of Incomplete Response ("NOIR") requesting additional documents, including documents through May 17, 2022. DBI timely responded.

50. In August 2022, the Division requested a meeting to discuss the possibility of a

negotiated closure of the investigation.

51. At the August 15, 2022, meeting the Division demanded $95,000 in overtime wages to close the investigation.

52. When asked to identify in the record the overtime that was allegedly not paid, the Division indicated they would continue reviewing and provide evidence to review.

53. The Division never responded or provided evidence of unpaid overtime to review, nor did it ever reengage settlement discussions.

54. DBI did not hear from the Division until nine months later, on February 2, 2023, when the Division requested additional information from DBI relating to active projects in 2023. Despite its objections, DBI timely responded.

55. Seven months later, on September 14, 2023, the Division again requested additional information from DBI relating to active projects. Despite its objections, DBI timely responded.

56. Three years after the investigation began, on September 28, 2023, the Division's Investigator notified counsel for DBI via email that the Division intended to conduct a site visit at an undisclosed location the following morning at 9:00 a.m. to interview supervisors and employees.

57. Counsel for DBI informed the Investigator that counsel intended to be present during the site visit and to participate in any supervisor interviews in person.

58. At approximately 11:00 p.m. that same night on September 28, 2023, the Investigator informed DBI's counsel of the location of the site visit.

59. The following day, on September 29, 2023, the Division visited a worksite located at 7110 Montview Boulevard in Denver ("7110 Montview Boulevard Worksite").

60. DBI objected to the unreasonable notice under the Division's Direct Investigation Rule 3.10.1, 7 Colo. Code. Regs. 1103-8 (2020).

61. Between September 2023, and March, 2024 DBI did not hear from the Division.

62. Nearly six months after the Division visited the 7110 Montview Boulevard Worksite, on March 21, 2024, the Division sent a **Notice of Expanded Investigation** ("NOEI") to DBI, notifying DBI that the Division was expanding its investigation regarding the same alleged violations from the NOI to encompass the time period from January 1, 2018 to May 17, 2022. **Exhibit 3.**

63. The Division has never provided no authority for the expanded timeframe, which directly contradicted the Division's own Direct Investigation Rules, which provided only a two year look back for investigations. *Id*.

64. The Division provided no Preliminary Findings as provided for under the Division's Direct Investigation Rule 4, 7 Colo. Code. Regs. 1103-8-4 (2020).

### C. The General Assembly Passes, and the Governor Vetoes, General Contractor Liability for Subcontractors' Workers

65. Colorado law has never made a construction contractor liable for the wages, pay statements, records, notices, or leave of workers employed by its subcontractors. The Colorado Wage Act imposes obligations on an "employer" with respect to its own "employees."

66. In the 2024 session, the General Assembly passed House Bill 24-1008, "Wage Claims Construction Industry Contractors." The bill would have made a general contractor "liable for all amounts owed to an employee for the employee's labor, construction, or other work, including amounts owed by a subcontractor"; would have required subcontractors to forward wage demands to the general contractor; and would have authorized general contractors to demand their

subcontractors' pay data. The House passed the bill on April 19, 2024, and the Senate on May 7, 2024.

67. On May 17, 2024, Governor Polis vetoed HB24-1008. His veto letter explained that under the bill the general contractor—even when not at fault under any reasonable standard—would effectively pay for the same work twice (in addition to fines, penalties, and interest), objected that the bill singled out construction for a unique and novel joint liability mechanism," and concluded that "wage theft is wrong, but punishment for any crime should focus on the wrongdoers."

68. In 2025, the General Assembly enacted a revised wage-enforcement bill, House Bill 25-1001, which omitted the general contractor liability mechanism that had prompted the veto. Ch. 228, 2025 Colo. Sess. Laws (eff. Aug. 6, 2025).

**D. The Citation**

69. On June 6, 2024, four years after the investigation began, and only 20 days after Governor Polis' veto of HB24-1008, the Division issued the Citation, which includes ninety-four (94) pages of unsupported allegations and vitriol against DBI. **Exhibit 1.**

70. The Citation was issued by the Division under the authority of the Director. *Id.*

71. In the Citation, the Division ordered that DBI pay **$1,055,900.00** in "fines and penalties" related to alleged violations of the Division's unilaterally implemented rules. *Id.*

72. These "fines and penalties" were related to alleged failures to keep and produce records related to individuals who were employees or third party contractors of *<u>other</u>* companies; including, pay statements; notice violations under the Colorado Overtime and Minimum Pay Standards Order ("COMPS Order") and Minimum Wage Orders ("MWO"); notice and posting

fines under the Colorado Healthy Family and Workplaces Act ("HFWA"), Colo. Rev. Stat. §§ 8-13.3-401, *et seq.* and the Public Health Emergency Whistleblower Act ("PHEW"), Colo. Rev. Stat. §§ 8-14.4-101, *et seq.*; failure to provide HFWA leave; and failure to pay wages.

73. The dates of which fines became applicable under those regulations was beyond the period specifically outlined int eh Wage and Hour Direct Investigations Rules that were promulgated by the Division and approved by the Attorney General.

74. The overwhelming majority of the "fines and penalties" are for purportedly not providing posters to third-party contractors employees after November 2020.

75. The "per employee" fines are not supported by the rules or statutory text.

76. In addition to the "fines and penalties," the Division issued Compliance Orders that not only included a number of unilateral directives but would also require DBI to re-classify the disputed workers as "employees" because *allegedly* DBI "misclassified" the disputed workers as independent contractors and "misled them into believing they had no Colorado employee rights." *See* **Exhibit 1**.

77. The Division of Labor Standards and Statistics does not have the authority under Colorado law to determine whether workers were correctly classified as independent contractors or employees.

78. The Division's Compliance Orders also mandated that DBI rescind all policies and practices (which would include the subcontractor agreements) that the Division concluded were violations of the of the Colorado Wage Act ("CWA"), Healthy Families and Workplaces Act ("HFWA"), 7 CCR 1103-11 (2020) ("WARNING Rules"), 7 CCR 1103-7 (2020) ("Wage Protection Rules"), Health Emergency Whistleblower Law ("PHEW"); Minimum Wage Orders

("MWO"), and Colorado Overtime and Minimum Pay Standards ("COMPS Orders"), and modify or replace them with policies and practices complaint with the Division's conclusions. *See* **Exhibit 1**.

79. The Division further ordered DBI to provide the Division with a sworn explanation of how each measure in the Compliance Order has been effectuated, from either the CEO or an owner of 50% or more of DBI, or another official with authority to making binding statements on behalf of DBI on topics "including but not limited to": 1) worker classifications; 2) paid sick leave; 3) rest and meal periods; 4) workweeks; 5) workdays; 6) time tracking and payments; 7) posting of the COMPS Order and HFWA and PHEW posters; 8) employee handbooks; and 9) notice of HFWA and PHEW rights. *Id*.

80. The Division additionally ordered DBI to provide the Division with copies of all documents constituting or confirming its compliance with the numerous orders, including: 1) all policies and practices drafted and implemented pursuant to the Compliance Orders; 2) all communications to or from employees as to policies and practices pursuant to the Compliance Orders; 3) the most recent available pay statement for all workers performing, since the date of this Citation, drywall and/or framing work similar to that of the Covered Workers; 4) notification to all employees of HFWA paid leave rights and responsibilities, PHEW rights, and wage and hour rights and responsibilities; 5) a list of all real estate owned in whole or in part by DBI, including the details of the nature of ownership, estimated value, the amount and holder of any outstanding debts secured by the property, including mortgages and lines of credit; 6) a list of all vehicles owned in whole or in part by DBI, including the details of the nature of ownership, estimated value, and the amount and holder of any outstanding debts secured by the property, including

purchase loans; 7) a list of all other physical property valued over $1000.00 owned in whole or in party by DBI, including the details of the nature of ownership, estimated value, and the amount and holder of any outstanding debts secured by the property; 8) a list of all ownership interest held by DBI in any business enterprise other than DBI, including a description of the enterprises' services performed, products sold, etc., the nature of ownership, annual gross receipts and expenses for the enterprise for each year from 2019 to present, a description and estimated value of all property owned by the enterprise, and the amount and holder of any outstanding debts owed by the enterprise; 9) a list of all financial institutions where DBI has an account or signature authority, including the details of the account number, current balance of each account, and the last three months of account statements; 10) a list of every person or entity that owes money to DBI in excess of $500.00, including the details of the debtor, the amount owed, the terms of repayment, and the reason the moneys are owed; 11) a list of all employment and contracts providing income to DBI from January 1, 2022 to the present, including the details of the parties to the contract, a description of the contract, all income the contract generated from January 1, 2022 to present, and the income the contract is expected to generate in the future; 12) a list of all general contractors that DBI either had had contracts, or has performed, procured labor for, billed or been paid for, drywall or framing since January 1, 2022 to present, including the details of the contractor, date of initial contracting, status of the contracting, and receipts to date from the contractor; 13) a list of all property with an estimated value of $5,000.00 or more, including ownership interest in any real property, funds or accounts containing funds, or business entities, transferred by DBI since November 23, 2020, including the details of the transferee, a description of the property, estimated value, and reason for the transfer; and 14) all bankruptcy proceedings

initiated by DBI from November 23, 2020 to the present. *Id.*

81. The Division, also unilaterally expanded the scope of the investigation from January 1, 2018 through June 6, 2024 regarding the same alleged violations from the original NOI. The Division provided no authority for the expanded timeframe. *Id.*

82. The correct timeframe for the investigation is November 23, 2018 to November 23, 2020.

83. The Citation expressly states that if DBI disagreed with the Citation, it could appeal it pursuant to CCR 1103-8 Direct Investigation Rule 6, and if no appeal hearing request is received by the Division within 35 calendar days of the issuance date of the Citation, the Citation would be "the **final decision** of the Colorado Department of Labor and Employment." *Id.*

84. The Citation did not include a finding that any amount of unpaid wages was owed to any worker, nor does it order payment of any wages to any worker. *Id.*

**E. DBI's Appeal**

85. On July 11, 2024, DBI timely appealed the Citation by filing an appeal with the Division using the Division's Direct Investigation Appeal Hearing Request Form, along with a Stay Request.

86. On July 15, 2024, the Division requested an extension to respond to DBI's Stay Request by August 2, 2024.

87. Yet, despite seeking this extension, the Division ultimately failed to submit any response.

88. On July 25, 2024, the Hearing Officer nevertheless denied the Stay Request.

89. On August 19, 2024, DBI timely appealed the denial of the Stay Request. See

*Diversified Boulders Inc. v. Colorado Department of Labor and Employment, Division of Labor Standards and Statistics*, Denver County District Court Case No. 2024CV32524.

90. On October 23, 2025, the Court dismissed that appeal, holding that the Citation was not a final agency order, and that the denial of a stay of a non-final order was not subject to judicial review. The Court further stated that "if the Division changes direction and decides to enforce a non-final order while on appeal, the state APA provides potential remedies.

91. In preparation for the hearing, on January 27, 2026, DBI submitted its Prehearing Witness and Exhibit Lists and its Subpoena Request Forms. The Subpoenas were for four witnesses (Gustavo Maldonado, Jose Lopez, Antonio Anduaga Bocanegra, and Jesus Loayza) who were believed to have information regarding the motives underlying the Division's investigation.

92. The Division opposed the Requests for Subpoena, arguing they were untimely named, irrelevant, and addressed privileged information. The Hearing Officer ultimately denied the Requests, finding DBI failed to show good cause.

93. A hearing on the Citation was held on February 10, 2026. The hearing lasted less than thirty (30) minutes, including the Hearing Officer's introduction, and the Division presented no witnesses or additional testimony in response to the sworn testimony provided by DBI.

94. The parties agreed to submit written closing arguments, which were submitted on February 11, 2026.

95. On February 19, 2026, eight days after the hearing, and despite the record including more than 78,000 documents, the Hearing Officer affirmed the Citation in full, adopting the Division's determination as to every alleged violation and every dollar of the fines and penalties assessed. **Exhibit 4.**

96. The Order provided the standard of review, a brief history of the appeal, and a one-sentence opinion: "Upon consideration of the record, the submissions of the parties on appeal, and the arguments made by the parties before and after the hearing, I find that both the factual findings and the legal conclusions provided in the determination issued by the Division: (a) are correct, and were not shown to be erroneous in any material respect by the hearing or appeal record; and (b) are incorporated by reference into, and attached to, this decision." *Id.*

97. DBI's appeal of the Citation was not heard by a court, or by an administrative law judge of the Office of Administrative Courts, C.R.S. § 24-30-1001, *et seq.*, but by a hearing officer designated by the Director. *See* C.R.S. § 8-4-111.5(2) ("the director shall designate a hearing officer"). The hearing officer was Raja Raghunath (the "Hearing Officer").

98. Mr. Raghunath is an employee of the Division, is hired, supervised, evaluated, and compensated by the Division, reports to the Director, and serves at the Director's pleasure. He has no statutory or regulatory protection against removal, reassignment, or adverse employment action by the Director, and no fixed term of office.

99. Pursuant to Division policy, Mr. Raghunath seeks and receives approval on judicial findings, such as requests for recusal, from the Director of the Division of Labor Standards and Statistics.

100. Given the Hearing Officer reports directly to the Director of the Division of Labor Standards and Statistics, not the Director of the Department of Labor, there is a clear conflict of interest.

101. The Director of the DLSS, or persons acting under the Director's supervision, initiated the Investigation, directed the Investigator, decided to issue the Citation, and determined

the fines and penalties assessed.

102. Upon information and belief, the Director took part in reviewing and drafting the Order.

103. The same Director then designated the hearing officer who reviewed that Citation. The Division thus acted as investigator, prosecutor, and judge of its own charges.

104. The Division also has a direct institutional financial interest in the outcome. Fines collected are credited to the Wage Theft Enforcement Fund, and "[t]he money in the fund may be used by the division … for the division's direct and indirect costs associated with implementing this article 4." C.R.S. § 8-4-113(3).

105. Because the entire $1,055,900.00 assessed in the Citation consists of fines payable to the Division, every dollar the Hearing Officer affirmed was revenue to the agency that designated and employs him.

**F. DBI's Complaint for Judicial Review**

106. DBI timely filed its Complaint for Judicial Review on March 24, 2026. That appeal is pending before the District Court in Denver County, Case no. 2026-CV-34045.

107. Despite the fact that the General Assembly has twice declined to legislatively enact the liability the Division imposed on DBI, and the Division continues to pursue DBI based on that theory alone.

108. On July 16, 2026, the Division issued a Second Notice of Expanded Investigation. It extended the scope of the original investigation to cover a period from January 1, 2018 to July 16, 2026. **Exhibit 5.**

109. The Second Notice provides no basis for the expansion, but simply includes an

extensive list of invasive demands. *Id.* In addition to information related to compliance with the Citation, the Second Notice seeks updated information on DBI's "labor relationships" and subcontractors, demands a list of all real estate owned by DBI, with its estimated value and outstanding debt, all vehicles, physical property, ownership interests, all financial institutions used along with account number, balance, and statements, a list of everyone who owes DBI more than $500, all employment and contracts providing income since 2022, a list of all general contractors DBI has worked with, all property worth more than $5,000, and any bankruptcy proceedings since November 23, 2020. *Id.*

**G. The Administrative Lien**

110. On September 15, 2026, the Office of the Attorney General, on behalf of the Division, filed a Notice of Lien against DBI, served on UMB Financial Corp. **Exhibit 7.**

111. The lien purports to secure and collect the $1,055,900.00 in fines assessed in the Citation. *Id.*

112. The lien claims that DBI owes "wages", which is an intentional misrepresentation.

113. The Lien does not contemplate wages due to any employee and is improper under §8-4-113(4), which specifically states "The division may issue the notice of administrative lien and levy when an employer is past due on paying wages determined to be due to its employees and any fines or penalties determined to be due pursuant to this article 4 without an order staying or reversing the applicable deadline for payment." (emphasis added).

114. There are no "wages" or "penalties determined to be due pursuant to this article 4" contemplated by the lien.

115. DBI received no notice that the Division or the Attorney General intended to file

the lien, and DBI was afforded no hearing or other opportunity to contest whether a lien was warranted, the amount of the lien, or the assets it would encumber.

116. At the time the lien was filed, the Citation and the ALJ's February 19, 2026 Decision and Order were, and remain, the subject of DBI's pending Complaint for Judicial Review. No court has reviewed the merits of the Citation or the fines and penalties it assesses.

117. While the Division continues to maintain that its Investigation of DBI is ongoing, treating the Citation as not final for purposes of its Investigation, it is treating the very same fines and penalties as finally "determined to be due" and "past due" for purposes of collection. *See* C.R.S. § 8-4-113(4)(a).

118. An administrative lien and levy is a severe collection remedy. It reaches an employer's "[r]eal, intangible, or personal property," its "[p]ayments due" and "accounts receivable," and its "[c]redits or debts," C.R.S. § 8-4-113(4)(e); bars any person holding those assets from transferring or disposing of them; and requires their surrender within thirty days. *Id.* § 8-4-113(4)(a)(V)–(VI).

119. The lien clouds title to DBI's property; impairs DBI's ability to sell, finance, or otherwise use its assets; interferes with DBI's receivables from general contractors and its relationships with customers, lenders, and sureties; and threatens DBI's ability to meet payroll and continue operations, all before any court has determined whether the underlying fines and penalties are lawful.

## <u>CLAIMS FOR RELIEF</u>

### I. Count One: 42 U.S.C. § 1983 – Deprivation of Property Without Due Process of Law in Violation of the Fourteenth Amendment (Lien) (Against Defendants Weiser and the Director)

120. DBI hereby incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

121. The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Section 1983 provides a cause of action against any person who, under color of state law, deprives another of rights secured by the Constitution. 42 U.S.C. § 1983.

122. Defendant Weiser and Rossett, acting under color of state law, filed or caused to be filed the September 15, 2026 lien against DBI's assets.

123. The lien makes direct misrepresentations to the financial institutions who received, including claiming that "wages" were owed by DBI.

124. The lien itself is improper as C.R.S. § 8-4-113(4) only authorizes a lien on an employer's assets when "wages" are owed and there are no wages owed under the Citation itself.

125. DBI has a constitutionally protected property interest in its real and personal property, financial accounts, receivables, and contract rights. A lien on that property, even if temporary, is a deprivation of a significant property interest that triggers the protections of the Due Process Clause.

126. The State's interest in the lien is correspondingly weak. The administrative lien and levy statute is built around the collection of "past-due wages" for employees: it requires the notice to name each employee owed wages and the amount due, and it directs that available assets go first to employees and only thereafter to fines "owed to the state." C.R.S. § 8-4-113(4)(a)(IV), (VII).

127. Here there are no employees owed wages. The lien serves only to collect revenue

for the Division itself, in advance of any judicial determination that the fines are lawful.

128. Defendants deprived DBI of that property interest without prior notice, without a pre-deprivation hearing before a neutral decisionmaker, and without any showing of exigent circumstances, while the underlying fines and penalties remain subject to pending judicial review. Under the balancing test utilized by the Supreme Court, the procedures Defendants employed fall short of what the Fourteenth Amendment requires.

129. The private interest at stake is substantial. The lien encumbers the assets and receivables of a business that has operated in Colorado for forty-six years, threatening its operations, credit, bonding capacity, and relationships with customers, general contractors, lenders, and sureties.

130. The risk of an erroneous deprivation is high. The fines and penalties underlying the lien are the product of an Investigation that the Division initiated at the suggestion of a union representative, conducted in violation of its own rules, and continues to expand; they are the subject of pending judicial review; and the Division itself maintains that its Investigation is not complete. No neutral decisionmaker considered, before the lien was filed, whether a lien was warranted, what assets it should reach, or whether less drastic measures would protect the State's interest.

131. Additional safeguards, such as notice and a hearing before filing, or deferral of any lien until judicial review is complete, would have substantial value and would impose minimal burden on Defendants.

132. There is no exigency: Defendants have not alleged that DBI is dissipating or concealing assets, DBI is an established Colorado business that has participated in the Division's

process for nearly six years, and the State's interest in eventual collection is fully protected through the judicial review process.

133. To the extent C.R.S. § 8-4-113(4) authorizes a lien on an employer's assets without prior notice, without an opportunity to be heard, and while judicial review of the underlying citation is pending, the statute violates the Fourteenth Amendment as applied to DBI.

134. DBI is entitled to declaratory and prospective injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, including an order declaring the lien void, directing its release, and enjoining Defendants from filing or enforcing any lien, levy, or other collection action against DBI's assets based on the Citation until DBI's judicial review is finally resolved, together with its reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

### II. Count Two: 42 U.S.C. § 1983 – Excessive Fines in Violation of the Eighth and Fourteenth Amendments (Against Defendants Weiser and the Director)

135. DBI hereby incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

136. The Eighth Amendment provides that "excessive fines [shall not be] imposed." U.S. Const. amend. VIII. The Excessive Fines Clause applies to the States through the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

137. The $1,055,900.00 in fines and penalties assessed in the Citation are punitive in nature and are imposed, at least in part, as punishment for alleged recordkeeping, notice, and posting violations, and for the alleged misclassification of workers who were employees or contractors of other companies. Ex. 1.

138. The fines are entirely punitive. The Citation orders no back wages, restitution, or other compensatory payment to any worker; the full $1,055,900.00 is payable to the Division. A

sanction that serves, even in part, to punish is a "fine" subject to the Excessive Fines Clause, *Austin v. United States*, 509 U.S. 602, 610 (1993), and a sanction with no remedial component at all is the paradigm case.

139. The fines are for alleged violations outside of the Investigation time period direct by the rules.

140. The fines include a "per employee" fine that is not contemplated by the statute o rules.

141. For example, the Citation assesses a fine of $547,500 for alleged violations of C.R.S. § 8-4-103(4) and (4.5). This section requires employers to keep wage records for three years, and allows for a "fine of up to two hundred fifty dollars per employee per month … up to a **maximum fine of seven thousand five hundred dollars**." C.R.S. § 8-4-103(4.5) (emphasis added). The Citation did not limit the fine to the maximum amount but instead imposes a fine of $250 for 1630 worker months. *See* **Exhibit 1** at 80, Attachment D.

142. The fines are also grossly disproportional because they punish DBI for the alleged non-compliance of other companies' workers with obligations that Colorado law did not impose on DBI, and that the Governor vetoed three weeks before the Citation issued. A fine for conduct the law does not prohibit is excessive by definition.

143. A fine is unconstitutionally excessive when it is grossly disproportional to the gravity of the offense.

144. The fines and penalties assessed against DBI are grossly disproportional to the alleged violations: they bear no relationship to any actual harm to any identified worker; they were assessed for alleged paperwork and notice failures over a period the Division unilaterally and

unlawfully expanded; they were assessed against a company the Division targeted, at a union representative's suggestion, precisely because of its "good financial solvency"; and they are of a magnitude that threatens the continued existence of a forty-six-year-old Colorado business.

145. The "per person" fine assessed against DBI for allegedly not providing posters to a subcontractors employees are grossly disproportional to the alleged violations: they bear no relationship to any actual harm to any identified worker.

146. The September 15, 2026 lien seeks to collect these excessive fines and penalties by seizing DBI's assets before any court has reviewed them.

147. DBI is entitled to a declaration that the fines and penalties assessed in the Citation, and the lien filed to collect them, violate the Eighth and Fourteenth Amendments, and to an order enjoining their collection.

### III. Count Three: 42 U.S.C. § 1983 – Denial of a Fair and Independent Tribunal in Violation of the Fourteenth Amendment (Against the Director and Defendant Weiser)

148. DBI hereby incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

149. A fair trial in a fair tribunal is a basic requirement of due process. That requirement applies to administrative adjudicators as well as courts.

150. Due process is violated not only by actual bias, but whenever "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."

151. An adjudicator whose institution has a "direct, personal, substantial, pecuniary interest" in the outcome cannot satisfy due process. That is so even where the interest is institutional rather than personal: a mayor who sits as judge in cases whose fines fund the village

treasury is disqualified, because the "possible temptation" to favor the institution's finances is itself a due process violation.

152. While the combination of investigative and adjudicative functions within a single agency does not by itself violate due process, it does so where "special facts and circumstances" present a risk of unfairness that is "intolerably high."

153. Those special facts and circumstances are present here. The hearing officer who adjudicated DBI's appeal (a) is designated by the Director who is responsible for the Citation under review, C.R.S. § 8-4-111.5(2); (b) is employed, supervised, evaluated, and compensated by the Division and serves at the Director's pleasure, with no tenure protection or independence from the Director; (c) sits within the same Division that initiated the Investigation at the suggestion of a union representative, conducted it in violation of the Division's own rules, and continues to expand it; and (d) adjudicated fines every dollar of which is payable to the Division and credited to a fund the Division itself uses for its "direct and indirect costs." C.R.S. § 8-4-113(3).

154. The hearing officer's decision is considered "a final agency action" from which the only recourse is deferential judicial review of the administrative record. C.R.S. §§ 8-4-111.5, 24-4-106. DBI has therefore never received, and under the Division's structure will never receive, a determination of the Division's charges by a neutral and independent adjudicator.

155. The structural defects in the Division's adjudicative process are of the same character as those that federal courts have recognized in challenges to the adjudicative structure of federal agencies, and are, if anything, more acute: the hearing officer here lacks even the independence protections afforded to federal administrative law judges.

156. The risk of an erroneous or biased deprivation is heightened by the magnitude of

the fines and penalties at stake ($1,055,900.00), their punitive character, the Division's demonstrated targeting of DBI for its "good financial solvency," and the Division's use of the Citation as the basis for a lien on DBI's assets while it simultaneously maintains that its Investigation is incomplete.

157. By subjecting DBI to adjudication of the Division's own charges before a hearing officer who is designated by, employed by, and answerable to the Director, and whose determinations enrich the Division, Defendants deprived DBI of property without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

158. To the extent C.R.S. § 8-4-111.5(2) and the Direct Investigation Rules require or permit the Director to designate a hearing officer who lacks independence from the Director and the Division, those provisions are unconstitutional as applied to DBI.

159. DBI is entitled to a declaration that the Division's adjudication of the Citation violated due process; a declaration that the hearing officer's February 19, 2026 Decision and Order was rendered in violation of due process; an order enjoining Defendants from enforcing the Citation or the Decision and Order unless and until the Division's charges are adjudicated before a neutral and independent adjudicator, and an order enjoining Defendants from enforcing any lien or levy based on them unless and until DBI receives such a hearing. DBI seeks this relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 against the Director and Defendant Weiser in their official capacities, together with its fees and costs under 42 U.S.C. § 1988.

## IV. Count Four: 42 U.S.C. § 1983 – Unreasonable Search and Seizure in Violation of the Fourth and Fourteenth Amendments (Against the Director)

160. DBI hereby incorporates by reference the allegations contained in all preceding

paragraphs as if set forth fully herein.

161. Rule 3.3 of the Division's Direct Investigation Rules restrict an investigation to two years prior to the commencement of the investigation. **Exhibit 6** at Rule 3.3. The language is mandatory. *Id*. However, it also allows that an investigation may include potential violations that occurred no more than three years prior to the commencement "if the Division receives a credible allegation or suggestion that the employer willfully violated Colorado labor standards law." Id. No notice has indicated the Division received such allegation or suggestion. *See* **Exhibits 1-3, 5**. The Division therefore had no authority to expand the temporal scope beyond these dates.

162. The Fourth Amendment, applicable to the States through the Fourteenth Amendment, protects corporations as well as individuals against unreasonable searches and seizures, including unreasonable administrative demands for records. An administrative demand for records is reasonable only if it is "sufficiently limited in scope, relevant in purpose, and specific in directive that compliance will not be unreasonably burdensome."

163. The Citation and the Second Notice of Expanded Investigation demand, on pain of additional fines and penalties, that DBI disclose, among other things: every financial institution at which it holds an account or has signature authority, with account numbers, current balances, and three months of statements; every person or entity that owes it more than $500, with the terms of repayment; all of its contracts and the income they have generated since 2022 and are expected to generate in the future; all real estate, vehicles, and other property worth more than $1,000, with values and encumbrances; all ownership interests in other businesses, with those businesses' gross receipts and expenses since 2019; and every transfer of property worth more than $5,000 since November 23, 2020. **Exhibits 1, 5**.

164. These demands bear no relationship to any alleged violation of Colorado wage and hour law. They are not directed to hours worked, wages paid, worker classification, or the notices and postings the Citation concerns. By the Division's own description, they are intended "to facilitate further Division investigation and enforcement." **Exhibit 1** at 90. No statute or rule authorizes them. *See* **Exhibit 6**.

165. The demands are also unlimited in time and scope. The Division has expanded the Investigation to cover more than eight years, January 1, 2018 through July 16, 2026, has repeatedly extended it without stated authority, and has signaled that it will continue to do so. **Exhibits 1, 3, 5**.

166. The Division's September 29, 2023 site visit, conducted on less than 24 hours' notice with the location disclosed at 11:00 p.m. the night before, was not "reasonable" under the Direct Investigation Rules and was carried out without a warrant and without DBI's voluntary consent, and included entry into non-public areas of the worksite.

167. Defendants' financial disclosure demands constitute an unreasonable search and seizure of DBI's papers and effects in violation of the Fourth and Fourteenth Amendments. DBI is entitled to a declaration to that effect and an order enjoining Defendants from enforcing those demands, or imposing any fine, penalty, or other adverse consequence for DBI's non-compliance with them.

### V. Count Five: 42 U.S.C. § 1983 – Deprivation of Property Without Fair Notice or Legal Authority in Violation of the Fourteenth Amendment (Against the Director and Defendant Weiser)

168. DBI hereby incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

169. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." The requirement of fair notice applies to civil penalties imposed by administrative agencies, and it is violated when an agency penalizes a regulated party for conduct that no statute or rule prohibited at the time.

170. No Colorado statute or rule, at any time relevant to the Investigation or the Citation, required a construction contractor to keep records for, provide pay statements or notices to, provide leave to, or pay wages to workers employed by its subcontractors. The General Assembly passed a bill that would have created such liability, and the Governor vetoed it on May 17, 2024, on the express ground that it would punish contractors "even when not at fault under any reasonable standard." The General Assembly then omitted that mechanism from the wage-enforcement legislation it enacted in 2025.

171. Twenty days after the veto, the Division imposed that liability on DBI by citation. The Citation fined DBI $1,055,900.00 for alleged violations concerning "individuals who were employees or third party contractors of other companies," and ordered DBI to treat those workers as its own employees and to rescind its subcontractor agreements. **Exhibit 1**.

172. DBI had no fair notice that Colorado law required it to assume the wage, record-keeping, notice, and leave obligations of its subcontractors, because Colorado law did not require it. The veto of HB24-1008 was the clearest possible statement, by the State's chief executive, that such liability was not the law of Colorado. The Division nonetheless penalized DBI more than $1 million for failing to comply with it, and Defendants now seek to collect that penalty through a lien on DBI's assets.

173. A state executive agency's imposition of a substantial monetary penalty for conduct

that no enacted law prohibits, in the face of the chief executive's veto of the very bill that would have prohibited it, is the arbitrary exercise of governmental power that the Due Process Clause forbids.

174. DBI is entitled to a declaration that the Citation, to the extent it imposes fines, penalties, or compliance obligations on DBI with respect to workers employed by other companies, was issued without fair notice and without legal authority in violation of the Fourteenth Amendment, and to an order enjoining Defendants from enforcing or collecting those fines and penalties, including through the September 15, 2026 lien.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Diversified Builders Inc., hereby prays for relief and respectfully requests that the Court enter judgment in favor of DBI, and issue an Order:

1) Declaratory relief in the form of a declaration that the lien filed against DBI on September 15, 2026 violates the Due Process Clause of the Fourteenth Amendment and is void;

2) An order directing Defendants to release and withdraw the September 15, 2026 lien, and preliminarily and permanently enjoining Defendants from filing, serving, or enforcing any lien, levy, or other collection action against DBI's assets based on the Citation until DBI's judicial review is finally resolved;

3) Declaratory relief in the form of a declaration that the fines and penalties assessed in the Citation are excessive in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and an order enjoining their collection;

4) Declaratory relief in the form of a declaration that the Division's adjudication of the Citation before a hearing officer designated by and answerable to the Director violated the Due

Process Clause of the Fourteenth Amendment, and an order enjoining Defendants from enforcing the February 19, 2026 Decision and Order or the Citation unless and until the Division's charges are adjudicated before a neutral and independent adjudicator;

5) Declaratory relief in the form of a declaration that the financial-disclosure demands in the Citation and the Second Notice of Expanded Investigation violate the Fourth and Fourteenth Amendments, and an order enjoining Defendants from enforcing them;

6) Declaratory relief in the form of a declaration that the Citation, to the extent it imposes fines, penalties, or compliance obligations on DBI with respect to workers employed by other companies, was issued without fair notice and without legal authority in violation of the Fourteenth Amendment, and an order enjoining Defendants from enforcing or collecting those fines and penalties;

7) Preliminarily and permanently enjoining Defendants, and all persons acting in concert with them, from enforcing or collecting the Citation and Compliance Orders pending final judgment in this action;

8) Awarding DBI its costs and reasonable attorneys' fees incurred in this action as allowed by applicable law, including 42 U.S.C. § 1988; and

9) Affording DBI any such other and further relief the Court deems just and appropriate.

Dated September 18, 2026.

FISHER & PHILLIPS LLP

*s/Micah D. Dawson*
Micah D. Dawson
Hillary R. Ross,

1125 17th Street, Suite 2400
Denver, CO 80202
Telephone: 303-218-3665
Facsimile: 303-218-3651
hross@fisherphillips.com
mdawson@fisherphillips.com

*Attorneys for Plaintiff Diversified Builders Inc.*