# EXHIBIT 1

COLORADO
Department of Labor and Employment
CDLE
Division of Labor Standards and Statistics
633 17th Street, Denver, CO 80202-2107
303-318-8000 | www.ColoradoLaborLaw.gov | www.LeyesLaboralesDeColorado.gov

June 6, 2024

Diversified Builders Incorporated
8360 W 48th Avenue
Wheat Ridge, CO 80033
By email to: dmackender@fisherphillips.com

Division of Labor Standards & Statistics, Direct Investigation #20-0027

## Citation (Phase 1):
## Determination and Finding of Systemic Labor Violations

After reviewing all submissions and evidence in an investigation of Diversified Builders Incorporated ("DBI"), the Division of Labor Standards and Statistics **fines DBI $1,055,900.00 and orders DBI to cease illegally misclassifying employees as non-employee contractors, and denying them key rights the law guarantees to employees: overtime pay, paid sick leave, adequate notice of rights, and pay records** that both help workers know their pay and prevent employers like DBI from concealing their violations. DBI's systemic misclassification remains ongoing, and has long been ongoing, as shown by a 2017 court judgment that, after a federal investigation, required DBI to stop misclassifying workers as contractors rather than employees.

DBI performs construction work, specializing in drywall and framing, relying on a mix of its own employees and workers provided by third-party contractors known as labor brokers. As needed, DBI requests workers from a labor broker, which finds and sends workers to a DBI site — where DBI supervises them, directs daily tasks, sets schedules, and tracks hours worked. DBI pays weekly through the labor brokers, who, after keeping an administrative fee, provide workers their pay. DBI claims, including in documents like contracts and tax forms, that the workers are not DBI employees, but contractors the labor brokers retain and supervise.

But DBI's workers served as DBI employees: DBI had substantial control over their work, which was central to DBI's primary business. DBI's contracts and protestations that the workers were not its employees cannot deny that reality, because **employers can't opt out of their legal responsibilities just by *declaring* workers non-employees, if the workers *in reality* serve as employees**. For example, DBI contracts say a labor broker, not DBI, was responsible for supervising. In reality, a supervisor from the labor broker was rarely if ever present, and *everyone* interviewed in this investigation identified a DBI employee as a supervisor of the workers: the workers; a DBI supervisor; a labor broker; and an employee of a general contractor. As one worker summarized: "we work under his [labor broker's] name, but practically everything is run by DBI. DBI gives us the tasks, the projects, tools, the material, everything."

Wage theft, paid leave denial, withholding labor rights information, and other **systemic labor violations harm not only the employees denied rights, but a broad array of others**: **law-abiding competitors**, whom the unlawful employer gains an unfair edge against; **customers of the unlawful employer**, whom the unlawful employer embroils in ongoing labor enforcement; **and taxpayers**, who keep paying their taxes while the unlawful employer pays less. That is why unremedied labor violations risk a race to the bottom imposing an ugly choice on honest employers: lose market share to your unlawful competitors or join their illicit ranks. **To prevent the wide-ranging harms of races to the bottom, labor enforcement prioritizes widespread violations — especially systemic misclassifications that, by denying workers are employees, deny them the rights of employees.** Significant progress is ongoing in remedying drywaller, framer, and other misclassifications across Colorado — through not only violation citations, but also cooperative efforts with employers to properly reclassify workers as employees. **As fewer and fewer employers still misclassify, their race is to a *shrinking* bottom — making their illegality easier to catch, riskier to continue, and riskier for customers to associate with**.

Following is a summary of the specific violations that the evidence proves DBI committed, as part of its systemic misclassification of workers as non-employees.

**(1) DBI not only failed its legal duty to maintain employee wage and hour records, but intentionally destroyed its own records that identified the workers' names and work hours** — daily sign-in sheets that recorded each worker's arrival and departure times. DBI executed that evidence destruction even after DBI was:

- required, in the federal court judgment after the federal investigation of DBI misclassifications, to keep records of all hours worked, even for workers DBI contends are not its "employees";
- notified by the Division that it was under investigation for not maintaining required records; and
- expressly reminded, in the Notice of Investigation from the Division, of DBI's legal duty to retain all records related to this investigation.

These failures, which continued despite repeated reminders of DBI's duties, not only violate the law, but also concealed, and delayed redress for, DBI's wage theft, refusal to give paid leave, and other illegalities.

**(2) DBI failed to pay the time-and-a-half overtime, and to provide the paid sick leave, required for employees**. Despite DBI's destruction of most of the best records of its misclassified workers' hours (such as sign-in sheets), available evidence establishes that numerous specific workers did not receive paid sick leave and worked overtime hours without overtime premium pay (such as a fraction of sign-in sheets used by DBI's admitted employees also included certain of the misclassified workers).

**(3) DBI did not provide required notices of rights** to the misclassified workers — which are critical to ensuring that workers know the protections Colorado law guarantees them, can demand these rights from their employer, and can seek private aid (such as, worker advocacy groups or attorneys) or public remedies (such as complaints to this Division). DBI led the misclassified workers to believe that it was lawful for DBI to give them *none* of the rights they should have had, further stripping them of the knowledge that allows self-advocacy.

The Division has not yet calculated exact amounts DBI may owe each worker, which it will address in an upcoming Phase 2 of this investigation that will award whatever specific wage amounts the Division finds to be due, as well as any additional relief, such as potential further fines or compliance orders, either for additional findings of violations or for any failures to comply with the orders in this citation.

## Table of Contents

INTRODUCTION ........ 5
I. INVESTIGATION ........ 5
A. Names and Terms Used in This Citation ........ 6
B. The Division Obtains Information and Documents from DBI. ........ 8
C. The Division Obtains Information and Documents from Workers, Subcontractors, Labor Brokers, and General Contractors. ........ 9
D. The Division Visits a DBI Work Site ........ 10
E. The Division Submits Evidence to DBI and Provides DBI the Opportunity to Respond ........ 11
II. ANALYSIS ........ 11
A. Credibility Determinations ........ 11
1. The Disputed Workers and DBI Supervisor Provided Credible Information. ........ 12
2. The Record Lacks Contrary Facts From DBI That Would Undermine Information the Division Gathered. ........ 13
B. The Disputed Workers Were "Employees." ........ 13
1. The Disputed Workers Performed Labor or Services — Drywall Work — for the Benefit of DBI. ........ 15
2. The Disputed Workers Performed Work that is the Primary Work of DBI. ........ 15
3. DBI Could and Did Exercise Control Over the Disputed Workers to a Significant Degree. ........ 18
a. The DBI Labor Brokers Found and Hired the Disputed Workers, but DBI Exercised Control Over Hiring and Staffing Levels. ........ 20
b. The DBI Labor Brokers Set the Pay Rates for the Disputed Workers. ........ 21
c. DBI Supervised, Directed, and Corrected the Work Performed by the Disputed Workers. ........ 22
d. DBI Controlled the Details of the Manner and Method of the Disputed Workers' Job Performance, Including Work Schedules and the Timing, Place, and Sequence of Work, Tracked Hours Worked, and Enforced Clothing and Gear Requirements. ........ 29
i. DBI Set the Schedule for Disputed Workers ........ 30
ii. DBI Tracked Hours Worked by Disputed Workers ........ 32
iii. DBI Enforced Clothing and Gear Requirements for Disputed Workers ........ 34
e. DBI had Authority to Terminate a Disputed Worker Without Incurring Liability ........ 35
f. DBI Restricted the Disputed Workers from Working for Third Parties at the Same Time They Performed Work for DBI ........ 40
g. The Division Concludes the Disputed Workers are Subject to the Control of DBI ........ 42
4. DBI Did Not Establish That the "Independent Contractor" Exception Applies. ........ 45
a. The Disputed Workers Were Not "Primarily Free from Control and Direction in the Performance of the Service" Either in Fact or in Contract. ........ 45
b. The Disputed Workers Were Not "Customarily Engaged in an Independent Trade, Occupation, Profession, or Business Related to the Service Performed." ........ 46
i. Softrock Factors ........ 48
1. DBI Imposed Work Conditions that Prohibited the Disputed Workers from Working for Others While Working for DBI. ........ 48
2. DBI Supervised the Actual Work Performed, and Instructed the Disputed Workers on How to Perform the Work. ........ 48
3. DBI Directly, or as Directed through the DBI Labor Brokers, Paid on an Hourly or Piece Rate Basis, not a Fixed Contract Amount. ........ 48
4. DBI Could and Did Terminate at Will. ........ 48

5. DBI Did Not Provide More than Minimal Training. ....48
6. DBI Did Not Provide Tools or Benefits Other Than Materials and Equipment. ....49
7. DBI Dictated the Time that Work was Performed. ....50
8. DBI Required Receipt of Payments through the Nominal Subcontractors. ....50
9. DBI Combines Its Business Operations with the Labor and Services Performed. ....50
ii. Other Factors Indicating an Independent Business. ....51
1. DBI Has Not Produced Other Evidence of an Independent Trade or Business. ....51
2. The Disputed Workers Performed Work for Indefinite and Short Periods of Time Typical of Employment Relationships in the Construction Industry. ....52
C. The Evidence Is Representative of the Terms and Conditions of Employment for Disputed Workers at All DBI's Job Sites. ....54
D. Phase 1 Violations Found. ....60
1. DBI Failed to Provide and Retain Disputed Worker Pay Statements in Violation of C.R.S. § 8-4-103(4) and (4.5). ....61
2. DBI Failed to Provide Disputed Workers with Notice of Wage and Other Rights in Violation of MWOs, COMPS Orders, the WARNING Rules, HFWA, PHEW. ....64
a. Applicable Notice and Posting Laws. ....64
b. Demand to Produce Information of Notice and Posting and DBI's Response. ....66
c. DBI Failed to Post Notices of Rights Required by HFWA, PHEW, and MWO/COMPS Orders ....67
d. DBI Failed to Provide Individual HFWA Notice Directly to the Covered Employees, Including the Disputed Workers. ....69
3. DBI Failed to Provide HFWA Leave to the Covered Workers and Interfered with Their Rights. ....70
4. Violations Arising from DBI's Failure to Pay Wages Owed to the Disputed Workers. ....73
III. REMEDIES FOR VIOLATIONS ....78
A. Overview: Phase 1 Determination as to Systemic Violations. ....78
B. Fines and Penalties: $1,055,900.00 in Total. ....80
1. $547,500 for Pay Statement Violations of C.R.S. § 8-4-103(4) and (4.5). ....80
2. $156,900 for Violations of Notice and Posting Responsibilities under MWOs #34 and 35, COMPS Orders #36 #37, and #38, HFWA, and PHEW. ....81
a. $93,600.00 for Violations of Posting Responsibilities of MWOs and COMPS Orders. ....81
b. $63,300.00 for Violations of Notice Responsibilities Under PHEW, HFWA, and WARNING Rule 4. ....82
3. $69,500.00 for Violations of HFWA, the Wage Protection Rules, and the Colorado WARNING Rules as to HFWA Interference and Complete Failure to Provide HFWA-Required Leave. ....85
4. $282,000.00 for Failure to Pay Wages ....87
5. Total Fines. ....88
C. Compliance Orders. ....88
D. Information and Document Demands. ....90
E. Notice of Possible Consequences for Non-Compliance. ....92
F. Notice of Expanded Investigation ....93
IV. CONCLUSION ....93
V. APPEAL RIGHTS ....94

## INTRODUCTION

The Division of Labor Standards and Statistics ("Division") of the Colorado Department of Labor and Employment, pursuant to the Direct Investigation Rules, 7 CCR 1103-8, conducted an investigation of Diversified Builders Incorporated ("DBI"). After review of all submissions and evidence, this Citation is issued under Colorado statutes and rules (collectively, "Colorado labor law"). The Division interviewed 8 Disputed Workers, a DBI supervisor, and a DBI labor broker. It received additional written information from 22 Disputed Workers, 18 of which are signed under penalty of perjury. DBI produced substantial information and documents and was provided multiple chances to respond to the Division's investigation and four chances to respond to information the Division obtained.

Based on its investigation, the Division determines that DBI violated the Colorado Wage Act ("CWA"), the Healthy Families in the Workplace Act ("HFWA"), and the Public Health Emergency Whistleblower Act ("PHEW"), and rules implementing these labor statutes by:

**(1) failing to maintain and provide pay statements and other required wage and hour records;**
**(2) failing to provide time-and-a-half overtime premium pay and paid sick leave; and**
**(3) failing to provide legally required notice of wage and hour, paid sick leave, and other rights.**

To remedy these violations, as described further in Section III below, **DBI is ordered to pay $1,055,900 in fines for multiple violations affecting *at least* 168 employees.**[1]

As Section III also details, this determination does not conclude and resolve this entire investigation. This is a "Phase 1 determination": it includes determinations about the issue of worker classification as well as binding and appealable orders — e.g., fines and a compliance order— but does not yet include additional fines and individual employee remedies that may be ordered in a "Phase 2 determination" or later proceedings.

## I. INVESTIGATION

On November 23, 2020, the Division issued DBI a Notice of Investigation ("NOI").[2] The NOI notified DBI of the Division's statutory authority to investigate possible violations of Colorado wage and hour statutes and regulations, and that the scope of this investigation included whether DBI had committed the following violations:

(1) Classifying workers as "independent contractors," rather than as "employees," thereby depriving them of the rights of "employees" under Colorado law.

(2) Failing to pay all earned wages to workers, including but not limited to final wages due upon termination, wages for paid rest periods, and overtime wages.

(3) Failing to provide workers itemized pay statements and notices of their rights required by laws and rules governing wage rights, paid sick days, and whistleblowing and personal protective equipment use during a public health emergency.

[1] 110 Disputed Workers and 58 DBI Employees, as shown in Attachments D and E.
[2] November 23, 2020 Notice of Investigation, App'x 1.

## A. Names and Terms Used in This Citation

The following diagram illustrates the relationships between some general contractors, DBI, and the labor brokers involved in this investigation:




In this Citation, the Division uses the following terms to identify certain people, groups, and entities:

- *DBI Supervisors*: managerial or supervisory workers DBI acknowledges as its employees.[3]
    - Julio Ortiz: DBI employee identified by multiple individuals as a supervisor. The Division interviewed Mr. Ortiz.
    - Matthew Kopecky: DBI employee identified by multiple individuals as a supervisor.
    - Michael Connelly: DBI employee identified by multiple individuals as a supervisor.
    - Ivan Hernandez-Marquez: DBI employee identified by multiple individuals as a supervisor.
    - Tony Garcia: DBI employee identified by multiple individuals as a supervisor.
    - Xavier[4] Ortega: DBI employee identified by multiple individuals as a supervisor.
- *DBI General Contractors*: construction companies that contracted DBI to perform drywall services on their projects, including the general contractors discussed in this Citation: Milender White, Shaw Construction, and Taylor Kohrs.[5]
- *DBI Labor Brokers*: business entities DBI contracted to supply *workers* to DBI.[6]
    - DBI Labor Broker Millan refers to Santiago Millan and all entities owned, operated, or managed by him, including Botin Contracting, LLC; Zeta Contracting LLC; Sunpower Contractors Inc.; National Building Solutions Inc.; Interstate Drywall Inc; and Rimax Contractors Inc. Because the name of the business entities changed throughout the Investigatory Period, the Division refers to both the business entities and him individually as "DBI Labor Broker Millan."
    - DBI Labor Broker Montoya refers to Edgar Montoya and all entities owned, operated, or managed by him, including Master Drywall Installers and Dunlap Dallas services LLC. Because the name of the business entities changed throughout the Investigatory Period, the Division refers to both the business entities and him individually as "DBI Labor Broker Montoya."

---

[3] *See* Section II.B.3.d, below.
[4] In Worker Packets, Disputed Workers spell the name as "Javier"; the Division uses "Xavier," the name on DBI's payroll.
[5] *See, e.g.,* App'x 9, DLSS 2903 (Millender White); DLSS 8822 (Shaw Construction); and DLSS 9995 (Taylor Kohrs).
[6] *See* App'x 4, DBI 15529.

  - DBI Labor Broker Rodriguez refers to Manuel Rodriguez and all entities owned, operated, or managed by him, including Rodriguez Construction Org., L.L.C. and RDZ Build. Because the name of the business entities changed throughout the Investigatory Period, the Division refers to both the business entities and him individually as "DBI Labor Broker Rodriguez."
  - DBI Labor Broker Manpower refers to Erik Montoya who supplied workers under the trade name of Manpower Services.
  - DBI Labor Broker New Era refers to New Era Drywall LLC.
  - DBI Labor Broker Pedro Stubbs refers to Pedro Stubbs Enterprises LLC.
- *DBI Subcontractors*: companies, that are not analyzed in this Citation, that contracted with DBI to perform services, including Alonso Construction, Brothers Insulation, Ice Drywall, Mountain Custom Painters, Pro Wall Inc., R&R Drywall, ROL Drywall.[7]
- *Admitted Employees:* workers DBI named on employee rosters or otherwise acknowledged as its employees.[8]
- *Covered Workers:* all workers covered by Colorado labor law, including the *Admitted Employees* and the *Disputed Workers.*
- *Disputed Workers:* workers DBI denies are its employees, and whom it hired directly or through DBI Labor Brokers, to perform drywall and framing labor and services required under DBI contracts with general contractors.

| Disputed Workers who Submitted Packets | Disputed Workers whom the Division Interviewed |
|---|---|
| Eddie Campos | Gonzalo Bautista |
| Eloy Rodriguez | Valeriano Chairez |
| Ermerlindo Lemus | Martin Estrada |
| Fransisco Jimenez | Jesus Ramirez |
| Francisco Marquez | Francisco Marquez |
| Gilberto Alcantara | Lorenzo Quiroz |
| Gonzalo Bautista | Dublas Quiñones |
| Hector Lemus | Edson Marroquin |
| Jesus Ramirez | |
| Jose Alvarez | |
| Jose Lemus | |
| Jose Rodriguez | |
| Julio Caballero | |
| Kelvin Lemus | |
| Leopoldo Leyva | |
| Limber Lemus | |
| Lorenzo Quiroz | |
| Mario Garcia | |
| Martin Estrada | |
| Neo Alvarez | |
| Pedro Martinez | |
| Valeriano Chairez | |

[7] In using the term "DBI Subcontractors," the Division neither concedes nor admits that these are bona fide subcontractors or independent businesses, and makes no findings as to those contractors in this Citation at this phase of the investigation.
[8] App'x 2, DBI 10 (employee roster).

## B. The Division Obtains Information and Documents from DBI.

In the NOI, the Division ordered DBI to provide documents and information relevant to DBI's treatment of its employees and contractors, relationship with general contractors and subcontractors, and compliance with various wage and hour statutory and regulatory requirements.

After multiple extensions, the Division received DBI's response to the NOI on February 22, 2021. The documents are in Appendix 2, DBI 1-15460.[9] The over 15,000 documents include a written response to the Division's request; a list of DBI employees; a list of DBI independent contractors and associated records; and payroll records from 2018-2020.

On May 17, 2022, the Division issued DBI a Notice of Incomplete Response (NOIR)[10] identifying deficiencies and ordering DBI to cure them.[11] It required DBI to supplement its responses through May 17, 2022.

On July 12, 2022, the Division received DBI's response to the NOIR and the documents in Appendix 4, DBI 28503-55675.[12] Those 27,000 documents include an updated written response to the Division's requests, lists of DBI employees and DBI independent contractors; payroll records; and contracts, payments, and invoices from subcontractors. DBI produced those documents through December 7, 2020, rather than May 17, 2022.

Accordingly, on July 28, 2022, the Division received additional responsive documents.[13] Those documents are in Appendix 5, as DBI 15461-28504. Those 13,000 documents included updated payroll records through 2022, as well as updated payments to subcontractors, but not contracts or invoices with the subcontractors. DBI did not submit an additional written response with these documents.

On October 5, 2022, the NOIR was rescinded due to clerical errors in the identified demands.[14] On November 29, 2022, DBI nevertheless supplemented its written response, but with no additional documents.[15]

On February 2, 2023, Investigator Loayza issued DBI an Order for Information on active DBI construction sites.[16] On February 17, 2023, Darin Mackender responded to the Division's Order for Information by providing DBI's active construction projects at the time.[17]

On September 19, 2023, the Division issued another Order for Information on active DBI construction sites.[18] On September 21, 2023, DBI responded with a filled-out table with details on its active construction sites.[19]

[9] February 22, 2021 Response to NOI, App'x 2.
[10] May 17, 2022 NOIR, App'x 3.
[11] May 17, 2022 NOIR, App'x 3.
[12] July 12, 2022 Response to NOIR, App'x 4.
[13] App'x 5.
[14] App'x 6.
[15] App'x 7.
[16] App'x 9, DLSS 9964–67.
[17] App'x 9, DLSS 9964–67.
[18] App'x 9, DLSS 9992–93.
[19] App'x 9, DLSS 9994–95.

**C. The Division Obtains Information and Documents from Workers, Subcontractors, Labor Brokers, and General Contractors.**

The Division received packets from 22 workers. The packets include:

a. A completed and signed "Worker Questionnaire."[20] Each Questionnaire included, among other information, the following attestations: their start and end dates (Question 6), their rate of pay (Question 14), how many hours the worker worked per day and per week (Question 19), whether they were paid all wages owed for all hours that they worked (Questions 20 and 21), and whether they received overtime pay (Question 22);

b. A written declaration signed under penalty of perjury. Each declaration contains a narrative description of the worker's job duties with DBI, the hiring process, work arrangements, and issues they had with DBI, including the lack of payment of wages;[21]

c. A calendar with the worker's notes showing the hours that they worked on various days;[22]

d. A completed and signed Division "Demand for Payment of Wages" form;[23]

e. A completed and signed Division "Worker Classification Questionnaire"[24] certifying "the information provided in this questionnaire is true and correct to the best of my knowledge and belief";[25]

f. A completed "Individual Liability Questionnaire" signed under penalty of perjury;[26] and

g. A completed Division Wage and Hour Complaint Form signed under penalty of perjury.[27]

The Division conducted an initial round of five interviews with Disputed Workers who submitted packets:

| Name | Date |
|---|---|
| Martin Estrada[28] | May 11, 2021 |
| Gonzalo Bautista[29] | July 9, 2022 |
| Valeriano Chairez[30] | July 12, 2022 |
| Francisco Marquez[31] | July 11, 2022 |
| Lorenzo Quiroz[32] | July 15, 2022 |
| Jesus Ramirez[33] | November 18, 2022 |

The record contains recordings and transcripts from all 5 interviews of Disputed Workers who submitted packets that were conducted between May 2021 and July 2022.

The Division reviewed and analyzed DBI's responses and multiple productions, and in accordance with its authority under Article 1 of Title 8 of the Colorado Revised Statutes ("C.R.S."), issued 32 letters demanding

[20] *See, e.g.,* App'x. 8 at DLSS 16–20.
[21] *See, e.g., id.* at DLSS 21.
[22] *See, e.g., id.* at DLSS 22.
[23] *See*, *e.g.*, *id.* at DLSS 23.
[24] *See*, *e.g.*, *id.* at DLSS 24–30.
[25] *See*, *e.g.*, *id.* at DLSS 39–43.
[26] *See*, *e.g.*, *id.* at DLSS 31–33.
[27] *See*, *e.g.*, *id.* at DLSS 39–43.
[28] App'x 8, DLSS 1087–1108.
[29] App'x 8, DLSS 1157–74.
[30] App'x 8, DLSS 1208–26.
[31] App'x 8, DLSS 1131–56.
[32] App'x 8, DLSS 1175–1207.
[33] App'x 9, DLSS 9292–9305.

information and documents from various non-parties ("Article 1 Letters"). The Division sent its Article 1 Letters to general contractors and subcontractors identified as ones with whom DBI held a professional relationship:[34]

| Name | General Contractor or Subcontractor? | Date |
|---|---|---|
| Millender White | General Contractor | October 21, 2022 |
| Shaw Builders | General Contractor | October 21, 2022 |
| Unlimited Drywall | Subcontractor | May 19, 2022 |
| Ultimate Drywall | Subcontractor | May 19, 2022 |
| Walpro Builder | Subcontractor | May 19, 2022 |
| 5280 CDF Contractors, LLP | Subcontractor | May 10, 2022 |
| Angel Gabriel Drywall, LLC | Subcontractor | May 10, 2022 |
| Botin Contracting LLC | Subcontractor | May 10, 2022 |
| Brothers Insulation, LLP | Subcontractor | May 10, 2022 |
| Cain Painting, LLC | Subcontractor | May 10, 2022 |
| Denver Paining Pros, LLC | Subcontractor | May 11, 2022 |
| E.C.A. Drywall | Subcontractor | May 11, 2022 |
| Force Drywall, LLC | Subcontractor | May 11, 2022 |
| Gutierrez Drywall, Inc | Subcontractor | May 11, 2022 |
| ICE Drywall | Subcontractor | May 11, 2022 |
| Interstate Drywall, Inc. | Subcontractor | May 18, 2022 |
| LDM Drywall | Subcontractor | May 12, 2022 |
| Master Drywall Installers | Subcontractor | May 13, 2022 |
| Mountain Custom Painters LLC | Subcontractor | May 13, 2022 |
| National Building Solutions | Subcontractor | May 17, 2022 |
| O&J Labor | Subcontractor | May 17, 2022 |
| Pro-Wall, Inc. | Subcontractor | May 17, 2022 |
| R.O.L. Drywall Inc. | Subcontractor | May 17, 2022 |
| R&R Drywall | Subcontractor | May 17, 2022 |
| Rimax Contractors | Subcontractor | May 18, 2022 |
| Sunpower Contractors, Inc. | Subcontractor | May 18, 2022 |
| HC Drywall Pros, LLC | Subcontractor | May 11, 2022 |
| Zeta Contracting | Subcontractor | May 17, 2022 |
| Alonso Construction | Subcontractor | May 10, 2022 |
| Santiago Millan | Subcontractor | March 29, 2023 |
| Cesar Montoya | Subcontractor | October 21, 2022 |
| Edgar Montoya | Subcontractor | June 15, 2023 |

In addition to receiving documents and information from these parties, the Division interviewed DBI Labor Broker Edgar Montoya on July 14, 2023.[35] They provided extensive documents.[36]

## D. The Division Visits a DBI Work Site

On September 29, 2023, Division Investigators Jose Lopez, Taylor Volkman, and Jesus Loayza visited one of the construction sites, at 7110 Montview Blvd Denver, CO 80220, and conducted three interviews:

| Name | Role | Date |
|---|---|---|
| Dublas Quiñones[37] | Disputed Worker | May 11, 2021 |
| Edson Marroquin[38] | Disputed Worker | July 9, 2022 |
| Julio Ortiz[39] | DBI Supervisor | July 12, 2022 |

[37] App'x 9, DLSS 10994–11016. Due to minor transcription and translation errors, the Division produced a corrected transcript as App'x 11, DLSS 21440–62.

[38] App'x 9, DLSS 11017–43. Due to minor transcription and translation errors, the Division produced a corrected transcript as App'x 11, DLSS 21463–89.

In addition to the interviews, the Division was able to observe the worksite and check DBI's compliance with posting requirements under Colorado labor law.

### E. <u>The Division Submits Evidence to DBI and Provides DBI the Opportunity to Respond</u>

On September 28, 2022, the Division's first Notice of Evidence (NOE) was issued to DBI.[40] The NOE contained documents, primarily questionnaires filled out by Disputed Workers and the interviews conducted with the workers. No response to the NOE was provided by DBI.

On November 15, 2023, a second Notice of Evidence was issued to DBI.[41] On December 22, 2023, Darin Mackender responded that "DBI will not be submitting additional evidence at this time. DBI incorporates by reference all prior objections to the Division's order, and reserves the right to assert those and all other objections in this and any future proceedings."[42]

On January 26, 2024, the Division issued a third Notice of Evidence to DBI with a response deadline of February 9, 2024.[43] No response to the third NOE was provided by DBI.

On March 21, 2024, the Division issued a fourth Notice of Evidence and Notice of Expanded Investigation to DBI with a response deadline of April 4, 2024.[44] The Notice of Evidence included corrected transcripts from three interviews. Importantly, the Notice of Expanded Investigation extended the investigatory time period to May 17, 2022. The investigatory time period at issue is thus January 1, 2018 to May 17, 2022. No response to the fourth NOE and Notice of Expanded Investigation was provided by DBI.

In sum, the Division has granted DBI four opportunities to respond to evidence the Division obtained, and the Division has reviewed the entire record in this matter, including DBI's submissions.

## II. ANALYSIS

The Division finds that the evidence establishes the Disputed Workers are employees of DBI, not independent contractors or employees of independent contractors as DBI contends.

### A. <u>Credibility Determinations</u>

When investigating whether Colorado employers have violated Colorado labor laws, the Division must weigh the reliability of evidence, which requires assessing the credibility of evidence sources — which include witnesses, documents, and DBI itself.[45] The Division first makes those credibility determinations.

---

[36] App'x 9, DLSS 10070–10372; App'x 10, 11187–21439.
[37] App'x 9, DLSS 10994–11016. Due to minor transcription and translation errors, the Division produced a corrected transcript as App'x 11, DLSS 21440–62.
[38] App'x 9, DLSS 11017–43. Due to minor transcription and translation errors, the Division produced a corrected transcript as App'x 11, DLSS 21463–89.
[39] App'x 9, DLSS 11044–75.
[40] *See* App'x 8.
[41] *See* App'x 9.
[42] App'x 9, December 22, 2023 Response to Supplemental Notice of Evidence, DBI 55700.
[43] *See* App'x 10.
[44] *See* App'x 11.
[45] *Burns v. Bd. of Assessment Apps.*, 820 P.2d 1175, 1177 (Colo. App. 1991) (when conflicting evidence is presented to an agency, "credibility of the witnesses and the weight to be given their testimony are committed to the fact-finding discretion of the agency") (citing *Charnes v. Labato*, 743 P.2d 27 (Colo. 1987)); *Rocky Mt. Retail Mgmt., LLC v. City of Northglenn*, 2017

**1. The Disputed Workers and DBI Supervisor Provided Credible Information.**

The Division finds the information provided by Disputed Workers credible for the following three reasons. First, most portions of the Worker Packets are *signed under penalty of perjury*.[46] The Division chooses to disregard the Worker Packets not signed under penalty of perjury – Gilberto Alcantara, Jose Alvarez, Julio Caballero, and Neo Alvarez.[47] For each Covered Worker who completed a Worker Packet, the Division used its standard, thorough procedure to verify the information in the packet. After receiving Worker Packets from the Carpenters/Contractors Cooperation Committee ("QUAD C"), a Division investigator reviews the information in each Worker Packet to determine the extent of the Covered Worker's allegations of labor violations, and to ensure that the Covered Worker signed certain documents within the Worker Packet under penalty of perjury. After this review, the Division investigator interviews a sample of the signatories of the Worker Packets. In each interview, the Division investigator asked questions to confirm with the signatory that the information to which the signatory attested is correct, to get more robust factual information from the witness, and to clarify any ambiguities.

Second, the Disputed Workers' statements are *materially consistent* with each other, statements by DBI Supervisor Ortiz, documentary evidence obtained from DBI, and a DBI worksite. While some variance exists in some Disputed Workers' specific accounts of supervision, hiring, control, etc., some variance is expected, since DBI operates multiple worksites with various subcontractors, but does not impact the overall consistency among the Disputed Workers' interviews and Worker Packets on the relevant work terms and conditions.

Third, the Disputed Workers' statements are *corroborated or made in interviews with detail and specificity*. The Division interviewed a number of workers, who provided detailed and specific statements, based on personal recollections; the Division found no indicia of unreliability or misrepresentation.

In addition to the Worker Packets interviews and interviews of Disputed Workers, the Division finds the DBI Supervisor Julio Ortiz credible in his interview. DBI Supervisor Ortiz has no stake in determination that the Disputed Workers are DBI employees. His incentive would be to make statements in support of his employer, not the Disputed Workers.

Regarding DBI Labor Broker Montoya, they claimed that they did not remember most facts related to this investigation, largely due to the passage of time.[48] While the Division doubts the veracity of Montoya's claim not to remember information responsive to many interview questions, it credits the substantive answers Montoya did provide (mainly regarding business structure and control of Disputed Workers).

Therefore, the Division finds the credibility of DBI Labor Broker Edgar Montoya mixed. On many occasions, the Division has doubts about the accuracy of his interview *when they claimed they could not remember* (that is, the Division believes they *do* recall those answers). When they do recall the answers, the Division finds they are credible because Montoya's responses align with the Disputed Workers and DBI Supervisor Ortiz.

---

CO 33, ¶ 37, 393 P.3d 533, 543 ("An administrative agency, not the reviewing court, has the task of weighing conflicting evidence and determining the credibility of the witnesses.") (citing *McClellan v. Meyer*, 900 P.2d 24, 34 (Colo. 1995)).

[46] Eddie Campos (DLSS 13), Eloy Rodriguez (DLSS 41, 51), Ermelindo Lemus (DLSS 69, 80), Francisco Jimenez (DLSS 96), Francisco Marquez (DLSS 123, 134), Gonzalo Bautista (DLSS 168, 189), Hector Lemus (DLSS 204, 216), Jesus Ramirez (DLSS 230, 239), Jose Lemus (DLSS 283, 293), Jose Rodriguez (DLSS 308, 323), Kelvin Lemus (DLSS 360, 372), Leopoldo Leyva (DLSS 387, 395), Limber Lemus (DLSS 413, 426), Lorenzo Quiroz (DLSS 433), Martin Estrada (DLSS 458, 474), Pedro Martinez (DLSS 511, 520), Valeriano Chairez (DLSS 530, 540).

[47] The Division chooses to disregard those Worker Packets, even though they are consistent with the other Worker Packets.

[48] *See, e.g.,* App'x 9, DLSS 9792 ("I just don't remember, it has been a long time").

### 2. The Record Lacks Contrary Facts from DBI That Would Undermine Information the Division Gathered.

Generally, the record does not require the Division to resolve conflicting evidence. DBI offers conclusory statements — not facts — about the classification of the Disputed Workers. DBI asserts it "directs its own employees only" and "does not control or direct 'other' drywall or construction workers."[49] DBI had numerous opportunities to provide contrary information with specific facts and detailed responses.

But conclusions do not contradict facts.[50] Therefore, there are no facts in the record that would undermine, for example, DBI Supervisor Ortiz's description of how they supervised two Disputed Workers on a daily basis.

To the extent evidence from the Disputed Workers contradicts the DBI conclusory statements, the Division finds more credible the specific, consistent facts from the Disputed Workers and DBI Supervisor Ortiz.

## B. The Disputed Workers Were "Employees."

The fundamental issue in this case is whether the Disputed Workers are employees, and thus entitled to the rights and protections of employees under Colorado law.

This investigation concerns rights under many sources of Colorado law — including the Colorado Wage Act ("CWA"), Article 4 of Title 8, C.R.S.; the Colorado Minimum Wage Act ("CMWA"), Article 6 of Title 8, C.R.S.; the Healthy Families and Workplaces Act ("HFWA"), Article 13.3 of Title 8, C.R.S.; and Division regulations pursuant to these statutes. However, this investigation concerns only one legal definition of an "employee" under Colorado law — that in the CWA — which is sufficient for applying all relevant labor laws.[51]

This investigation covers work performed from January 1, 2018, to May 17, 2022 ("Covered Period" or "Investigatory Period") — implicating two different statutory definitions of "employee" due to an amendment of the CWA effective January 1, 2020.[52] Since the 2020 amendment, the CWA has defined "employee" as:

> [A]ny person, including a migratory laborer, performing labor or services for the benefit of an employer. … [R]elevant factors in determining whether a person is an employee include the degree of control the employer may or does exercise over the person and the degree to which the person performs work that is the primary work of the employer; except that an individual primarily free from control and direction in the performance of the service, both under his or her contract for the performance of service and in fact, and who is customarily engaged in an independent trade, occupation, profession, or business related to the service performed is not an "employee".[53]

The prior CWA definition, effective through 2019, was identical to the core "employee" definition in the first sentence ("any person ... performing labor or services for the benefit of an employer"), and the exception at the

---

[49] App'x 2, DBI 4-6.
[50] *See, e.g.*, *Sinclair Transp. Co. v. Sandberg*, 2014 COA 76M, ¶ 65, 350 P.3d 924, 935 ("A conclusory statement made without supporting documentation or testimony is insufficient to create an issue of material fact.")
[51] HFWA uses the CWA "employee" definition, so both laws apply the same analysis of coverage of the Disputed Workers. C.R.S. § 8-13.3-402(4) ("'Employee' has the meaning set forth in section 8-4-101(5)."). A third statute is also implicated in the violations found in this citation, the Public Health Emergency Whistleblower ("PHEW") Act, but that statute uses a broader definition of "worker" which implicates the employer even if the Disputed Workers were properly classified as independent contractors. C.R.S. § 8-14.4-101(5) ("'Worker' means: (a) An employee as defined in section 8-4-101(5); or (b) A person who works for an entity that contracts with five or more independent contractors in the state each year.").
[52] H.B. 19-1267, effective January 1, 2020.
[53] C.R.S. § 8-4-101(5).

end of the definition ("primarily free from control and direction" and "customarily engaged in an independent trade, occupation, profession, or business").[54] But the 2020 definition *broadened* the "employee" definition by:

(1) replacing the *requirement* that a worker is an employee only if the employer "may command" specifics of the work ("when, where, and how much labor or services") with the "degree of control the employer may or does exercise over the person" (not over the specifics of the work) as a "factor" (not a requirement); and

(2) adding a second "factor," the "degree to which the person performs work that is the primary work of the employer," as part of a broader emphasis that the "employee" analysis depends on a non-exclusive list of factors — consistent with how courts, under various labor laws, apply a totality-of-circumstances analysis of employee status, in which no one factor is considered "in isolation,"[55] because the ultimate question is the "economic reality" of the parties' relationship.[56]

These differences between the 2019 and 2020 "employee" definitions do not impact the analysis here. First, the same evidence applies to both definitions, because the two new "factors" in the 2020 definition ("degree of control" and "primary work") were already considered in assessing elements of the 2019 definition (power to command, freedom from control, and customarily independent work).[57] Second, the evidence here of "degree of control" and "primary work" (under the 2020 definition) are, as detailed below, amply strong to establish DBI's command of work specifics such as "where, when, and how much" work was performed — a key material aspect of the 2019 definition that was eliminated by the 2020 definition.

---

[54] Under the pre-2020 CWA definition, "employee" meant

> … any person ... performing labor or services for the benefit of an employer in which the **employer may command when, where, and how much labor or services** shall be performed. For the purpose of this article, an individual primarily free from control and direction in the performance of the service, both under his or her contract for the performance of service and in fact, and who is customarily engaged in an independent trade, occupation, profession, or business related to the service performed is not an "employee".

C.R.S. § 8-4-101(5) (2019) (emphasis added).

[55] *Merrill v. Harris*, 2022 U.S. App. LEXIS 24120 at *13 (10th Cir. Aug. 26, 2022) (unpublished) (reviewing district court's application of totality of the circumstances approach to evaluating "control" factors in reaching FLSA misclassification determination) (quoting *Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989)); *Bermel v. BlueRadios, Inc.*, 442 P.3d 923, 2017 COA 20, ¶¶ 36–38 (reversing summary judgment entered against employee's CWA claim and holding that employer failed to establish that worker was an "independent contractor" who was free from control "in contract" based on totality of the circumstances approach to CWA independent contractor-employee classification determination); *Yakubov v. Fastex Transport, LLC*, 2020 Colo. Dist. LEXIS 3306, at *4 (Colo. Dist. Ct. Aug. 27, 2020) (recognizing that CWA "employee/independent contractor" analysis requires inquiry into the totality of circumstances surrounding the working relationship between the parties where "no single factor is determinative") (quoting *Lufti v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 56 (Colo. App. 2001)); *see also Lufti*, 40 P.3d at 56 (applying totality of the circumstances examination to employee-independent contractor classification analysis in Title VII case).

[56] *Acosta v. Paragon Contrs. Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018) (recognizing "economic realities" test for FLSA employee classification depends on an "overarching inquiry … based on the totality of the circumstances, and no single factor is dispositive" and in "determining whether an individual was an independent contractor or employee, we focus on the economic realities and the worker's economic dependence on the business.") (citing *Baker v. Flint Eng'g & Contr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)); *Merrill*, 2022 U.S. App. LEXIS 24120 at *13 ("No one factor is dispositive because *Baker* contemplates a 'totality-of-the-circumstances approach.'").

[57] *CMC Transportation, Inc.*, DLSS Claim #5354-18 (Hearing Officer Decis. No. 20-038, June 15, 2020) (applying 2019 definition of "employee": "[T]he work the claimant performed for CMC was the central function of CMC's business: it is not the kind of work generally done by an outside contractor. CMC had expertise in the work. Meanwhile, the claimant did not have experience with the work and could not have done the work without CMC, which strongly supports that CMC needed to provide direction and control for the claimant to do the work."); *The Deck Builder of Colorado LLC*, DLSS Claim #4276-18 (Hearing Officer Decis. No. 19-083, Dec. 5, 2019) ("If the work being done by workers is central to the business (e.g., as here, where workers are building the decks for a deck-building business) it is more likely that the business would control and direct the performance of its workers in an area in which it has expertise.").

At its core, the test of whether an individual is an "employee" has long focused on the actual relationship between the individual and employer "on the ground" — not how parties label themselves in contracts or otherwise. Thus, the Division determines whether the Disputed Workers are "employees" by assessing:

(1) whether the Disputed Workers performed labor or services for the benefit of the employer, informed by both

(2) the degree to which the Disputed Workers performed work that is *the primary work of the worker*, and

(3) the *degree of control* the employer may, did, or does exercise over the Disputed Workers.

As detailed below, the evidence shows the Disputed Workers were "employees."

**1. The Disputed Workers Performed Labor or Services — Drywall Work — for the Benefit of DBI.**

The Disputed Workers performed labor or services: drywall work.[58] DBI benefitted from the work of the Disputed Workers: it received the value of drywall work being performed and, in turn, was paid by a general contractor for the drywall work.[59]

However, the "benefit" analysis requires further inquiry. In nearly all cases — and here — an employer benefits from labor or services it pays for, regardless of whether that work is performed by an employee or an independent contractor. To determine whether the "benefit" indicates employer status, the question is whether DBI "benefitted" more *as an employer* of the Disputed Workers, or *as a customer* of DBI providing the work of the Disputed Workers. To answer that question, the CWA, at Section 101(5), notes two commonly relevant factors: the degree to which DBI *controlled* the Disputed Workers; and the degree to which the Disputed Workers performed work that was the *primary work* of DBI.

Subpart 2 below analyzes whether the Disputed Workers performed DBI's primary work. Subpart 3 analyzes the degree of control exercised by DBI.

**2. The Disputed Workers Performed Work that is the Primary Work of DBI.**

The CWA "primary work" inquiry is meaningfully similar to a review of two factors that the Division and state and federal courts have long assessed in deciding employee-independent contractor classification under the CWA, FLSA, and various state unemployment and workers' compensation insurance laws — "the extent to which

---

[58] The workers all described drywall and framing work. App'x 8, DLSS 17 ("Frame/drywall); DLSS 45 (same); DLSS 100 (same); DLS 127 (same); DLSS 158 (same); DLSS 169 (same); DLSS 391 (same); DLSS 428 (same); DLSS 525 (same); DLSS 73 ("Drywall/hanger"); DLSS 417 (same) DLSS 193 ("Frame/Drywall/Insulation"); DLSS 219 ("Drywall hanger"); DLSS 245 ("Hang drywall/frame); DLSS 269-70 ("Drywall/insulation"); DLSS 349-50 (same); DLSS 297 ("Drywall, frame, insulation, tape"); DLSS 325 ("Hanger drywall / frame"); DLSS 515 ("Hang drywall").

[59] Section II.B.2, below.

the [individual's] work is an integral part of the alleged employer's business"[60] and whether "the worker performed work that is outside the usual course of the hiring entity's business."[61]

To determine whether an individual's work is an integral part of the employer's business or outside the usual course of the business, courts have examined the type of work the business performs, including how it defines itself and holds itself out to the public; whether the work is necessary to or in furtherance of the overall operation of the business, including whether the work was a source of the business' revenue; and whether the work occurs regularly or only on isolated occasions.[62] And since the 2020 CWA amendments, the Division has applied these factors and relied upon these authorities to assess the CWA "primary work" prong.[63]

To assess the relationship between the Disputed Workers' work and DBI's primary work, the Division must first examine the type of work DBI performs, including how DBI defines itself and holds itself out to the public.

DBI describes itself as "a drywall and metal stud framing company" and its employees "perform drywall and metal stud framing."[64] It holds itself out to the public as "The Mountain West's Premier Steel Framing & Drywall Contractor."[65] On DBI's website, it lists fifty projects as "work accomplished"; out of the fifty projects, it performed drywall work on 48 and framing work on all 50 projects.[66]

---

[60] *Dole*, 875 F.2d at 805 (citing authority from the federal Second, Seventh, Ninth, and Third Circuit Courts of Appeals considering whether the individual's work was an integral part of the alleged employer's business as part of analyzing worker classification under the FLSA); *Baker*, 137 F.3d at 1440, 1443 (assessing whether individual's "labor services" are a "necessary component" of the employer's business, and as a result, an "integral" part of the business, in FLSA worker classification analysis); *see also* Colo. Div. of Labor Standards & Statistics, *Statement of Basis, Purpose, Specific Authority, and Findings: COMPS Order #36*, 5 (Jan. 22, 2020), (analogizing CWA "primary work" analysis to FLSA analysis of whether "the service rendered is an integral part of the alleged employer's business").

[61] *See McPherson Timberlands, Inc. v. Unemp. Ins. Comm'n*, 714 A.2d 818, 820-22 (Maine 1998) (reviewing unemployment insurance claim and assessing whether individual's work was an integral part of or outside employer's usual business); *Vazquez v. Jan-Pro Franchising Int'l*, 986 F.3d 1106, 1122 (9th Cir. 2021). Relevant to this point, the Ninth Circuit explained that in examining whether work was in "the usual course" of an employer's business, "[a]nalytically, courts have framed … [the] inquiry in several ways. They have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in. … In some cases, this inquiry can be conducted through a common-sense observation of the nature of the businesses. … In other cases, courts view [the] distinction in more economic terms." *Id.* at 1125–26.

[62] Colo. Div. of Labor Standards & Statistics, *Statement of Basis, Purpose, Specific Authority, and Findings: COMPS Order #36*, p. 5 (Jan. 22, 2020) (listing factors as to whether "the service rendered is an integral part of the alleged employer's business"); *The Spine Savers*, DLSS Claim #3114-21, 6 (Hearing Officer Decis. No. 22-020, Mar. 18, 2022), (where claimant "performed the central work" of the employer, "for which the business receives its revenue" supported "primary work" factor under CWA); *Log Home Finishing LLC*, DLSS Claim #1992-21, 9 (Hearing Officer Decis. No. 22-014, Mar. 2, 2022) (same); *Baker*, 137 F.3d at 1443 (examining whether "workers' services are a necessary component of the business" and whether their work "is a critical step" on business projects); *Vasquez*, 986 F.3d at 1125–28 (examining whether "work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in").

[63] *See, e.g.*, *A2A Ventures, LLC d/b/a Madison Cleaning Servs.*, DLSS Claim #2489-20, 8–9 (Hearing Officer Decis. No. 21-128, Dec. 22, 2021), (citing FLSA "integral part" and "usual business" factors, and supporting authority, for CWA "primary work" inquiry); *The Spine Savers*, DLSS Claim #3114-21, 6 (Hearing Officer Decis. No. 22-020, Mar. 18, 2022) (same); *Log Home Finishing LLC*, DLSS Claim #1992-21, 9 (Hearing Officer Decis. No. 22-014, Mar. 2, 2022) (same).

[64] Response to NOI, App'x 2, DBI 3.

[65] "Home - Diversified Builders," https://diversifiedbldrs.com (DLSS 11117-21) (archive dated October 19, 2023 available at https://web.archive.org/web/20231019150020/https://diversifiedbldrs.com/).

[66] "Our Projects - Diversified Builders," https://diversifiedbldrs.com/our-projects/ (DLSS 11122-28) (archive dated October 19, 2023 available at https://web.archive.org/web/20231019151428/https://diversifiedbldrs.com/our-projects/)

DBI identified contractor work that is arguably not "DBI's core business": tile work, wall coverings, and bathroom specialties;[67] a separate response identified "insulation, FRP, Division 10 specialties and window installation" as work "not common" for DBI.[68] Neither list identifies drywall or framing as uncommon work.

The Division finds that DBI's primary work is drywall and framing.

Next, the Division examines the work performed by the Disputed Workers to determine whether it is necessary for, or is in furtherance of, operation of DBI's business and is a source of employer revenue.

DBI receives its revenue from performing framing and drywall work. For example, DBI contracted with Milender White to perform "Framing & Drywall" in exchange for $7,715,135.00.[69] DBI billed $1,146,250.00 to Shaw Builders in exchange for "Drywall Framing." [70]

The Disputed Workers performed the framing and drywall work to fulfill DBI's contracts. All Disputed Workers describe their jobs as hanging drywall and building framing, using the job titles "frame/drywall," and "drywall/hanger."[71] On its website, DBI solicits applications for identical jobs as DBI employees: "drywall finisher" and "framer / hanger."[72]

The Division finds that the Disputed Workers performed work — drywall and framing — that was necessary for DBI to fulfill its contracts with general contractors and earn payment for its work.

Third, the Division examines whether the Disputed Workers perform this primary work regularly or only on isolated occasions.

The Disputed Workers performed a substantial amount of framing and drywall work for DBI. On some projects, the Disputed Workers outnumbered DBI employees and performed different work types no DBI worker performed. Disputed Worker Chairez explained that DBI employees were "[doing] metal frame, doing details or framing units, top up, framing top up" and "I never saw DBI employees doing what we did, like sheetrockers, never saw that."[73] Disputed Worker Ramirez stated that DBI employees were "doing different jobs" and they were not aware of DBI employees hanging drywall.[74].

On other projects, DBI commingled Admitted Employees and Disputed Workers, performing the drywall and framing work side-by-side.[75] Sometimes, direct employees and Disputed Workers worked together in pairs.[76]

---

[67] Supplemental Response to NOI, App'x 4, DBI 15541. The Division need not, and does not, determine whether any such work might also be within the primary work of DBI.
[68] Supplemental Response to NOI, App'x 4, DBI 15535.
[69] App'x 9, DLSS 2903–05.
[70] "Drywall Framing at Level 2 Amenity Space, T&M Drywall & Finish, T&M Work for Drywall Finish - Ticket #03, T&M Work for Drywall - CO #04, T&M Work for Drywall - Ticket #05, DBI - T&M Work for Drywall - Ticket #06-07, Drywall T&M TIckets - #08-#09, DBI ticket #010, ROM, Final Drywall Invoice." DLSS 8817.
[71] Disputed Workers used two job titles. "Frame/drywall": App'x 8, DLSS 559, 587, 642, 669, 700, 712, 802, 854, 882, 933, 980, 1033; and "Drywall/hanger": DLSS 615, 750, 773, 826, 906, 959, 1057.
[72] "Careers - Diversified Builders," https://diversifiedbldrs.com/careers (DLSS 11112-17) (archive dated October 19, 2023 available at https://web.archive.org/web/20231019150020/https://diversifiedbldrs.com/careers).
[73] App'x 8, DLSS 1214.
[74] App'x 9, DLSS 9300.
[75] App'x 9, DLSS 1181.
[76] App'x 9, DLSS 11012.

When the Division visited DBI's work site, DBI Supervisor Ortiz told the Division they were supervising *only* two workers, "Edson and Jason," who were "working for Rodriguez."[77] The work on the Site Visit project could not be completed without the two Disputed Workers. Therefore, the Division concludes that the Disputed Workers regularly performed drywall and framing work on behalf of DBI.

The Division determines that DBI's "primary work" includes drywall and framing labor and services to general contractors, that the Disputed Workers directly performed this primary work, and that the Disputed Workers regularly performed the primary work. Accordingly, the Division finds that the Disputed Workers performed the primary work of DBI.

**3. DBI Could and Did Exercise Control Over the Disputed Workers to a Significant Degree.**

Measuring the "degree of control" an employer may or does exercise over the individual includes consideration of factors that Colorado state courts have long considered for determining whether an individual is "primarily free from control and direction in the performance of their services" in the statutory context of the CWA[78] and the Colorado Employment Security Act ("CESA"),[79] as well as for determining whether an employment relationship exists for establishing statutory liability under the Colorado Workers' Compensation Act ("WCA")[80] and vicarious liability under common law claims.[81] Similarly, "degree of control" encompasses "control" and "direction" factors that Colorado federal courts have long used for determining worker classification under the FLSA.[82] Among both sets of state and federal court decisions, to measure the degree of control or direction over a worker, the following "control" factors apply:

1. whether the employer controls hiring of an individual;[83]
2. whether the employer controls the rates and distribution of an individual's pay;[84]

[77] App'x 11, DLSS 21541. Ortiz's statement is corroborated by the sign-in lists that the Division obtained at the site visit. App'x 9, DLSS 11100–01.
[78] *Bermel*, 2017 COA 20, ¶¶ 36–38.
[79] *Colo. Custom Maid, LLC v. Indus. Claim Apps. Office*, 2019 CO 43, ¶ 14, 441 P.3d 1005, 1007 (assessing "control" factors in determining employer-employee relationship by examining "free from control and direction" statutory exception to CESA "employee" definition); *Dana's Housekeeping v. Butterfield*, 807 P.2d 1218, 1220–21 (Colo. App. 1990) (same); *Wagner & Sons Constr., Inc. v. Pagels*, 720 P.2d 987, 990 (Colo. App. 1986) (same); *Dumont v. Teets*, (Colo. 1953) (same, prior statute).
[80] *Faith Realty & Dev. Co. v. Indus. Comm'n*, 460 P.2d 228, 229–30 (Colo. 1969) (assessing "control" factors in determining employer-employee relationship of real estate broker and real estate salespersons for applying WCA to real estate salespersons); *Indus. Comm'n v. Bonfils*, 241 P. 735, 736 (Colo. 1925) (assessing "control" factors in determining employer-employee relationship of coal company and coal hauler for applying WCA to coal hauler).
[81] *See, e.g.*, *Perkins v. Reg'l Transp. Dist.*, 907 P.2d 672, 674–75 (Colo. App. 1995) (assessing "control" factors to determine whether employer-employee relationship existed for vicarious liability under "doctrine of respondeat superior" whereby "an employer is liable for the torts committed by an employee or agent while acting within the scope of ... employment or agency"); *Jacobson v. Doan*, 319 P.2d 975, 978-81 (Colo. 1957) (assessing "control" and "whose business" tests to determine whether employer-employee relationship existed for liability under older Colorado statute that made "every employer liable in damages for injuries or death to an employee, when caused by its own negligence or the negligence of a co-employee"); *Landis v. McGowan*, 165 P.2d 180, 184–86 (Colo. 1946) (applying "control test" and assessment of "control" factors to determine employee-independent contractor classification for vicarious liability of employer for worker negligence).
[82] *E.g.*, *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, 2015 U.S. Dist. LEXIS 97640, *32–34 (D. Colo. July 27, 2015) (applying control factors in economic realities test for FLSA employee classification); *Baker v. Flint Eng'g & Contr.*, 137 F.3d 1436, 1441 (10th Cir. 1998) (same); *Dole*, 875 F.2d at 806–08 (same).
[83] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 20 (employer "right to control whom the cleaners hire as assistants" as evidence of employer "control"); *Perkins*, 907 P.2d at 675 (finding that employer's right to control other company's hiring process showed evidence of "control" over other company and its employees); *Baker*, 137 F.3d at 1440 (FLSA "economic reality test" for worker classification includes assessing "control" factor of whether employer maintains "the power to hire").
[84] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 21 (employer control of "the collection and distribution of fees paid by the client" to workers, and employer "negotiation of the price with the client" that funded the fees paid to the workers, evidenced employer "control" over workers); *Baker*, 137 F.3d at 1440 (FLSA "economic reality test" for worker classification includes assessing

3. whether the employer supervises, directs, or corrects the performance of an individual's work;[85]
4. whether the employer controlled the details of the manner and method of job performance, including setting an individual's work schedules, directing the timing, place, and sequence of the individual's work, and monitoring or tracking the number of hours worked by an individual;[86]
5. whether the employer had the authority to terminate an individual without liability;[87] and
6. whether an individual could work for third parties at the same time as for the employer.[88]

"control factor" of whether employer "determines the rate and method of payment" of workers).

[85] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14 (assessing employer's "general right to control and direct the individual in the performance of the service" as relevant in determining "control" factor under "independent contractor" exception to CESA); *Butterfield*, 807 P.2d at 1220–21 (employer's "authority to correct or direct the claimant or to reassign her" was evidence of "control"); *Faith Realty & Dev. Co.*, 460 P.2d at 230 (broker's supervision over a real estate agent supported finding that broker had the "right, duty and power to control" the agent, and as a result, was an important factor "in distinguishing a servant or employee from a contractor"); *Pagels*, 720 P.2d at 990 (employer's supervision of worker's employment, which included monitoring of work and subsequent firing of worker due to frequent absences, supported finding the employer's "control and direction" of the worker); *Jacobson*, 319 P.2d at 979 (common law "control test" provided that the "relationship of master and servant exists whenever one person stands in such a relation to another that he may control *the work* of the other and *direct the manner* in which it shall be performed") (emphasis in original); *Mason*, 2015 U.S. Dist. LEXIS 97640 at *32–34 (employer "ability to enforce" rules as to workers "[o]f primary importance" in determining employer control); *Dole*, 875 F.2d at 806–07 (employer that deemed worker's work product "unsatisfactory" and rejected it was evidence of "a highly regulated work force absolutely controlled by" the employer "with regard to the production and quality demands of the business"); *Baker*, 137 F.3d at 1440 (FLSA "economic reality test" for worker classification includes considering "control" factor of whether the employer "supervises and controls employee work schedules or conditions of employment").

[86] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶¶ 14, 21 ("An [] employer's firm hand in controlling the details of the manner and method of job performance [] evinces an overall right to control the actions of an employee.") (internal quotation marks omitted); *Pagels*, 720 P.2d at 990 (finding that informing laborers of "specific tasks which needed completion, and occasionally ordered laborers to different job sites" was evidence of "control"); *Perkins*, 907 P.2d at 674–75 (explaining that the "central element in an employer-employee relationship is the right of the employer to control the details of performance of the employee's duties" and that "control over the means and methods of accomplishing the contracted-for result is inconsistent with 'independent contractor' status"); *Jacobson*, 319 P.2d at 979 (reasoning that common law "control test" provided that the "relationship of master and servant exists whenever one person stands in such a relation to another that he may control *the work* of the other and *direct the manner* in which it shall be performed") (emphasis in original); *Mason*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, 2015 U.S. Dist. LEXIS 97640 at *32–34 (finding employer's "control over when dancers work and related scheduling requirements indicates control and employee status"); *Baker*, 137 F.3d at 1441 (finding that employer's directing worker "when to report to work, when to take breaks, on what portion of the project they will be working, and when their workday ends" demonstrated evidence of employer "control" over worker); *Dole*, 875 F.2d at 806 (finding that employer's requirements that worker arrive at work by a certain time in the morning and punch a clock prior to starting work, leaving for breaks, and finishing workday were evidence of the employer's control over the worker).

[87] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14 ("the right to terminate a service contract without liability is an important factor in determining [] whether the individual is free of control and direction [] because the right immediately to discharge involves the right of control [] []") (internal quotation marks omitted); *Butterfield*, 807 P.2d at 1220 ("[the] right to discharge someone without liability inherently involves the right to control and is inconsistent with the concept of independent contractor"); *Faith Realty & Dev. Co.*, 460 P.2d at 230 (employer right to terminate without liability "usually" shows worker is an employee; absence of that right means worker is usually a contractor); *Pagels*, 720 P.2d at 990 (employer's "discharge" of worker supported finding of employer's "control and direction" over the worker); *Bonfils*, 241 P. at 736 ("most important point 'in determining the main question (a contractor or employee), is the right of either to terminate the relation without liability'" in conducting worker classification analysis under Workmen's Compensation Act) (quoting *Indus. Comm'n v. Hammond*, 236 P. 1006, 1008 (Colo. 1925)); *Perkins*, 907 P.2d at 675 ("right to discharge someone without liability inherently involves the right to control because it gives the power to control the smallest details and method of work").

[88] *Baker*, 137 F.3d at 1441 (employer's project that renders a worker unable to offer services to third parties while the employer's project is ongoing is evidence of the employer's control over the worker); *Dole*, 875 F.2d at 808 (even though workers were permitted to offer services to third parties while working for employer, the economic realities of the employer-worker relationship and hours required by the employer demonstrated that workers could hardly conduct work for third parties, and as a result, such circumstances were evidence of the employer's control over the workers).

In examining each factor, the Division applies a totality of the circumstances approach, with no one factor dispositive.[89] As discussed below, the evidence establishes that the weight of these factors show that DBI could and did exercise control over the Disputed Workers to a significant degree.

***a. The DBI Labor Brokers Found and Hired the Disputed Workers, but DBI Exercised Control Over Hiring and Staffing Levels.***

An employer's control over the hiring of an individual supports evidence of the employer's control over the individual as though they were an employee.[90] An employer can exercise control indirectly, such as by controlling staffing levels and access to the job site.[91]

The Disputed Workers, in all Worker Packets, stated they were hired by the respective owner of each DBI Labor Broker after being referred by friends or colleagues.[92] Worker Packets comport with the interviews of Disputed Workers.[93] DBI Labor Broker Edgar Montoya confirmed that they find workers through referrals.[94]

DBI had some influence over the hiring process because the purported subcontractors hired and solicited workers upon DBI's request for staffing. Disputed Worker Estrada explained:

> Disputed Worker Estrada: Ok, those who do not work directly with DBI, Santiago Millán puts out a publication on Facebook that requests either framers, sheetrockers, or tapers and he sends the employees to DBI. . . .
>
> Investigator Bocanegra: Do you know if DBI asks Santiago Millán to do that?

---

[89] *Merrill*, 2022 WL 3696669, 2022 U.S. App. LEXIS 24120, *13 (unpublished) (reviewing district court's application of totality of the circumstances approach to evaluating "control" factors in reaching FLSA misclassification determination and affirming district court's independent contractor-employee FLSA classification where district court erroneously analyzed two "control" factors) (quoting *Dole*, 875 F.2d at 805); *Bermel*, 2017 COA 20, ¶¶ 36–38 (reversing summary judgment entered against employee's CWA claim and holding that employer failed to establish that worker was an "independent contractor" who was free from control "in fact" based on totality of the circumstances approach to CWA independent contractor-employee classification determination); *Yakubov*, 2020 Colo. Dist. LEXIS 3306, *4 (recognizing that CWA "employee/independent contractor" analysis requires inquiry into the totality of circumstances surrounding the working relationship between the parties where "no single factor is determinative") (quoting *Lufti*, 40 P.3d at 56); *Lufti*, 40 P.3d at 56 (analyzing totality of the circumstances to employee-independent contractor classification under Title VII).

[90] *See, e.g.*, *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 24 (finding evidence of employer's control over cleaners and who cleaners could hire as evidence of control indicative of an employer-employee relationship between employer and cleaners); *see also Perkins*, 907 P.2d at 675 (finding that employer's right to control other company's hiring process showed evidence of "control" over other company and its employees); *Baker*, 137 F.3d at 1440 (explaining that FLSA "economic reality test" for worker classification includes assessing "control" factor of whether an employer maintains the "the power to hire").

[91] *See Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 216 (3d Cir. 2015) (finding is weakened when the employer controls hiring through staffing levels and ultimate access to the job site) (applying Title VII).

[92] Workers said they were hired by DBI Labor Broker Montoya: Eloy Rodriguez (App'x 1, DLSS 574); by DBI Labor Broker Millan: Eddie Campos (DLSS 559), Ermelindo Lemus (DLSS 602); Francisco Jimenez (DLSS 642); Gonzalo Bautista (DLSS 720); Hector Lemus (DLSS 737); Jose Lemus (DLSS 812-13), Jose Rodriguez (DLSS 841), Leopoldo Leyva (DLSS 920), Limber Lemus (DLSS 946), Lorenzo Quiroz (DLSS 974), Valeriano Chaire (DLSS 1071); and by DBI Labor Broker Rodriguez: Marroquin (DLSS 21493).

[93] Disputed Worker Chairez: "I was finishing a job with [a different drywall contractor], work I usually do, hanger, drywall hanger, and I got a recommendation from a framer; his name is Miguel. He told me he knew a person named Santiago, Santiago Millán, who was looking for hangers. I got in contact with him, I called him.... I called him to see if it was true, and yes, we met at the job site, a DBI job, a building that's around Highway 25 and 20 Avenue, 20 Avenue. There's a project there, a building they were working on at the time and I met Santiago there and we came to an agreement." App'x 1, DLSS 1209.

[94] App'x 9, DLSS 9798.

> Disputed Worker Estrada: Yes, DBI asks Santiago for people, and Santiago, then, puts out the publication.[95]

DBI Supervisor Ortiz described how DBI controls staffing levels on the project:

> When I ask for laborers, they send me laborers, and they tell me, "These guys work for DBI." They sign the DBI sheet. Sometimes it's with Rodriguez…[96]

DBI maintained ultimate control over staffing on the job site, though it channeled the actual hiring through the DBI Labor Brokers. DBI may not have decided *who* to hire, but it decided *how many* to hire when it requested workers from DBI Labor Brokers. It requested workers — not work, as is typical of bona fide independent contractor situations[97] — from the purported subcontractor. Because DBI is not contracting for work, DBI's contracts with Labor Brokers do not include a scope of work.[98]

Sometimes, DBI did contract for fixed prices for work that DBI says is "not common" for it to perform. For example, DBI contracted for FRP (Fiber reinforced plastic) work with JBII Constructions.[99] Under the contract,[100] DBI did not have any power over JBII Construction's staffing levels; JBII Constructions could perform the work with as many or as few workers as it chose. DBI did not pay an hourly rate to JBII Constructions.[101]

The Division finds that the Disputed Workers were hired by DBI Labor Brokers, primarily through personal referrals.[102] The Division concludes that this factor weakly supports a finding that DBI is not an employer. It supports a finding that DBI was not an employer of the Disputed Workers; but that support is undermined because DBI indirectly controlled the hiring by requesting workers from the purported subcontractor and controlling who was allowed to work on its projects.[103]

***b. The DBI Labor Brokers Set the Pay Rates for the Disputed Workers.***

Courts have found that employer control over the negotiation or setting of pay rates for workers and the collection and distribution of fees paid by clients to workers evidences the employer's control and direction similar to that of an employer over its employee.[104] Such control over pay rates and the distribution of payment to a worker causes the worker to become dependent on the employer, and as a result, this control forms a "relationship" that "bears the hallmarks of control and direction characteristic of an employment relationship."[105]

---

[95] App'x 8, DLSS 1090.
[96] App'x 11, DLSS 21546.
[97] *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 753, 109 S. Ct. 2166, 2179 (1989) ("a sum dependent on completion of a specific job, [is] a method by which independent contractors are often compensated").
[98] *See, e.g.,* DBI 53155-53160. Attachment A, the scope of work, is blank.
[99] App'x 4, DBI 54140.
[100] The record does not indicate whether DBI actually had that power in reality or exercised it.
[101] App'x 4, DBI 54140.
[102] Disputed Worker Quiñones stated they were hired and interviewed by DBI representatives, not by a purported subcontractor. DLSS 21556. That worker's experience appears to be an outlier; no other Disputed Worker described being interviewed or hired by DBI.
[103] *See Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) (FLSA) (finding employer status when the employer did not directly hire but did determine "the number of workers hired for a job").
[104] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 21 (employer's control of "the collection and distribution of fees paid by the client" to workers, and "negotiation of the price with the client" that funded the fees paid to the workers, evidenced "control" over the workers); *Baker*, 137 F.3d at 1440 (FLSA "economic reality test" for worker classification includes assessing "control factor" of whether employer "determines the rate and method of payment" of workers).
[105] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 21.

In both the Worker Packets[106] and interviews,[107] Disputed Workers consistently stated that the DBI Labor Broker set and told them the rate of pay. Based on this consensus, the Division finds that the Disputed Workers had their pay set by the purported subcontractors.

DBI Labor Brokers Millan and Montoya paid Disputed Workers at the job site.[108] However, a Rodriguez Disputed Worker told the Division that DBI distributed his pay, "Saul [Cera] brings the checks every Friday and hands them out here at work," but that his checks were from Rodriguez rather than DBI.[109] The Division finds that DBI distributed pay to the Rodriguez Disputed Workers, but DBI did not distribute pay to the Disputed Workers of any other subcontractor.

In sum, the Division concludes that this factor supports a finding that DBI was an employer of the Disputed Workers of Rodriguez, but does not support a finding that DBI was an employer of the Disputed Workers of Millan and Montoya.

***c. DBI Supervised, Directed, and Corrected the Work Performed by the Disputed Workers.***

An employer's ability to supervise or direct the performance of an individual's work or that individual's work conditions, as well as to correct, remediate, or discipline an individual based on the performance of their work are strong characteristics of employer control that represents an employer-employee relationship.[110]

Disputed Workers consistently reported that DBI, through its foreman, directed their work by assigning them daily tasks and supervising their work. Disputed Worker Quiroz explained the level of supervision by DBI:

> "we were subcontracted and then we would deal with the DBI foremen. The DBI foremen would be the ones who would give us orders and tell us what to do."[111]

---

[106] App'x 8, DLSS 687, 720, 737, 763, 789, 813, 841, 869, 893, 920, 946, 991, 1020, 1044.

[107] App'x 8, DLSS 1099 ("Investigator Bocanegra: Okay. How much are workers normally paid? Are there any kind of pay scales? Disputed Worker Estrada: Well, the master is paid $24, $25 and an apprentice, $16, $18. Investigator Bocanegra: Who determines that? Investigator Bocanegra: Santiago.") and DLSS 1140 ("Investigator Loaisa: Ok, but did Santiago tell you how much he was going to pay you? Disputed Worker Marquez: Yes, he told me how much he was going to pay me.").

[108] App'x 8, DLSS 1180, 1221, 1225.

[109] App'x 11, DLSS 21556. Earlier in the interview, Disputed Worker Quiñones stated: "[B]asically, they pay me here. They give me a check here at work." DLSS 21555.

[110] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14 (assessing employer's "general right to control and direct the individual in the performance of the service" as relevant in determining "control" factor under "independent contractor" exception to CESA); *Butterfield*, 807 P.2d at 1220–21 (finding that employer's "authority to correct or direct the claimant or to reassign her" was evidence of "control"); *Faith Realty & Dev. Co.*, 460 P.2d at 230 (reasoning that a broker's supervision over a real estate agent supported finding that broker had the "right, duty and power to control" the agent, and as a result, was an important factor "in distinguishing a servant or employee from a contractor"); *Pagels*, 720 P.2d at 990 (reasoning that employer's supervision of worker's employment, which included monitoring of work and later firing of worker due to frequent absences, supported finding the employer's "control and direction" of the worker); *Jacobson*, 319 P.2d at 979 (reasoning that common law "control test" provided that the "relationship of master and servant exists whenever one person stands in such a relation to another that he may control *the work* of the other and *direct the manner* in which it shall be performed") (emphasis in original); *Mason*, 2015 U.S. Dist. LEXIS 97640 at *32–34 (finding employer's "ability to enforce" rules as to workers "[o]f primary importance" in determining whether employer exercised control over workers); *Dole*, 875 F.2d at 806–07 (finding that employer that deemed worker's work product "unsatisfactory" and rejected it was evidence of "a highly regulated work force absolutely controlled by" the employer "with regard to the production and quality demands of the business"); *Baker*, 137 F.3d at 1440 (explaining that FLSA "economic reality test" for worker classification includes considering "control" factor of whether the employer "supervises and controls employee work schedules or conditions of employment").

[111] App'x 8, DLSS 1180.

Later in the interview, Disputed Worker Quiroz continued:

> Investigator Loaisa: Who gave you the instructions?
>
> Disputed Worker Quiroz: A foreman, but... Yes, he was from DBI, now that I recall. He was an American. He gave us the instructions.[112]

In comparison to the level of supervision by DBI, Disputed Worker Quiroz both told the Division that they only saw the owner of the DBI Labor Broker on payday.[113] Disputed Worker Marquez corroborated Disputed Worker Quiroz's statement; they too saw the owner of the DBI Labor Broker on payday only.[114]

Disputed Workers identified DBI employee **Saul Cera** as their supervisor. Saul Cera is a DBI employee on DBI's employment roster.[115] DBI Supervisor Ortiz also identified Saul Cera as a DBI supervisor.[116]

In an interview, Disputed Worker Quiñones identified Saul Cera as their supervisor: "Saul Cera. They would also come from DBI to check the work. But for us, directly, from DBI is Saul."[117] They further explained that Saul Cera "is the one who's here all the time on a daily basis. We work together all the time and communicate everything to him."[118] Disputed Worker Quiñones identified Saul Cera as the one who checks his work daily[119] and the one who would correct his work.[120]

On the other hand, DBI Labor Broker Rodriguez's role was limited, according to Disputed Worker Quiñones: "[W]e work under his name, but practically everything is run by DBI. DBI gives us the tasks, the projects, tools, the material, everything."[121]

Disputed Worker Marroquin identified **Julio Ortiz** as their supervisor. Julio Ortiz is a DBI employee on DBI's employment roster.[122]

When asked who supervised them, Disputed Worker Marroquin responded "Julio" who works "for DBI."[123] They explained that DBI Supervisor Ortiz told them what to do on a daily basis and "he comes by, walks around and checks the work to see if we are handling it correctly, or that we are working in a clean area, that we have gloves, that we have our goggles or things like that. He comes by often to check on us."[124]

[112] App'x 8, DLSS 1180. In his interview, Disputed Worker Quiroz was unable to recall the names of his supervisors. *Id.*
[113] App'x 8, DLSS 1180.
[114] App'x 8, DLSS 1134.
[115] App'x 2, DBI 10.
[116] App'x 11, DLSS 21525.
[117] App'x 11, DLSS 21563.
[118] App'x 11, DLSS 21563.
[119] App'x 11, DLSS 21570–71.
[120] App'x 11, DLSS 21565.
[121] App'x 11, DLSS 21560.
[122] App'x 2, DBI 10.
[123] App'x 11, DLSS 21495.
[124] App'x 11, DLSS 21504.

The Division interviewed DBI Supervisor Ortiz and they confirmed both they were an employee of DBI and the supervisor of Disputed Worker Marroquin:

> Investigator Loaisa: No one that you know. Okay. Could you tell me who you are supervising here today?
>
> DBI Supervisor Ortiz: Right now I'm supervising Edson and Jason. That's the two guys you see in the sign-in sheet. They're working right now.
>
> Investigator Loaisa: Okay. Edson and Jason. Who do they work for?
>
> DBI Supervisor Ortiz: They're working for Rodriguez.

DBI Supervisor Ortiz described being in charge of Rodriguez workers and telling the Disputed Workers "you can do this, do this, do this."[125] DBI Supervisor Ortiz gave the Disputed Workers those instructions on a daily basis:

> Investigator Loaisa: Do you have contact with the worker from Rodriguez's?
>
> DBI Supervisor Ortiz: Every day.
>
> Investigator Loaisa: Every day.
>
> DBI Supervisor Ortiz: Yeah.
>
> Investigator Loaisa: Okay. And you... you tell them what work to do every day?
>
> DBI Supervisor Ortiz: Yes, sir.
>
> Investigator Loaisa: Okay. And can you tell me what kind of work they do?
>
> DBI Supervisor Ortiz: They do frame, and they do drywall.
>
> Investigator Loaisa: Okay. And do you review the quality of their work?
>
> DBI Supervisor Ortiz: I have to because we have to pass inspections.[126]

DBI Supervisor Ortiz was unaware of any Rodriguez supervisors.[127] A safety manager for the general contractor of the project (Taylor Kohrs) stated that DBI Supervisor Ortiz was Disputed Worker Marroquin's supervisor.[128]

Disputed Workers identified **Ivan Hernandez-Marquez** as their supervisor. Ivan Hernandez-Marquez is a DBI employee who appears on DBI's employee roster.[129]

Disputed Worker Marquez identified four supervisors, including Ivan Hernandez-Marquez.[130] Disputed Worker Marquez explained the DBI employees

> came in and told me... 'Francisco, you have to do this work,' and then I'd say yes and all that. They'd put me to do the work and then come around to see the work... They came and saw if the work was okay, what they had told me to do, and then they'd say... I'd say, "I finished this job..." And they'd say, "Okay, go to this floor

[125] App'x 11, DLSS 21538.
[126] App'x 11, DLSS 21539.
[127] App'x 11, DLSS 21540.
[128] App'x 11, DLSS 21510–12.
[129] App'x 2, DBI 10.
[130] App'x 8, DLSS 669.

> and these needs be done...," let's say, the units' bathroom frames, and I'd go and work... And, well, they'd come and see if it was fine.[131]

Disputed Worker Chairez detailed DBI Supervisor Hernandez-Marquez's close control to sequence and correct their work:

> There were several occasions where he even- I did the preliminary in the units before they passed inspection. For us to be able to move forward with production, we had to finish some preliminary details in those units so that the inspection would pass, and he would take me... I would walk behind him, and he would tell me this is what we have to do, this is what has to be done and I personally stayed to do it so that it could pass inspection. And I did that with him on several occasions.[132]

The Worker Packets confirm the interviews of Disputed Workers Chairez and Marquez:

- Francisco Marquez: "D.B.I.'s supervisors walked the job site to verify workers were working in their areas."[133]
- Jesus Ramirez: "Ivan Hernandez…D.B.I.'s supervised and evaluated the jobsite in person."[134]
- Valeriano Chairez: "Ivan personally told us what to do in what units" and "Ivan personally assessed the works."[135]

The worker packets identify three additional DBI employees as a supervisor of the Disputed Workers: **Xavier Ortega, Tony Garcia, and Michael Connelly.**

**Xavier Ortega** is a DBI employee on DBI's employment roster.[136] The following workers, in Worker Packets, identified Xavier Ortega as their supervisor and who gave the Disputed Workers daily tasks:

- Eddie Campos: "D.B.I. foremen and Xavier walked the site and evaluated workers. if they didn't like someone, they fired him."[137]
- Eloy Rodriguez: D.B.I.'s foreman, Xavier Ortega, walked the jobsite."[138]
- Fransisco Jimenez: "Xavier and Tony from D.B.I walk the job site every day."[139]
- Jose Rodriguez: "D.B.I.'s supervisors monitored our work and they told us which unit should be completed and where we should work, they did this personally…Xavier Ortega walked the project personally."[140]

---

[131] App'x 8, DLSS 1153.
[132] App'x 8, DLSS 1212.
[133] App'x 8, DLSS 658, 669.
[134] App'x 8, DLSS 765, 773.
[135] App'x 8, DLSS 1068, 1075.
[136] App'x 2, DBI 10.
[137] App'x 8, DLSS 548.
[138] App'x 8, DLSS 34.
[139] App'x 8, DLSS 640.
[140] App'x 8, DLSS 843.

**Tony Garcia** is a DBI employee on DBI's employment roster.[141] The following workers[142] identified Tony Garcia as their supervisor and who gave the Disputed Workers daily tasks:

- Eloy Rodriguez: "Xavier and Tony, D.B.I. perso[n]nel walk the job site everyday."[143]
- Ermerlindo Lemus: "Superintendent Tony (D.B.I.) supervises us personally and check the units we worked on and evaluated the work."[144]
- Fransisco Jimenez: "Xavier and Tony from D.B.I walk the job site every day."[145]
- Hector Lemus: "Tony (D.B.I.) The superintendent supervised us in person and checked the units we worked on, and evaluated us."[146]
- Jose Lemus: "Superintendent Tony (D.B.I.), personally supervises us and examines the units where we work and a[s]sesses our work."[147]

In addition to the workers, DBI Supervisor Ortiz identified Tony Garcia as a DBI employee who supervised the Disputed Workers.[148]

Third, **Michael "Mike" Connelly** is a DBI employee on DBI's employment roster.[149] The following workers identified Mr. Connelly as their supervisor and who gave the Disputed Workers daily tasks:

- Eloy Rodriguez: "Mike (superintendent) from D.B.I. was in charge of hiring and firing workers …D.B.I. supervisors are the ones telling [us] what to do and where to work."[150]
- Ermerlindo Lemus: "Tony/Mike D.B.I. personally supervise the work we are doing, and if they want changes, they let us know."[151]
- Jose Lemus: "Tony / Mike D.B.I. personally supervise our work and tell us if some changes are needed."[152]
- Jose Rodriguez: "Mike (D.B.I. superintendent) hires and dismisses workers … D.B.I. assess every worker and determine if they are [master] or apprentices."[153]

The Division's investigation did find three individuals who are potentially supervisors on behalf of the DBI Labor Brokers, Disputed Worker Martin Estrada, DBI Labor Broker Montoya, and DBI Labor Broker Millan.

[141] App'x 2, DBI 10.
[142] In addition, Kelvin Lemus (App'x 8, DLSS 895) and Limber Lemus (DLSS 948) also identified DBI Supervisor Garcia.
[143] App'x 8, DLSS 557.
[144] App'x 8, DLSS 604.
[145] App'x 8, DLSS 640.
[146] App'x 8, DLSS 640.
[147] App'x 8, DLSS 815.
[148] App'x 11, DLSS 21525.
[149] App'x 2, DBI 10.
[150] App'x 8, DLSS 585.
[151] App'x 8, DLSS 613.
[152] App'x 8, DLSS 824.
[153] App'x 8, DLSS 852. In addition, Hector Lemus (App'x 8, DLSS 748, 750), Kelvin Lemus (DLSS 904), and Limber Lemus (DLSS 957, 959) also identified DBI Supervisor Connelly.

As an initial matter, a finding that a representative of a DBI Labor Broker was a supervisor of Disputed Workers does not preclude a finding that DBI Supervisors are *also* supervisors of the Disputed Workers. To determine the level of supervision by DBI, the Division must evaluate the degree of control exercised by the DBI Supervisors, as analyzed above, even if others *also* supervised the Disputed Workers. The Division finds the DBI Supervisors exercised substantial and requisite control.

Nevertheless, the Division evaluates the degree of control of representatives of DBI Labor Brokers.

Disputed Worker Bautista, purported employee of Santiago Millan, describes receiving orders directly from DBI Labor Broker Millan. But in an interview, Disputed Worker Bautista explained that DBI Labor Broker Millan did nothing more than relay orders from DBI Supervisors to the Disputed Workers.[154] Further, Disputed Worker Bautista describes receiving orders directly from DBI foremen *in addition to* DBI Labor Broker Millan.[155]

Disputed Worker Estrada describes himself as a supervisor for DBI Labor Broker Millan.[156] Disputed Worker Estrada describes their role as dependent on the direction of DBI, "I take orders from DBI, the foremen, and the one in charge,"[157] and he relays the orders. He also relayed messages when DBI Supervisors corrected his or a Disputed Worker's work.[158] Disputed Worker Estrada gives an example: "if DBI says 'I don't like this wall, take it down and put it back up,' they tell me, and then I have to get workers to get the job done."[159] Disputed Worker Estrada acknowledged that, while they relay the messages to the Disputed Workers, DBI is ultimately the one with control in the workplace.[160]

DBI Labor Broker Montoya similarly described that they – a purported independent contractor – received instructions from DBI like a regular employee: "when I go to work, I get directions on what they want me to do…instructions, directions on the work they wanted me to do."[161] After completing an assigned task, DBI Labor Broker Montoya spoke to a DBI foreman who "gave us new instructions on what he wanted us to help with."[162] That describes an employee level of control.

**DBI Labor Broker Montoya explained** that they did not relay those directions to "his workers," **they simply paid the Disputed Workers and DBI told them what to do**:

> Investigator Loaisa: These people who worked for you, did you tell them what to do during the day?
>
> DBI Labor Broker Montoya: No.
>
> Investigator Loaisa: So, if they worked for you...in what sense did they work for you?
>
> DBI Labor Broker Montoya: I paid them.

---

[154] App'x 8, DLSS 1166.
[155] App'x 8, DLSS 1166 ("I just know it was an American, but some foremen there, because they almost didn't go there. He just came and told us what we had to do, but from there I don't know. I just know it was the Americans themselves, but I don't know their names.")
[156] App'x 8, DLSS 1088.
[157] App'x 8, DLSS 1089.
[158] App'x 8, DLSS 1095.
[159] App'x 8, DLSS 1102.
[160] App'x 8, DLSS 1101.
[161] App'x 9, DLSS 9796.
[162] App'x 9, DLSS 9797.

> Investigator Loaisa: But in terms of what they did at work, how did they know what to do?
>
> DBI Labor Broker Montoya: When we arrived at the company, the supervisor or manager of the company gave them directions.
>
> Investigator Loaisa: So, you're saying "The DBI supervisors gave them instructions"?
>
> DBI Labor Broker Montoya: I don't know if they were supervisors, I wouldn't know, but yes.
>
> Investigator Loaisa: But they were DBI people.
>
> DBI Labor Broker Montoya: Yes.
>
> Investigator Loaisa: My question is if the DBI people were the ones who informed the people you brought into the job what to do during the day.
>
> DBI Labor Broker Montoya: That's correct.[163]

Later in the interview, DBI Labor Broker Montoya repeated the same explanation:

> Investigator Loaisa: You said you never had any supervisor for Master Drywall Installers on the projects. You were the only employee of Master Drywall Installers.
>
> DBI Labor Broker Montoya: Yes.
>
> Investigator Loaisa: Did you review the work of your, of the people you brought in to work?
>
> DBI Labor Broker Montoya: No.
>
> Investigator Loaisa: Did anyone review your work to see they were okay?
>
> DBI Labor Broker Montoya: I don't know.
>
> Investigator Loaisa: You were only in charge of paying them?
>
> DBI Labor Broker Montoya: Yes.[164]

The Division is unable to find evidence in the record that the DBI Supervisors identified by the Disputed Workers — Saul Cera, Julio Ortiz, Xavier Ortega, Mike Connelly, Tony Garcia, and Ivan Hernandez-Marquez — are either (a) not employees of DBI or (b) not supervisors of the Disputed Workers.

DBI contends that "DBI requires a lead person/foreman from the subcontractor that supervises any subcontractor workers. The subcontractor's lead/foreman is the only one to interact with DBI field leadership. DBI does not inspect the subcontractors task based work."[165] The paper matches. DBI's contracts provide that DBI Labor Brokers "have a designated lead that is responsible for communication with [DBI] and that is responsible for the safety, production and quality of work."[166]

[163] App'x 9, DLSS 9798–99.
[164] App'x 9, DLSS 9808.
[165] Response to Notice of Incomplete Response, App'x 7, DBI 15519.
[166] *E.g.*, App'x 4, DBI 53155.

In reality, DBI Supervisors had contact with the Disputed Workers daily.

> Investigator Loaisa: Do you have contact with the worker from Rodriguez's?
>
> DBI Supervisor Ortiz: Every day.[167]

The Disputed Workers, DBI Supervisor Ortiz, and DBI Labor Broker Montoya all describe the Disputed Workers having contact with DBI supervisors daily.

Even accepting DBI's contention as true, that DBI Supervisors relayed instructions through a representative of a DBI Labor Broker, it does not diminish the level of control exercised by DBI Supervisors. On the contrary, when DBI exercised control and direction over a *subcontractor's supervisor*, this supervisor then acts as a *DBI supervisor*. This level of monitoring, correction, and instruction is more typical of an employer's relationship with its own supervisors or work leads — relaying requirements to be passed on to a team of subordinates — than an autonomous subcontractor-contractor relationship. Accordingly, DBI Supervisors exercised a high level of control over the supervisors of DBI Labor Brokers when using the DBI Labor Brokers to relay instructions to Disputed Workers.

The Division finds that DBI foremen did supervise the Disputed Workers, based on the interviews of DBI Supervisor Ortiz and DBI Labor Broker Montoya in addition to the Disputed Worker interviews. The evidence for this factor is particularly strong because it is not limited to statements by the Disputed Workers; the Disputed Workers' statements are confirmed by DBI Supervisor Ortiz and DBI Labor Broker Montoya — parties who are independent of the Disputed Workers.

#### *d. DBI Controlled the Details of the Manner and Method of the Disputed Workers' Job Performance, Including Work Schedules and the Timing, Place, and Sequence of Work, Tracked Hours Worked, and Enforced Clothing and Gear Requirements.*

The Division finds that DBI controlled the details of the manner and method of the Disputed Workers' job performance across worksites by implementing their work schedules, directing Disputed Workers when and where to attend certain worksites for work, and enforcing clothing and gear requirements at worksites.

Assessing whether an employer controlled the details of the manner and method of an individual's job performance is an important "control" factor for understanding whether the employer could or did exercise control over the individual to a meaningful degree, supporting an employment relationship.[168] "An [] employer's firm hand in controlling the details of the manner and method of job performance [] evinces an overall right to control the actions of an employee."[169] The "central element in an employer-employee relationship is the right of the employer to control the details of performance of the employee's duties[.]"[170] To that end, "control over the means and methods of accomplishing the contracted-for result is inconsistent with 'independent contractor' status."[171] And

---

[167] App'x 11, DLSS 21539.
[168] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶¶ 14, 21; *Pagels*, 720 P.2d at 990 (finding that informing laborers of "specific tasks which needed completion, and occasionally ordered laborers to different job sites" was evidence of "control"); *Perkins*, 907 P.2d at 674–75; *Jacobson*, 319 P.2d at 979 (reasoning that common law "control test" provided that the "relationship of master and servant exists whenever one person stands in such a relation to another that he may control *the work* of the other and *direct the manner* in which it shall be performed") (emphasis in original); *Mason*, 2015 U.S. Dist. LEXIS 97640 at *32–34; *Baker*, 137 F.3d at 1441; *Dole*, 875 F.2d at 806.
[169] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶¶ 14, 21.
[170] *Perkins*, 907 P.2d at 674–75.
[171] *Id.*

control over the method and manner in which the work will be performed includes the scheduling of when and where to work, as well as *how* the work will be performed.[172]

### *i. DBI Set the Schedule for Disputed Workers*

The Disputed Workers consistently reported that DBI controlled their work hours. Disputed Worker Quiñones, when asked "Could you identify the person who told you about your schedule?", identified DBI Supervisor Saul Cera, "Saul, the foreman."[173] Disputed Worker Quiroz said "DBI set the schedule. The foremen would tell us, 'you have to be here at 7 am, 15 minutes early […] Yes, in the morning... We'd sign in during the morning in the projects. We'd sign in in the morning and we'd sign out in the afternoon, when it was time to leave."[174] The Worker Packets corroborate this point:

- Eddie Campos: "D.B.I. sets the starting and finishing time."[175]
- Eloy Rodriguez: "D.B.I. set what time to start and finish."[176]
- Ermerlindo Lemus: "D.B.I. yes they say we work from 7 am to 5:30 pm"[177]
- Francisco Marquez: "D.B.I. says when you start and when you finish."[178]
- Gonzalo Bautista: "D.B.I sets starting and ending time"[179]
- Hector Lemus: "D.B.I. say we work from 7am to 5:30pm"[180]
- Jesus Ramirez: "D.B.I. tells you what time to start and when to finish."[181]
- Jose Lemus: "D.B.I., they tell us to work from 7 am to 5:30 pm."[182]
- Jose Rodriguez: "[W]ork schedule is set by D.B.I."[183]
- Kelvin Lemus: "D.B.I., they tell us to work from 7 am to 5:30 pm."[184]
- Leopoldo Leyva: "[W]ork schedule is set by D.B.I."[185]

---

172 *Mason*, 2015 U.S. Dist. LEXIS 97640 at *32–34 (finding employer's "control over when dancers work and related scheduling requirements indicates control and employee status"); *Baker*, 137 F.3d at 1441 (finding that employer's directing worker "when to report to work, when to take breaks, on what portion of the project they will be working, and when their workday ends" demonstrated evidence of employer "control" over worker); *Dole*, 875 F.2d at 806 (finding that employer's requirements that worker arrive at work by a certain time in the morning and punch a clock prior to starting work, leaving for breaks, and finishing the workday were evidence of the employer's control over the worker).
173 App'x 11, DLSS 21559.
174 App'x 8, DLSS 1190. The record indicates DBI required Disputed Workers to show up 10-15 minutes before their shift began at 7. DBI did not compensate the Disputed Workers for that time worked. The Division reserves making factual findings and conclusions for Phase 2 of this investigation.
175 App'x 8, DLSS 557.
176 App'x 8, DLSS 585.
177 App'x 8, DLSS 613.
178 App'x 8, DLSS 667.
179 App'x 8, DLSS 710.
180 App'x 8, DLSS 748.
181 App'x 8, DLSS 780.
182 App'x 8, DLSS 282.
183 App'x 8, DLSS 852.
184 App'x 8, DLSS 904.
185 App'x 8, DLSS 931.

- Limber Lemus: "D.B.I., would tell us to work from 7 am to 5:30 pm."[186]
- Lorenzo Quiroz: "Yes, work schedule is set by D.B.I."[187]
- Valeriano Chairez: "Yes, work schedule is set by D.B.I."[188]

DBI Supervisor Julio Ortiz confirmed the Worker Packets and Disputed Worker interviews: they personally told DBI Employees and Disputed Workers that the project starts at 7:00.[189]

Asked about its control over the Disputed Workers' schedules, DBI stated: "Respondent's employees work schedules according to project needs and clock-in/out or provide records of their hours/overtime. Respondent does not control or direct 'other' drywall or construction workers."[190] It later supplemented its response to say "Per the contractual terms of the specific agreements included in the supplemental production, DBI requires other entities to submit invoices for their work and that they attest/agree to compliance with wage and hour laws."[191]

But the contractual terms and DBI's blanket assertion do not contradict the specific facts provided by the Disputed Workers and DBI Supervisor Ortiz.

Perhaps the job site hours were set by the general contractors. But that too is immaterial. The CWA does not distinguish the source or basis of employer control.[192] Employer control to ensure worker compliance with third-party requirements — like government safety laws, or general contractor site rules — is no different than enforcing an employer's own standards or rules. While these laws and rules may apply to every worker onsite, how they are communicated to and required of a worker indicates an employment or contracting relationship. A contractor may be required to comply with safety laws or worksite rules, and may be in breach of a contract if it does not, day-to-day inspection and correction of workers by a supervisor walking onsite, as the DBI Supervisors did, is more consistent with control and direction of an employee.

Additionally, DBI controlled the schedule of Disputed Workers through handling requests for leave. DBI Supervisor Ortiz told the Division that Rodriguez Disputed Workers would call them when they were sick and needed to miss work.[193] Disputed Worker Quiñones identified DBI Supervisor Cera as who they would call to say if they needed to miss work.[194] Disputed Worker Ramriez identified DBI Supervisor Hernandez-Marquez as who they would call.[195]

The Division finds that DBI controlled the schedule for Disputed Workers.

---

[186] App'x 8, DLSS 958.
[187] App'x 8, DLSS 978.
[188] App'x 8, DLSS 1070.
[189] App'x 11, DLSS 21541–42.
[190] Response to NOI, App'x 2, DBI 6.
[191] Supplemental Response to NOI, App'x 5, DBI 1553.
[192] C.R.S. § 8-4-101(5). This definition thus stands in contrast to the CESA definition, which prohibits considering in favor of "covered employer" status "the degree of control exercised by the person for whom the service is performed over the performance of the service or over the individual performing the service, if exercised pursuant to the requirements of any state or federal statute or regulation[.]"
[193] App'x 11, DLSS 21549.
[194] App'x 11, DLSS 21561.
[195] App'x 9, DLSS 9302.

### *ii. DBI Tracked Hours Worked by Disputed Workers*

The Disputed Workers consistently stated that DBI tracked the hours worked by the Disputed Workers. In four interviews, Disputed Workers told the Division that DBI kept the sign-in sheets.

- Disputed Worker Jesus Ramirez told the Division that the sign-in sheets where they "signed it in the morning, at the office" and identified DBI Supervisor Hernandez-Marquez as the individual who kept the sign-in sheets.[196]
- Disputed Worker Martin Estrada said DBI had the timesheets.[197]
- Disputed Worker Quiñones identified DBI Supervisor Cera as in charge of the time sheet.[198]
- Disputed Worker Marroquin identified DBI Supervisor Ortiz as in charge of both the DBI sheet and the Rodriguez sheet.[199]

DBI Supervisor Ortiz explained that he submits sign-in sheets to DBI's office for both DBI Employees and Disputed Workers.[200] DBI provided those pages to the Division at the site visit, where the sign-in sheets were kept together:



| Job Code | DBI (WALES) Date 9/25/2023 | Time in | Park Hill (W) 7110 Montview Blvd. Job # 693 | Alyssa Time out |
|---|---|---|---|---|
| | SAUL CERA | 7:00 | SAUL CERA | 3:30 |
| | Sara E. Pizano Gtz | 7:00 | [illegible] | 3:30 |
| | 9/26/2023 | | | |
| | SAUL CERA | 7:00 | SAUL CERA | 3:30 |
| | 09/27/2023 | | | |
| | Sara E. Pizano Gtz | 7:00 | [illegible] | 3:30 |
| | SAUL CERA | 7:00 | SAUL CERA | 3:30 |
| | 09/28/2023 | | | |
| | SAUL CERA | 7:00 | SAUL CERA | 3:30 |
| | 09/29/2023 | | | |
| | SAUL CERA | 7:00 | SAUL CERA | 3:30 |
| | Sara E. Pizano Gtz | 7:00 | [illegible] | 3:30 |

[201]

[196] App'x 9, DLSS 9301.
[197] App'x 8, DLSS 1095, 1097.
[198] App'x 11, DLSS 21561.
[199] App'x 11, DLSS 21498.
[200] App'x 11, DLSS 21545-47.
[201] App'x 9, DLSS 11100.



| Job Code | RDZ (WALES) Date 9/25/2023 | Time in | Park Hill 7150 Montview Blvd. Job # 693 | Alyssa Time out |
|---|---|---|---|---|
| | Dublas Quiñonez | 7:00 | Dublas Quiñonez | 3:30 |
| | Duban Asencio | 7:00 | Duban Asencio | 3:30 |
| | 09/26/2023 | | | |
| | Dublas Quiñonez | 7:00 | Dublas Quiñonez | 3:30 |
| | Duban Asencio | 7:00 | Duban Asencio | 3:30 |
| | 09/27/2023 | | | |
| | Dublas Quiñonez | 7:00 | Dublas Quiñonez | 3:30 |
| | Duban Asencio | 7:00 | Duban Asencio | 3:30 |
| | 09/28/2023 | | | |
| | Duban Asencio | 7:00 | Duban Asencio | 3:30 |
| | Dublas Quiñonez | 7:00 | Dublas Quiñonez | 3:30 |
| | 09/29/2023 | | | |
| | Dublas Quiñonez | 7:00 | Dublas Quiñonez | 3:30 |
| | Duban Asencio | 7:00 | Duban Asencio | 3:30 |

[202]

On some occasions, Disputed Workers signed in on the same sheet as DBI's Admitted Employees sheet:



Date: 10-26-19 Job Name TMCA Job # 607

| Name | Time In | Name | Time Out |
|---|---|---|---|
| DBI | | | |
| LORENZO SALCEDO | 6:00 | | 2:30 |
| VICTOR SOTO | 6:00 | | 2:30 |
| NEW ERA | | | |
| ANTONIO MOLINAR | 6:00 | | 2:30 |
| RDZ | | | |
| EDDIE CAMPOS | 6:00 | | 2:30 |
| FRANCISCO JIMENEZ | 6:00 | | 2:30 |
| SALVADOR GOMEZ | 6:00 | | 2:30 |
| ZETA | | | |
| PEDRO HERNANDEZ | 6:00 | | 2:30 |
| ERASMO GARCIA | 6:00 | | 2:30 |

[203]

[202] App'x 9, DLSS 11101.
[203] App'x 4, DBI 42915.

DBI Labor Broker Montoya explained that *even when they were present at the job sites, they did not keep sign-in sheets* — the DBI manager did.

> Investigator Loaisa: When the workers whom you brought in to the project came in to work, did they have to sign a sheet?
>
> DBI Labor Broker Montoya: Yes.
>
> Investigator Loaisa: A clock-in sheet?
>
> DBI Labor Broker Montoya: Yes.
>
> Investigator Loaisa: And who...? These workers you brought in to the project, who did they go to find this clock-in sheet?
>
> DBI Labor Broker Montoya: A manager of that company.
>
> Investigator Loaisa: So, at the DBI projects, was it a DBI manager?
>
> DBI Labor Broker Montoya: I would imagine.
>
> Investigator Loaisa: They didn't sign a clock-in sheet with you?
>
> DBI Labor Broker Montoya: No.[204]

DBI Labor Broker Montoya's interview clarifies an ambiguity in multiple Worker Packets that say DBI *and* DBI Labor Broker Montoya kept the time records, without providing more detail. DBI Labor Broker Montoya's own interview explains that DBI kept and administered the sign-in sheets on a daily basis, while DBI Labor Broker Montoya may have "kept" the sign-in sheets in the sense that they used the sign-in sheets to calculate the payment to Disputed Workers.[205]

In response, DBI disclaims any tracking of the Disputed Workers: "DBI does not provide or maintain any time records or payment information for employees or independent contractors of other companies."[206] Again, that conclusory statement is contrary to the reality described by the Disputed Workers, DBI Supervisor Ortiz, and DBI Labor Broker Montoya, as well as the sign-in sheets obtained by the Division when it visited DBI's job site.

The Division finds that DBI tracked hours worked by the Disputed Workers.

#### *iii. DBI Enforced Clothing and Gear Requirements for Disputed Workers*

The Disputed Workers consistently told the Division that DBI enforced safety and gear requirements for Disputed Workers:

Disputed Worker Lorenzo Quiroz explained to the Division:

> "They could also tell us, they could also tell us to wear the hard hat, because the general had already warned them a lot about it; we had to wore the safety goggles, I mean, they would also give us that... They would reprimand us, but because sometimes we didn't follow their instructions; which is a nuisance to wear the safety goggles when it is hot. So we'd take them off and all, and sometimes the general didn't tell us directly. Rather, it would tell them, and they would communicate it to us."[207]

---

[204] App'x 8, DLSS 9805.
[205] DBI Labor Broker Montoya produced few timesheets to the Division.
[206] Supplemental Response to Notice of Incomplete Response, App'x 7, DBI 15516.
[207] App'x 8, DLSS 1196. Grammatical error in original.

Disputed Worker Francisco Marquez told the Division:

> Investigator Loaisa: Sure, but DBI supervisors, I'm asking, could they correct you by saying like: "Hey, put your helmet on," or "Hey, you can't be here without a vest," something like that?
>
> Disputed Worker Marquez: Yes, yes, yes. The vest, helmet, iron tip shoes, and gloves.
>
> Investigator Loaisa: And could tell you, "Hey, put on your helmet, please?"
>
> Disputed Worker Marquez: Yes.[208]

Disputed Worker Jesus Ramirez told the Division:

> Investigator Loaisa: Thank you. So, Iván could discipline a worker that was doing something a bit unsafe, like not wearing a hardhat, goggles, or gloves.
>
> Disputed Worker Ramirez: Exactly."[209]

DBI Supervisor Ortiz and an employee of a DBI General Contractor (Taylor Kohrs) corroborated the Disputed Worker interviews. DBI Supervisor Ortiz confirmed that they could enforce safety gear requirements for Disputed Workers. The Taylor Kohrs' employee identified DBI Supervisor Ortiz as the one who would discipline Disputed Workers if they violated safety rules.[210]

The Division finds that DBI enforced safety and gear requirements based on the interviews of Disputed Worker, DBI Supervisor Ortiz and a General Contractor's employee.[211]

In sum, the foregoing evidence supports the Division's finding that DBI could and did exercise meaningful control over the Disputed Workers by controlling the method and manner of work performed by the Disputed Workers, including the controlling of their work schedules, the directing of when, where, or how they should perform work, and enforcing clothing and gear requirements. This finding supports the conclusion that the Disputed Workers are employees of DBI.

***e. DBI had Authority to Terminate a Disputed Worker Without Incurring Liability.***

Courts have long considered employer authority to terminate without liability an important indicator of control over the individual that is characteristic of employer-employee relationships.[212] The "right to terminate a

[208] App'x 8, DLSS 1138.
[209] App'x 9, DLSS 9299.
[210] App'x 11, DLSS 21510–12.
[211] DBI denies requiring its Admitted Employees to wear any gear at all. App'x 7, DBI 15518. At the least, DBI required its Admitted Employees to have adequate safety gear. *See e.g.,* App'x 11, DBI 21512 ("Yesterday the woman that was sweeping was walking around without goggles. I was on the second floor... here on the first floor. I first spoke to [DBI Supervisor] Julio [Ortiz]. I said, 'Tell her to put on the goggles.'"). The Division's finding is related to safety gear.
[212] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14 ("the right to terminate a service contract without liability is an important factor in determining [] whether the individual is free of control and direction [] because the right immediately to discharge involves the right of control [] []") (internal quotation marks omitted); *Butterfield*, 807 P.2d at 1220 ("[the] right to discharge someone without liability inherently involves the right to control and is inconsistent with the concept of independent contractor"); *Faith Realty & Dev. Co.*, 460 P.2d at 230 (employer's right to terminate the worker without liability "usually" shows that worker is an employee, whereas when that right is not present, the worker is "usually a contractor"); *Pagels*, 720 P.2d at 990 (reasoning that employer's "discharge" of worker supported finding of employer's "control and direction" over the worker); *Bonfils*, 241 P. at 736 ("[the] most important point 'in determining the main question (a contractor or employee), is the right of either to terminate the relation without liability'" in conducting worker classification analysis under Colorado's Workmen's Compensation Act) (quoting *Indus. Comm'n v. Hammond*, 236 P. 1006, 1008 (Colo. 1925)); *Perkins*, 907 P.2d at 675 ("[the]

service contract without liability" involves the "right to control" because "it gives" the employer the "power to control the smallest details and method of work."[213] Indeed, courts note that the "most important point" in answering the "main question (a contractor or employee)" is whether the employer has the right to "terminate the relation without liability."[214]

The touchstone when examining this factor is liability. In a typical contractor relationship, terminating the contractor either incurs a penalty or requires good cause or both.[215] The inverse of the power to terminate without liability is the power of the worker or contractor to quit. In a typical contractor relationship, quitting incurs a penalty or requires good cause.[216]

DBI Supervisors had the authority to terminate the Disputed Workers at DBI's sole discretion and without consequences, both in contract and in practice. The Disputed Workers were able to quit at any time without incurring liability. Disputed Worker Bautista quit without incurring liability or providing good cause.[217]

DBI denies that authority, stating that it "does not have the authority to terminate DBI's subcontractors' employees and/or independent contractors; rather, those subcontractors are the entities who have such authority."[218] Some contracts support DBI's position, reciting that the workers are only employees of the purported subcontractor.[219] However, that misses the mark. The question is whether DBI has the power to terminate workers from working on a specific project or for DBI in general, not whether DBI could terminate the Disputed Workers from the DBI Labor Broker.

With that distinction in mind, the contracts support a finding that DBI had the authority to terminate the Disputed Workers. Some of the contracts have provisions allowing DBI to terminate "subcontractor employees that are deemed to be unsatisfactory.[220] This is a power to terminate, not a *restriction* on that power. *None* of the contracts impose *restrictions* on the ability to terminate the Disputed Workers (i.e., only for cause) or *liability* for terminating the Disputed Workers.[221]

Even assuming the contracts did impose a limitation on DBI's authority to terminate (and they do not), that showing is insufficient. The Division must assess the relationship *in reality* where how the parties treat each other controls the classification of such parties — not labels, contract language, or the ways such parties refer to each other.[222] And when assessing how the parties treat each other, the evidence overwhelmingly supports the finding that DBI had the authority to terminate the Disputed Workers at will.

---

right to discharge someone without liability inherently involves the right to control because it gives the power to control the smallest details and method of work").

[213] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14; *Perkins*, 907 P.2d at 675.

[214] *Bonfils*, 241 P. at 736.

[215] *See Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 14.

[216] *See In re Pioneer Carriers, LLC,* 583 B.R. 891, 907 (Bankr. S.D. Tex. 2018) ("An Employee may quit work at any time without liability on the Employee's part. An Independent Contractor is legally responsible for job completion and, on quitting, becomes liable for breach of contract.").

[217] App'x 8, DLSS 1163.

[218] Response to Notice of Incomplete Response, App'x 7, DBI 15521.

[219] App'x 9, DLSS 11068.

[220] *E.g.*, DBI 52731, 53987, 54085.

[221] *E.g.,* DBI 52731, 53987, 54085.

[222] *See Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 2; *Butterfield*, 807 P.2d at 1221; *Van Noy*, 738 P.2d at 48.

In reality, DBI terminated Disputed Workers at will. Disputed Worker Estrada said that they were terminated by DBI:

> Investigator Bocanegra: No. Have you ever had a problem with DBI?
>
> Disputed Worker Estrada: Just once they fired me because I was working on the boom and a truck passed by and hit the boom, and they blamed me for having the boom in a place where I didn't have to work and they fired me.….
>
> Investigator Bocanegra: And the ones who fired you, were those from DBI?
>
> Disputed Worker Estrada: Yes.
>
> Investigator Bocanegra: And at that point, you were fired, by Eric, who was a supervisor at DBI.
>
> Disputed Worker Estrada: He was the one, he was the main DBI foreman.[223]

Disputed Worker Marquez told the Division that if DBI did not like their work, a worker would no longer be able to work for DBI and they witnessed other workers who were terminated by DBI:

> Investigator Loaisa: Okay... Okay, do you know if DBI supervisors had the ability to fire a worker from a job?
>
> Disputed Worker Marquez: Yes, yes, if the supervisor said, like, now, right now there's no more work, he would just tell you: "Talk to Santiago tomorrow to see where he'll fit you." And there you had to go and talk to Santiago and see where could Santiago send you; to another DBI project, you know what I mean?
>
> Investigator Loaisa: And did that happen when a supervisor didn't like a worker's job? Or, when did that happen?
>
> Disputed Worker Marquez: Yes, like that. For example, let's say they send me to work, and they didn't like my work. Then, they would tell you: "You know what? Talk to your contractor to send you to another job," or something like that, you know what I mean? Which it wasn't the case with me.…
>
> Investigator Loaisa: But did this happen with another one of your coworkers?
>
> Disputed Worker Marquez: For other friends... Or, well, others who worked there at the time, yes. I saw, that, well... It's just that in this job, you see people come and go... You know? Many people come and go…[224]

They continued to use an example, that DBI was able to terminate workers who violated safety rules because of DBI's close control of the job site:

> Investigator Loaisa: Right... Of course. And when there was, like, a violation of a policy about safety or quality; could supervisors correct subcontractors or contractor's workers?
>
> Disputed Worker Marquez: Yes, well, since we were in the building, we had to follow all the safety rules of the company and the general construction company, all of it. You know what I mean? If not, well, you're fired.[225]

[223] App'x 8, DLSS 1105.
[224] App'x 8, DLSS 1137.
[225] App'x 8, DLSS 1137–38.

Disputed Worker Marroquin explained that DBI was able to terminate workers and any termination would go through DBI's office:

> Investigator Loaisa: Could Mr. Julio Ortiz fire you from your job?
>
> Disputed Worker Marroquin: No, he could technically fire me. But he would have to talk to the office, and the office would make a decision.
>
> Investigator Loaisa: Which office?
>
> Disputed Worker Marroquin: DBI's office.
>
> Investigator Loaisa: And when you say you would be fired from your job, does that mean you would never work for DBI again? Or what does it mean?
>
> Disputed Worker Marroquin: I would think so.
>
> Investigator Loaisa: Okay. You'd be let out of a job. We knock on wood, right? But if it were to happen, right? If they wanted to fire you. This goes through DBI's office, right? Mr. Ortiz would talk with DBI's office. DBI's office, from what you understand, has the authority to take you off the project. Is that right?
>
> Disputed Worker Marroquin: Yes.[226]

During the interview of Disputed Worker Marroquin, a safety manager employed by a DBI General Contractor (Taylor Kohrs) interrupted the interview. The safety manager identified DBI Supervisor Ortiz as the supervisor of Disputed Worker Marroquin and the other drywall workers.[227] The safety manager explained that they would have the worker removed from the site by the DBI foreman.[228] The safety manager's understanding — an understanding that is necessary for them to perform their primary job duty — was that DBI had the authority to terminate the Disputed Workers.

Disputed Worker Quiñones said that DBI was able to fire them and they saw other workers removed from projects by DBI:

> Investigator Loaisa: Who could fire you?
>
> Disputed Worker Quiñones: DBI, I would think. He could say he didn't want me in this project anymore, but they would then send me to another DBI project with a different foreman. If he wanted, he would say, "Okay, well, I don't want you in this project anymore." But DBI has more projects, or I could go to another project with a different foreman.
>
> Investigator Loaisa: How do you know that's the policy?
>
> Disputed Worker Quiñones: Because it has happened before.
>
> Investigator Loaisa: That they didn't want you in a project?
>
> Disputed Worker Quiñones: No, not me, with other workers. [229]

Disputed Worker Quiñones noted that DBI, not DBI Labor Broker Rodriguez, "authorizes whether we can work or not."[230]

---

[226] App'x 11, DLSS 21507.
[227] App'x 11, DLSS 21510–12.
[228] App'x 11, DLSS 21510–12.
[229] App'x 11, DLSS 21565–66.
[230] App'x 11, DLSS 21566.

The Worker Packets are consistent with the interviews, stating that DBI and the purported subcontractors could terminate the Disputed Workers without any liability.

- Eddie Campos: "D.B.I. and Santiago M. hire and fire workers when they want without any problem."[231]
- Eloy Rodriguez: "D.B.I. could fire anyone they wanted, whenever they wanted."[232]
- Fransisco Jimenez: "They could fire me whenever they wanted."[233]
- Francisco Marquez: "D.B.I. and Santiago M. hire and fire workers without any issues."[234]
- Hector Lemus: "Santiago Millan fired us just because we disagreed with the deductions."[235]
- Jesus Ramirez: "D.B.I. and Santiago M fire workers when they want."[236]
- Jose Rodriguez: "Yes, D.B.I. could dismiss any worker any time, D.B.I.'s supervisors every day hired new workers and dismiss them."[237]
- Jose Lemus: "Santiago Millan dismissed us because we refused to be paid less."[238]
- Leopoldo Leyva: "They can hire and dismiss workers as they please."[239]
- Limber Lemus: "Santiago Millan dismissed us because we refused to be paid less."[240]
- Lorenzo Quiroz: "D.B.I. could fire me any time."[241]
- Pedro Martinez: "D.B.I. hire and fire workers as they please."[242]
- Valeriano Chairez: "He fired me and I was not paid."[243]

DBI Labor Broker Montoya's interview was unclear regarding authority to terminate Disputed Workers. Initially, Labor Broker Montoya stated that DBI could not fire a Disputed Worker that Labor Broker Montoya supplied.[244] However, Labor Broker Montoya then continued to clarify that they were not aware of any Disputed Workers who were terminated by them *or* DBI.[245] At best, assuming DBI Labor Broker Montoya's statements on this point are credible,[246] their statements are hypothetical and contradicted by the actual experience of Disputed

[231] App'x 8, DLSS 552.
[232] App'x 8, DLSS 580.
[233] App'x 8, DLSS 633.
[234] App'x 8, DBI 662.
[235] App'x 8, DLSS 743.
[236] App'x 8, DLSS 769.
[237] App'x 8, DLSS 847.
[238] App'x 8, DLSS 819.
[239] App'x 8, DLSS 926.
[240] App'x 8, DLSS 952.
[241] App'x 8, DLSS 973.
[242] App'x 8, DLSS 1050.
[243] App'x 8, DLSS 527.
[244] App'x 9, DLSS 9810.
[245] App'x 9, DLSS 9810–9811.
[246] DBI Labor Broker Montoya's statements on their ability to terminate Disputed Workers strain credulity. DBI Labor Broker Montoya claims there were no circumstances that could have made them fire the Disputed Workers; that they never once terminated a Disputed Worker; and that they did not even know if they had the power to terminate a worker. The Division does not find those claims credible because they are inconsistent with standard business operations and the information obtained from the Disputed Workers and DBI's Admitted Employees.

Workers who were terminated or saw other Disputed Workers terminated or removed from job sites. Nor do their statements bring into question DBI's ability to terminate *without liability.* The Division thus finds that Montoya's statements on this point do not weigh for or against DBI's authority to terminate Disputed Workers.

Similarly, DBI Supervisor Ortiz denies that they individually had the power to terminate Disputed Workers.[247] They instead described their power as limited to correcting the work of Disputed Workers.[248] This comports with the interview of Disputed Worker Marroquin, who told the Division that DBI Supervisor Ortiz could not personally terminate the Disputed Workers, but it would go through DBI's office.[249] Again, DBI Supervisor Ortiz's statements do not bring into question DBI's ability to terminate *without liability*, just his individual lack of power to unilaterally (without upper management approval) terminate Disputed Workers.

The record contains evidence that Disputed Workers were terminated from DBI's job sites. However, the record does not contain evidence that DBI *incurred liability* when it terminated Disputed Workers.

Based on evidence obtained from the Disputed Workers and a General Contractor employee, the Division concludes that DBI had the authority to terminate the Disputed Workers and to do so at its complete discretion without incurring liability. This finding supports a conclusion that the Disputed Workers are employees of DBI.

***f. DBI Restricted the Disputed Workers from Working for Third Parties at the Same Time They Performed Work for DBI***

When an employer, through contract or control of work conditions, restricts an individual's ability to hold competing employment at the same time the individual performs work for the employer, the employer evinces a degree of control over the individual indicative of an employer-employee relationship.[250] When examining whether DBI restricted the Disputed Workers' ability to hold competing employment *at the same time* they worked on DBI projects, "[i]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive."[251]

Given the parallels between the CWA and FLSA worker classification analyses, the Tenth Circuit's *Dole v. Snell* decision is instructive for applying this factor to the present case. There, as here, the question was whether certain workers (working as cake decorators) were employees or, as the employer (a bakery) claimed, independent contractors. A key representative of the cake decorators testified that the decorators were "free to work for other employers" or "free to decorate cakes at home for sale to third parties."[252] However, the court did not rely on this ostensible freedom alone but looked also to the realities of the working relationship, which showed that the decorators "worked an average of 50-60 hours a week at the bakery" and "much longer" hours "during holiday periods."[253] The bakery required its decorators to arrive by 9:00 a.m. and "stay until 6:00 p.m. or until all the cakes have been decorated" unless the employer granted permission for early departures.[254] The *Dole* representative

---

[247] App'x 11, DLSS 21540.
[248] App'x 11, DLSS 21540.
[249] App'x 11, DLSS 21507 ("he could technically fire me. But he would have to talk to the office, and the office would make a decision").
[250] *Baker*, 137 F.3d at 1441 (finding that an employer's project that renders a worker unable to offer services to third parties while the employer's project is ongoing is evidence of the employer's control over the worker); *Dole*, 875 F.2d at 808 (finding that, even though workers were permitted to offer services to third parties while working for employer, the economic realities of the employer-worker relationship and hours required by the employer demonstrated that workers could hardly conduct work for third parties, and as a result, such circumstances were evidence of the employer's control over the workers).
[251] *Dole*, 875 F.2d at 808 (examining "control" factor in FLSA misclassification context) (emphasis in original) (quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987)).
[252] *Id.* at 804.
[253] *Id.*
[254] *Id.*

decorator worked for a dairy approximately four times per year and chose not to decorate cakes for third parties even though some other decorators did.[255]

Under these circumstances, the Tenth Circuit reversed the district court's finding that decorators were "free to and do offer their services to outside and third parties while working for defendants" because, in reality, decorators "did so to a virtually insignificant degree insofar as there is anything shown in the record, with no indication of any income from such activity, and, in any event, nothing to indicate that incidental decorating for others involved an effort greater than might be done by any employee on his or her own time after hours, on weekends, or days off."[256] Thus, in reaching its ultimate conclusion that decorators were employees, not independent contractors, the Tenth Circuit reasoned that because the employer had regimented the time and place of the decorators' work, it was "virtually impossible to look upon these individuals as having the independence which characterizes a person conducting their own business."[257]

As in *Dole*, the economic realities here restrict Disputed Workers from operating independent businesses and holding competing employment at the same time they perform work for DBI. To examine an employer's degree of control in this context, the Division does not consider whether the Disputed Workers *could* technically work, or were contractually free to work, for a competing employer at the same time they performed work for DBI; the Division considers what the Disputed Workers *did* under these circumstances.[258]

Here, the Disputed Workers did not work for other employers at the same time they worked for DBI. Disputed Worker Marquez told the Division that they worked for DBI exclusively for *four years*:

> Investigator Loaisa: At any time, did Santiago or DBI ever restrict you from working for other construction companies?
>
> Francisco Márquez: Well... Honestly, almost never. Not really, you know? He always worked... Well, at that time he was always working for the DBI.
>
> Investigator Loaisa: Ok. And how did you know that?
>
> Francisco Márquez: What did I know?
>
> Investigator Loaisa: That he was working mostly for DBI.
>
> Francisco Márquez: Well, because we notice that... Well, I mean, since it was years in a row working there. We just worked in DBI projects, DBI buildings that take a year or a year and a half of work. I mean, he didn't move us... He didn't move us from that work, because... We did the job well and everything; and the foremen were happy with us at work.
>
> Investigator Loaisa: Ok, and during the four years you worked with Santiago, did you work on any non-DBI projects?
>
> Francisco Márquez: No, no, it was always for DBI. It was a job... It was a job there at Brush, but it was also from DBI.[259]

Disputed Worker Quiroz stated that they worked exclusively for DBI and DBI Labor Broker Millan:

[255] *Id.*
[256] *Id.* at 808.
[257] *Id.*
[258] *See Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 2; *Butterfield*, 807 P.2d at 1221; *Van Noy*, 738 P.2d at 48; *Dole*, 875 F.2d at 808.
[259] App'x 8, DLSS 1136. Disputed Worker Marquez continued to state that in his four years, he saw other Disputed Workers sent home by DBI. DLSS 1138.

> Investigator Loaisa: And when you were working for Santiago Millán, did you exclusively work on DBI projects?
>
> Disputed Worker Quiroz: Only for DBI. He would grab the DBI projects. He worked there. So he would grab the projects and include us all; the people.
>
> Investigator Loaisa: But only in DBI projects?
>
> Disputed Worker Quiroz: Yes.[260]

The Worker Packets support a finding that DBI restricted the Disputed Workers from performing work for other employers. All of the Worker Packets describe working *at least* forty hours per week for DBI,[261] which *in practice* precluded the Disputed Workers from working for other employers. Notably, those hours of work were determined by DBI, rather than the Disputed Workers, meaning the Disputed Workers could not even choose their own hours to facilitate other work

DBI states that "subcontractors work for other companies such as KHS&S, United Builders, Swinerton, Shaw, Spacecon, JNS, Randys Drywall Services, Star Drywall and Hollsinger at the same time."[262] However, that might be true for the *DBI Subcontractors and Labor Brokers*, but not for the *Disputed Workers*, as demonstrated by the Worker Packets and interviews. The reality of full time work for DBI prevents the Disputed Workers from working elsewhere.

Accordingly, the Division finds that DBI required the Disputed Workers to perform work, the nature of which, prohibited the Disputed Workers from conducting work for any third party *at the same time* they performed work for DBI. This finding supports a conclusion that the Disputed Workers are employees of DBI.

#### *g. The Division Concludes the Disputed Workers are Subject to the Control of DBI*

In sum, four of the factors support a finding that the Disputed Workers are subject to the control of DBI: (1) DBI supervises and directs their work; (2) DBI is able to terminate them without liability; (3) DBI determines the manner and method of performance; and (4) their work for DBI precluded their ability to work for third parties. Two of the factors support a finding they are not employees: (1) DBI does not *directly* control the hiring of the Disputed Workers (but it does *indirectly* control hiring by controlling staffing levels); and (2) DBI does not set the rate of pay or distribute pay for the Disputed Workers. By quantity, the factors show control by a score of 4-2.

Of course, whether the Disputed Workers are "employees" is not based on quantity. The Division must weigh the importance of the factors in this specific case. The factors are an aid to the ultimate determination: did DBI exercise a sufficient degree of control over the Disputed Workers? The Division concludes that it did.

The factors in favor of employee status weigh more heavily here. The ability to terminate without liability has been described as one of the most important factors and DBI wielded that powerful tool to control Disputed Workers on a daily basis. That daily control is distinct from a typical contractor relationship; it is typical of an

---

[260] App'x 8, DLSS 1177.

[261] App'x 8, Eddie Campos (DLSS 560), Eloy Rodriguez (DLSS 588), Ermelindo Lemus (DLSS 616), Francisco Jimenez (DLSS 643), Francisco Marquez (DLSS 670), Gonzalo Bautista (DLSS 712), Hector Lemus (DLSS 751), Jesus Ramirez (DLSS 774), Jose Lemus (DLSS 827), Jose Rodriguez (DLSS 855), Kelvin Lemus (DLSS 907), Leopoldo Leyva (DLSS 934), Limber Lemus (960), Lorenzo Quiroz (DLSS 981), Martin Estrada (DLSS 1005), Pedro Martinez (DLSS 1058), Valeriano Chairez (DLSS 1078).

[262] Response to Notice of Incomplete Response, App'x 7, DBI 15522.

employment relationship. Specifically, it is typical of staffing agency relationships where courts routinely find that the day-to-day supervision shows liability even though someone else found, hired, and paid the worker.[263]

The same confluence of factors is addressed in Interpretive Notice and Formal Opinion #10 ("INFO #10").[264] INFO #10 presents a hypothetical where one organization (MAT) hires a worker, Pat, to work at a different organization (HAT). HAT plays no role in hiring Pat. HAT is the organization that gives Pat directions on a daily basis, not MAT. Pat works on-site for HAT, not on-site for MAT. MAT has minimal communication with Pat. INFO #10 interprets Colorado law to conclude that HAT is an[265] employer of Pat because:

- HAT's degree of control is relatively high, despite one limit: Pat is retained for expert skills, so HAT's direction and evaluation don't include specific details of how to do the work.
- Pat performs HAT's primary work to a relatively high degree: not just sporadic expert setup / repair work, but also maintenance that is regularly needed for, and assures the functioning of, the core production equipment.
- MAT serves more as a mere placement agency than employer, finding labor for HAT without retaining any meaningful control over that labor.

The Division's interpretation here, as in INFO #10, is supported by courts that find a staffing agency's client to be an employer of the worker under the FLSA and other employment laws.[266] When considering this

---

[263] *Zheng v. Liberty Apparel Co*., 355 F.3d 61, 70 (2d Cir. 2003) ("in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them") (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 725, 67 S. Ct. 1473, 1474 (1947) (boners were employees of meatpacking plant even though independent boning supervisor fully controlled hiring and paying)); *Donovan v. Tavern Talent & Placements*, No. 84-F-401, 1986 U.S. Dist. LEXIS 30955, at *2 (D. Colo. Jan. 8, 1986) (topless dancers were employees of both talent agency who hired them and nightclubs where they performed, though nightclubs had no hiring role); *Freeman v. Kansas*, 128 F. Supp. 2d 1311, 1316 (D. Kan. 2001) ("Although plaintiff was a temporary employee of Key Staffing assigned to work at the State, the State exerted sufficient control by supervising plaintiff's daily activities and providing the place of work and the tools to work to conclude that the State was plaintiff's employer."); *Porter v. Erie Foods Int'l*, 576 F.3d 629, 634 n.5 (7th Cir. 2009); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344 (S.D.N.Y. 1984).

[264] Colo. Div. of Labor Standards & Statistics, *Interpretive Notice and Formal Opinion #10* ("INFO #10"), "Who Is and Isn't an Employee" (last updated Sept. 23, 2023) (available at https://cdle.colorado.gov/infos).

[265] See INFO #10, fn 8. INFO #10 does not consider whether both MAT and HAT are an employer of Pat.

[266] This arrangement is commonly called "vertical" joint employment. *See Salinas v. Comm. Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017). A different framing of the analysis in this citation is the test set forth in *Salinas:*

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
> (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 141-42 (4th Cir. 2017). The Division applies the joint employment test from *Salinas* when deciding *joint employment*, but, here, the Division is deciding employer status, as the Supreme Court did in *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 725, 67 S. Ct. 1473, 1474 (1947). Here, the distinction is immaterial — DBI would be a joint employer under the *Salinas* test as well and that analysis forms an alternative basis for the Division's legal conclusion of employer status based on the factual findings in this Citation.

specific split of factors, the Division finds instructive the cases deciding whether a staffing agency, the staffing agency's client, or both are "employers."[267] Those cases generally present the same split of factors as here: the staffing agency — DBI Labor Brokers — hires and pays the workers, but the staffing agency's client — DBI — supervises the workers with daily instruction and provides the job site.

In *Johnson v. Manpower Prof'l Servs., Inc.,* the Fifth Circuit found the staffing agency's client, Air Liquide, was an employer.[268] The staffing agency, Manpower Professional Services, was responsible for paying the plaintiff, maintaining pay records, and "removing any Assigned Employee at the request of" the Air Liquide. The Fifth Circuit noted the strength of those factors was weakened because the staffing agency, "while technically in charge of hiring and firing, does so only at Air Liquide's approval with respect to hiring and at Air Liquide's request with respect to firing." On the other hand, Air Liquide supervised workers on a daily basis (even though sometimes a staffing agency representative relayed instructions to workers from Air Liquide) and reviewed the workers' performance. The Court concluded Air Liquide was an employer of the plaintiff because "the more important right to control factors point" to the staffing agency's client as the employer.

In *McQueen v. Wells Fargo Home Mortg*, the Court found Wells Fargo was an employer of the plaintiff.[269] The staffing agency hired the plaintiff, paid the plaintiff, informed the plaintiff of work hours, and handled all employment issues, such that the plaintiff knew to contact the staffing agency if there were any questions. But "the plaintiff worked at Wells Fargo's facility, that Wells Fargo directed the plaintiff's work while she was there, that Wells Fargo approved the hours the plaintiff worked, and that Wells Fargo provided and paid for the materials used in the plaintiff's work." Because the plaintiff worked at Wells Fargo's job site and directed the plaintiff's work while at Wells Fargo, the Court concluded that Wells Fargo was an employer of the plaintiff.

Indeed, the weighing of the facts here mirrors *Johnson*, *McQueen*, and INFO #10. The Disputed Workers worked at DBI's job site and received instructions from DBI Supervisors, as in both cases and INFO #10. The DBI Labor Brokers serve the same purpose as MAT in INFO #10, "more as a mere placement agency than employer, finding labor for HAT without retaining any meaningful control over that labor."

*Johnson* offers nearly identical facts as here. As in *Johnson*, the Disputed Workers were only hired and fired at the request of DBI. The Disputed Workers here generally received daily instructions from DBI, but sometimes the instructions were channeled through a DBI Labor Broker in the same way that the employer in *Johnson* sometimes channeled instructions through a DBI Labor Broker. The DBI Labor Broker was responsible for hiring the workers, paying the workers, and removing the Disputed Workers from DBI sites at the request of DBI, just as the staffing agency in *Johnson* did.

*McQueen* too offers nearly identical facts. Both Wells Fargo and DBI provided the workplace, approved the hours worked (DBI did so by setting the schedule), and directed the work while the worker was at the respective workplaces, while the staffing agency and DBI Labor Brokers hired the Disputed Workers, paid them, and *informed* them (not set) of the work hours.

---

[267] These statutes apply a *narrower* definition of "employer." *See e.g., United States v. Rosenwasser, 323 U.S. 360, 363 n.3,* 65 S. Ct. 295, 89 L. Ed. 301 (1945) (describing the FLSA's definition of an employer as "the broadest definition that has ever been included in any one act."); *Haybarger v. Lawrence Cty. Adult Prob. & Parole, 667 F.3d 408, 415 n.6* (3d Cir. 2012) ("Title VII's definition of an employer is much narrower than the FMLA's and the FLSA's definition of an employer"). Therefore, a finding that a party is an "employer" under Title VII or the ADEA would support a finding of employer status under the FLSA and, in turn, Colorado law.

[268] 442 Fed. Appx. 977, 982 (5th Cir. 2011) (*per curiam*) (applying hybrid test under Title VII). Manpower Professional Services is unrelated to DBI Labor Broker Manpower.

[269] .955 F. Supp. 2d 1256, 1280 (N.D. Ala. 2013) (applying economic reality test under ADEA and Title VII).

The factors in favor of DBI are both mitigated. As described above, DBI exercised indirect control over the hiring of the Disputed Workers and over the rate of pay because it paid the subcontractor an hourly rate to pass through to the Disputed Workers (less an administrative fee to the purported subcontractor).

The fact that DBI had the power to terminate the Disputed Workers without liability, directed their work on a daily basis, provided the worksite, and precluded the Disputed Workers from working for a third party at the same time outweighs the fact that DBI Labor Brokers hired and paid the Disputed Workers particularly because those facts are weakened based on DBI's indirect control. Taken in totality, the Division concludes that DBI exercised direct and substantial control over the Disputed Workers on a daily basis when the Disputed Workers were at a DBI worksite.

### 4. DBI Did Not Establish That the "Independent Contractor" Exception Applies.

Because the Division has found that the Disputed Workers are "employees," under the CWA definition, the burden of persuasion shifts to DBI to demonstrate that the Disputed Workers are "independent contractors" as DBI claims.[270] The CWA creates a statutory exception for what is commonly called an "independent contractor," even though the CWA does not use that term. The CWA provides that an individual is not an "employee" if DBI can establish two conditions. First, the individual must be "primarily free from control and direction in the performance of the service, both under his or her contract for the performance of service and in fact." Second, the individual must be "customarily engaged in an independent trade, occupation, profession, or business related to the service performed."[271] The Division must narrowly construe this exception to ensure that the CWA's remedial purposes are fulfilled.[272]

For this exception to apply, DBI must demonstrate that the Disputed Workers met *both* conditions. The Division finds DBI has not met its burden. The Disputed Workers are neither free from DBI's control and direction, nor are they customarily engaged in an independent business related to the service performed.

#### *a. The Disputed Workers Were Not "Primarily Free from Control and Direction in the Performance of the Service" Either in Fact or in Contract.*

DBI fails to establish the first condition for two reasons. First, as thoroughly discussed above, the Division finds that, *in fact*, DBI exercised substantial control over the Disputed Workers and provided them significant direction in the performance of their framing and drywall services. In making that finding, the Division considered, weighed, and addressed the evidence pertinent to "control" factors, including evidence and arguments submitted by DBI in its responses to the Notice of Investigation and the First, Second, Third, and Fourth Notices of Evidence.

---

270 *Bermel*, 2017 COA 20, ¶¶ 36–38 (evaluating whether employer met its burden in establishing the "independent contractor" exception under the CWA); *see also* *Skintastique, Inc.*, DLSS Claim #5555-18, 0078-19 (Hearing Officer Decis. No. 20-048, July 23, 2020) ("The burden was on [the employer] to prove that the claimants were not employees."); *CMC Transportation, Inc.*, DLSS Claim #5354-18 (Hearing Officer Decis. No. 20-038, June 15, 2020) ("The burden was on [the employer] to prove that the claimant met the independent contractor exception to the definition of employee."); *see also Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 11 (applying CESA and explaining that "the employer has the burden of demonstrating that a putative employee is in fact an independent contractor"); *ICAO v. Softrock Geological Servs.*, 2014 CO 30, ¶ 9, 325 P.3d 560 ("The employer has the burden of proving that the putative employee is an independent contractor under section 8-70-115.").

271 C.R.S. § 8-4-101(5) (emphases added).

272 *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 27 (quoting *Montemayor v. Jacor Commc'ns, Inc.*, 64 P.3d 916, 923 (Colo. App. 2002)); *see also* C.R.S. § 8-6-102 ("Whenever this article or any part thereof is interpreted by any court, it shall be liberally construed by such court."); 7 CCR 1103-1, COMPS Order #38, Rule 8.7(A) ("Under the C.R.S. § 8-6-102 'Construction' provision …, applicable to" various rules implementing the CWA, the "provisions of the COMPS Order shall be liberally construed, with exceptions and exemptions accordingly narrowly construed").

Thus, the Division reaffirms that, under the totality of the circumstances, that DBI failed to prove that the Disputed Workers were "primarily free from control and direction in the performance of" their service in fact.

Second, DBI cannot show that the subcontractor agreements required the Disputed Workers to be primarily free from control and direction in the performance of their services. DBI must also show that the Disputed Workers were "primarily free from control and direction in the performance of the service … **under his or her contract** for the performance of service."[273] In *Bermel v. BlueRadios, Inc.*, the Colorado Court of Appeals determined that the first prong of the "independent contractor" exception contained two distinct parts that DBI must satisfy — that the individual "was free from control and direction" … "*both under his or her contract* for the performance of service *and* in fact."[274] Whether the individual was free from control and direction under their contract was a separate issue that required examining the parties' contract.[275] When the contract does not clearly convey that the individual is free from control and direction in the performances of services required under that contract, the contract alone cannot establish this part of the first prong.[276]

Accordingly, the Division finds that DBI has failed to establish the first prong of the CWA's two-prong independent contractor exception. Because both prongs must be satisfied for a worker to qualify for the statutory exception, the Disputed Workers are CWA-covered "employees."

***b. The Disputed Workers Were Not "Customarily Engaged in an Independent Trade, Occupation, Profession, or Business Related to the Service Performed."***

Though the Division need not analyze the second prong for the "independent contractor" exception because DBI has failed to meet the first one, the Division also finds that DBI has failed to carry its burden of proving that the Disputed Workers "were customarily engaged in an independent trade, occupation, profession, or business related to the framing and drywall services they performed."[277]

The CWA two-pronged "independent contractor" exception test is materially similar to the "independent contractor" exception in the Colorado Employment Security Act ("CESA"),[278] making CESA precedent helpful (albeit not controlling) in analyzing worker classification under the CWA. CESA cases indicate that the analysis of the second prong of the "independent contractor" exception is fact-sensitive and depends on the totality of the circumstances.[279] "[W]whether an individual is customarily engaged in an independent business is a question that can only be resolved by applying a totality of the circumstances test that evaluates the dynamics of the relationship between the putative employee and the employer; there is no dispositive single factor or set of factors."[280] In evaluating whether the Disputed Workers are engaged in a customarily independent business, the Division has incorporated the Colorado Supreme Court's CESA analysis and considered the following factors:

1) Whether the individual performing work is free to work for others, or is required to work exclusively for the person or business for whom services are performed;

---

[273] C.R.S. § 8-4-101(5) (emphasis added); *see also Bermel*, 2017 COA 20, ¶ 36.
[274] *Bermel*, 2017 COA 20, ¶ 36.
[275] *Id.* at ¶¶ 36–38.
[276] *Id.* at ¶ 38. The *Bermel* court reversed the district court's grant of summary judgment because the parties' contract, which restricted the worker's right to work in competing employment, did not establish that there was no genuine dispute of material fact that the worker was free from control and direction under the terms of that contract. *Id.*
[277] C.R.S. § 8-4-101(5).
[278] *Compare* C.R.S. § 8-70-115 *with* C.R.S. § 8-4-101(5).
[279] *See Indus. Claim Apps. Office v. Softrock Geological Servs.*, 2014 CO 30, ¶¶ 13–16; *W. Logistics, Inc. v. Indus. Claims Apps. Office*, 325 P.2d 550, 551 (Colo. 2014); *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 15.
[280] *Softrock*, 2014 CO 30, ¶ 19.

2) Whether the alleged employer provided "plans and specifications" regarding the work or whether the employer oversaw the actual work or instructed the individual as to how the work will be performed;
3) Whether the individual is paid a fixed or contract rate or an hourly wage or a salary;
4) Whether the employer can terminate the work during the contract period without liability;
5) Whether the employer provides more than minimal training for the individual;
6) Whether the employer provides tools or employment benefits to the individual;
7) Whether the employer dictates the time of performance;
8) Whether the employer makes checks payable to the trade or business name of the individual or pays the individual personally; and
9) Whether the employer maintains its operations as separate and distinct from the individual's business, or if it combines its business operations in any way with the individual's business.[281]

However, the Colorado Supreme Court emphasized that these nine *Softrock* factors are "not … exhaustive[.]"[282] Other relevant factors may include whether the worker:

- had their own business cards, a separate business address, or a separate business telephone number;
- made a financial investment in the services performed such that they could be vulnerable to financial loss in connection with performance of the service;
- set the price of the service;
- employed assistants; and
- carried their own liability or workers' compensation insurance.[283]

The Tenth Circuit, relying on federal authority, has identified as relevant factors, whether the employment is for a fixed period (more typical for an independent contractor) or an indefinite period (more typical for an employee).[284] However, although a fixed period or "short duration" of employment relationships is typical for independent contractors, those characteristics are representative of an independent contractor relationship when such timing is due to "any choice or decision on the part of" the workers, and not the nature of the work.[285] Other Colorado state courts have examined whether the worker was engaged in a trade, occupation, profession, or business

[281] *Softrock*, 2014 CO 30 at ¶ 15. C.R.S. § 8-70-115(1)(c) lists factors for classification of a worker as an employee for the purposes of unemployment insurance. Although this list may help the analysis required to determine "employee" status under the CWA, this list does not include *all* factors that may be relevant to determining "employee" classification under the CWA. *See id.* at ¶ 17 ("Given the wide array of factors that could be relevant, we conclude that rather than requiring a rigid check-box type inspection, a more accurate test to determine if an individual is customarily engaged in an independent business involves an inquiry into the nature of the working relationship. The ICAO and Division may consider the nine factors in section 8-70-115(1)(c) and any other information relevant to the nature of the work and the relationship between the employer and the individual.").

[282] *Id.* at ¶ 15; *see also Visible Voices, Inc*, 2014 COA 63, ¶ 26 (noting that the CESA "identifies factors that may be relevant in many cases, but clearly, in some cases some of those factors may not be relevant").

[283] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 15 (citing *Visible Voices, Inc.*, 2014 COA 63, ¶ 26).

[284] "'Generally speaking, "independent contractors" often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and of indefinite duration.'" *Baker*, 137 F.3d at 1442 (quoting *Dole*, 875 F.2d at 811).

[285] *Baker*, 137 F.3d at 1442 (affirming district court's finding that worker's fixed and short employment periods with construction company supported employee classification where workers' "short duration of their employment relationships and their frequent relocation to find employment" were "clearly due to the intrinsic nature of oil and gas pipeline construction work rather than any choice or decision on the part of plaintiffs").

that existed separate and apart from any relationship with a particular employer and that would survive the termination of that relationship.[286]

In the following subsections, the Division examines each factor with a focus on whether DBI has met its burden to prove that, under the totality of the circumstances, the factor supports that the Disputed Workers were engaged in an independent business related to the service they performed.

*i.* *Softrock* Factors

1. DBI Imposed Work Conditions that Prohibited the Disputed Workers from Working for Others While Working for DBI.

As analyzed in detail above Section II.B.3.f, DBI imposed work conditions upon the Disputed Workers, specifically as to hours worked per day and per week, that restricted the Disputed Workers from freely working for other companies *at the same time* they performed work for DBI. This factor weighs against a finding that these workers operated independent businesses.

2. DBI Supervised the Actual Work Performed, and Instructed the Disputed Workers on How to Perform the Work.

As analyzed in detail above in Section II.B.3.c., DBI supervised, directed, and corrected the Disputed Workers' work, instructing them on how to perform the work. This included directions on which units to service and when, prioritization of tasks for units, corrections when work was performed "wrong," alterations to how work was performed, and enforcement of safety requirements. To the extent DBI argues to the contrary, as found above, the conclusions it has proffered is not credible and is outweighed by the credible evidence provided by the Disputed Workers and obtained by the Division. This factor weighs against a finding that these workers operated independent businesses.

3. DBI Directly, or as Directed through the DBI Labor Brokers, Paid on an Hourly or Piece Rate Basis, not a Fixed Contract Amount.

As analyzed in detail above in Section II.B.3.b, DBI generally set and adjusted the pay rates and payment methods for Disputed Workers, which included hourly or piece rates, not a fixed contract amount. Further, DBI contracted with DBI Labor Brokers for an hourly rate per hour of labor, not a fixed rate.[287] This factor weighs against a finding that these workers operated independent businesses.

4. DBI Could and Did Terminate at Will.

As analyzed in detail above in Section II.B.3.e, DBI had authority to terminate the Disputed Workers without incurring liability and exercised that authority. This factor weighs against a finding that these workers operated independent businesses.

5. DBI Did Not Provide More than Minimal Training.

The Worker Packets generally deny receiving any substantial training from DBI, even safety training.[288] A couple of the Worker Packets describe safety meetings, but do not provide enough detail to conclude they are safety

---

[286] *Long View Sys. Corp. USA v. ICAO*, 197 P.3d 295, 300 (Colo. App. 2008) (applying CESA) (citing *Midland Atlas Co. v. South Dakota Dep't of Labor*, 538 N.W.2d 232, 235–36 (S.D. 1995)); *see also SZL, Inc. v. ICAO*, 254 P.3d 1180, 1184 (Colo. App. 2011) (affirming finding of "covered employment" under CESA in part because "there was no indication … claimant operated a business providing truck driving services immediately before or after his association with" the employer).
[287] *E.g.*, App'x 4, DBI 55707.
[288] App'x 8, For example, Eddie Campos (DLSS 549), Eloy Rodriguez (DLSS 577), and Francisco Marquez (DLSS 659).

*training.*[289] Some Worker Interviews describe a single orientation meeting as potential training,[290] but a single orientation is minimal training.

On the other hand, Disputed Worker Marroquin stated that DBI provided them training to receive a necessary certification.[291] However, most of the other workers stated they did not need any training because they have been doing drywall work for years.[292]

DBI states that if "an opportunity arises for safety training (equipment, scaffold, swing stage) etc. and capacity is available in the class, DBI will contact the subcontractor representatives to inquire if they are interested in attending."[293] But the record does not indicate how frequently these trainings were either made available to the Disputed Workers or actually attended by the Disputed Workers.

Because the record is unclear on how frequently DBI made training available and the Disputed Workers attended the training, the record is insufficient to decide either way. The Division concludes this factor is neutral.

6. DBI Did Not Provide Tools or Benefits Other Than Materials and Equipment.

An employer that provides tools or benefits to an individual treats that individual more like an employee rather than an independent contractor.[294] However, an employer may provide "materials and equipment" to an individual without treating the individual like an employee.[295]

DBI provided the Disputed Workers with building materials: drywall, drywall screws, etc, and large equipment — boom lifts and scissor lifts[296] — as well as scaffolding.[297]

The Worker Packets consistently describe providing their own tools, such as screw guns, lasers, and bags.[298] Two Disputed Workers, in interviews, referenced power tools that DBI lends; however, those interviews are unclear what specific power tools DBI lends or how frequently those tools are used.[299]

The record does not have references to any benefits provided by DBI to the Disputed Workers and DBI denies providing the Disputed Workers with benefits.[300]

---

289 App'x 8, For example, Jose Rodriguez (DLSS 590), Jesus Ramirez (DLSS 776), Lorenzo Quiroz (DLSS 983).
290 App'x 8, Francisco Marquez (DLSS 1146) and Valeriano Chairez (DLSS 1210).
291 App'x 11, DLSS 21517.
292 App'x 8, DLSS 577, 605, 723, 740, 816, 844, 896, 923, 949.
293 Response to Notice of Incomplete Response, App'x 7, DBI 15519.
294 *See Softrock*, 2014 CO 30, ¶ 15 (concluding that independent contractor CESA exception depends in part on factor that employer will not provide tools or benefits to the individual).
295 *Id.*
296 App'x 9, DLSS 11010–11.
297 "Investigator Bocanegra: Ok, and who provides the larger tools? The scaffolds? Investigator Bocanegra: DBI." DLSS 1092. Further, DBI's contracts with general contractors require DBI to provide scaffolding. DLSS 2904, 3062, 3423.
298 Eddie Campos (DLSS 560), Eloy Rodriguez (DLSS 581), Ermelindo Lemus (DLSS 616), Francisco Jimenez (DLSS 643), Francisco Marquez (DLSS 670), Gonzalo Bautista (DLSS 712), Hector Lemus (DLSS 751), Jesus Ramirez (DLSS 774), , Jose Lemus (DLSS 827), Jose Rodriguez (DLSS 855), Kelvin Lemus (DLSS 907), Leopoldo Leyva (DLSS 934), Limber Lemus (DLSS 960), Lorenzo Quiroz (DLSS 981), Martin Estrada (DLSS 1005), Pedro Martinez (DLSS 1058), Valeriano Chairez (DLSS 1078).
299 App'x 11, DLSS 21518, DLSS 21558.
300 Response to Notice of Incomplete Response, App'x 7, DBI 15521 ("DBI does not provide any benefits to individuals who are not DBI employees.")

Therefore, the Division finds that while DBI provided "materials and equipment" to the Disputed Workers, it generally did not provide the Disputed Workers with "tools" or "benefits." The Division finds that this factor supports a finding that the independent contractor exception applies to the Disputed Workers.

7. DBI Dictated the Time that Work was Performed.

As analyzed in detail above in Section II.B.3.d, DBI dictated the time the Disputed Workers performed work by controlling their work schedules and directing when and where they performed their work.

8. DBI Required Receipt of Payments through the Nominal Subcontractors.

When an employer issues payment in the name of the business or directly to a business, that factor may indicate that the payee is operating an independent business.

Here, DBI issued payment to DBI Labor Brokers, who in turn issued payments directly to the Disputed Workers in their individual names, not the name of an independent business entity.[301]

In addition to the control of contracting and pay rates (discussed above), DBI exercised significant control over the manner and distribution of wage payments. While checks were issued on behalf of the DBI Labor Broker, DBI itself hand-delivered payments to the Disputed Workers of DBI Labor Broker Rodriguez.[302]

The Colorado Supreme Court has emphasized that the second condition for the "independent contractor" exception, "[s]tripped of legal jargon, … asks whether the worker is an independent contractor with his or her own business that provides the particular services."[303] So, the Division must focus on whether the fact that DBI issues payment first to the DBI Labor Broker weighs in favor of finding that the Disputed Workers had their own independent businesses. The Division finds that the DBI Labor Brokers were a conduit for payment from DBI to Disputed Workers, in the workers' own names, and that these payments were functionally from DBI to the Disputed Workers, even when DBI did not hand the checks directly to Disputed Workers. This factor weighs against a finding that the Disputed Workers operated independent businesses.

9. DBI Combines Its Business Operations with the Labor and Services Performed.

As a preliminary matter, the Division has found that the Disputed Workers do not operate their own independent businesses; therefore, the Division cannot assess whether DBI combined its business operations with the Disputed Workers' "businesses."

However, the Division finds that DBI has combined its business operations with labor and services performed by the Disputed Workers. To that point, the Division's previous analysis of the degree to which the Disputed Workers perform the primary work of DBI is relevant. As analyzed in detail in above in Section II.B.2, the Division finds that DBI frequently relied and depended on the Disputed Workers' labor to fulfill its contractual obligations with general contractors and earn revenue for such fulfillment. DBI thus integrated the labor and services of the Disputed Workers into its own business. The Division finds that DBI combined its business operations with

---

[301] App'x 8. Eddie Campos (DLSS 5), Edson Marroquin (DLSS 21514-15), Eloy Rodriguez (DLSS 575), Ermelindo Lemus (DLSS 603), Dublas Quiñones (DLSS 21575-576), Francisco Jimenez (DLSS 630), Francisco Marquez (DLSS 667), Gonzalo Bautista (DLSS 721), Hector Lemus (DLSS 738), Jesus Ramirez (DLSS 764), Jose Lemus (DLSS 814), Jose Rodriguez (DLSS 843), Kelvin Lemus (DLSS 894), Leopoldo Leyva (DLSS 921), Limber Lemus (DLSS 947), Martin Estrada (DLSS 992), Pedro Martinez (DLSS 1045).
[302] *See* Section II.B.3.b, above.
[303] *Colo. Custom Maid, LLC*, 2019 CO 43, ¶ 15.

the labor of Disputed Workers, consistent with an employment relationship. This factor weighs against a finding that these workers operated independent businesses.

*ii. Other Factors Indicating an Independent Business.*

1. DBI Has Not Produced Other Evidence of an Independent Trade or Business.

Whether Disputed Workers "(1) had business cards, a business address, or a business telephone number; (2) made a financial investment in the services such that he or she could be vulnerable to financial loss in connection with performance of the service; (3) had his or her own equipment; (4) set the price of the service; (5) employed assistants; and (6) carried his or her own liability or workers' compensation insurance" is also relevant to whether the Disputed Workers engaged in an independent trade or business.[304]

Here, DBI failed to provide any evidence that the Disputed Workers engaged in an independent business:

(1) There is no evidence that the Disputed Workers had their own business cards, business address, or business telephone number. All Worker Packets and Interviews deny having their own business cards, business address, and business telephone number.[305]

(2) There is no evidence that the Disputed Workers made substantial financial investment in their services. A substantial financial investment refers to an individual's "large capital expenditures," such as risk capital or capital investments, that indicate that the individual bears a risk in the failure of their provision of services — "not negligible items, or labor itself."[306] Hand tools are generally considered "negligible items[;]" and courts "have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status."[307] Thus, the fact that some Disputed Workers provided their own hand tools does not constitute a "substantial financial investment" indicative of an independent business. By contrast, DBI made substantial expenditures to furnish material and equipment, such as significant quantities of drywall mud, scaffolding, and heavy machinery, as well as committing to the deliverables stated in its contracts with the general contractors,[308] opening up the business to hundreds of thousands of dollars in liability should it fail to provide those deliverables. The Disputed Workers were not parties to those contracts and did not bear this liability.

(3) As noted above, there is no evidence Disputed Workers meaningfully provided necessary equipment.[309]

(4) No workers set the prices for their services. DBI, through labor brokers, set the rate for and paid for the Disputed Workers' labor and services.[310]

---

[304] 2019 CO 43, ¶ 15.

[305] App'x 8, Eddie Campos (DLSS 552-53), Edson Marroquin (DLSS 21514-15), Eloy Rodriguez (DLSS 575, 580-81), Ermelindo Lemus (DLSS 608-09), Dublas Quiñones (DLSS 21575-76), Francisco Jimenez (DLSS 635-36), Francisco Marquez (DLSS 662-63), Gonzalo Bautista (DLSS 726-27), Hector Lemus (DLSS 743-44), Jesus Ramirez (DLSS 769-70), Jose Lemus (DLSS 819-20), Jose Rodriguez (DLSS 847-48), Kelvin Lemus (DLSS 899-900), Leopoldo Leyva (DLSS 926-27), Limber Lemus (DLSS 952-53), Martin Estrada (DLSS 997-98), Pedro Martinez (DLSS 1050-51).

[306] *Baker*, 137 F.3d at 1442 (quoting *Dole*, 875 F.2d at 810).

[307] *Id.* (quoting *Dole*, 875 F.2d at 810).

[308] App'x 9, DLSS 2908.

[309] *See* Section II.B.4.b.i.6, above.

[310] *See* Section II.B.3.b, above.

(5) No evidence revealed that Disputed Workers employed assistants to help them with performing work for DBI. All Worker Packets and Interviews say they did not.[311]

(6) No evidence showed that any Disputed Worker carried their own individual policy for liability or workers' compensation insurance; instead, DBI directed the Disputed Workers to perform work for DBI, but receive payment from DBI Labor Brokers, so that DBI Labor Brokers could provide insurance coverage for the Disputed Workers — not DBI.[312] All Worker Packets and interviews state that the Disputed Workers did not have their own insurance policies.[313]

Therefore, the Division finds that these additional factors weigh in favor of finding that the Disputed Workers were not engaged in an independent business.

2. The Disputed Workers Performed Work for Indefinite and Short Periods of Time Typical of Employment Relationships in the Construction Industry.

Work for a fixed period or "short duration" in some cases is more indicative of an independent contractor relationship than an indefinite period when fixed or short periods of work are due to "any choice or decision on the part of" the workers, not the nature of the work.[314] Indeed, "however temporary" a working relationship "may be," the relationship can become "permanent and exclusive" — more common for employee-employer relationships — for temporary durations depending on the frequency that workers return for similar work.[315]

On this point, in *Baker v. Flint Engineering and Construction Co.*, when Flint, an oil and gas pipeline construction company, would hire "a variety of workers, including rig welders" to complete its construction projects[,]"[316] the welders "rarely work[ed] for Flint more than two months at any one time, and rarely for more than three months during any twelve-month period."[317] Flint foremen supervised the rig welders' work; however, these foremen did not provide project blueprints, welding specifications and standards, nor tell welders how to weld or how long a particular weld should take.[318] These rig welders "remain[ed] on the job site until the necessary welding is done."[319] "Because of the nature of their work, rig welders … would be unemployed after completion of a project if they did not seek work on new projects. Accordingly, it [was] [] common for rig welders to work for

[311] App'x 8, Eddie Campos (DLSS 550), Edson Marroquin (DLSS 21514-15), Eloy Rodriguez (DLSS 578), Ermelindo Lemus (DLSS 606), Dublas Quiñones (DLSS 21575-76), Francisco Jimenez (DLSS 633), Francisco Marquez (DLSS 660), Gonzalo Bautista (DLSS 724), Hector Lemus (DLSS 741), Jesus Ramirez (DLSS 767), Jose Lemus (DLSS 817), Jose Rodriguez (DLSS 845), Kelvin Lemus (DLSS 897), Leopoldo Leyva (DLSS 924), Limber Lemus (DLSS 950), Lorenzo Quiroz (DLSS 972), Martin Estrada (DLSS 995), Pedro Martinez (DLSS 1048).

[312] *See* App'x 4, DBI 53155-53160 and App'x 9, DLSS 4280-4283.

[313] App'x 8, Eddie Campos (DLSS 553), Edson Marroquin (DLSS 21514-15), Eloy Rodriguez (DLSS 581), Ermelindo Lemus (DLSS 609), Dublas Quiñones (DLSS 21575-76), Francisco Jiminez (DLSS 636), Francisco Marquez (DLSS 663), Gonzalo Bautista (DLSS 727), Hector Lemus (DLSS 744), Jesus Ramirez (DLSS 770), Jose Lemus (DLSS 820), Jose Rodriguez (DLSS 848), Kelvin Lemus (DLSS 900), Leopoldo Leyva (DLSS 927), Limber Lemus (DLSS 953), Martin Estrada (DLSS 998), Pedro Martinez (DLSS 1051).

[314] *Baker*, 137 F.3d at 1442 (affirming district court's finding that worker's fixed and short employment periods with construction company supported employee classification where workers' "short duration of their employment relationships and their frequent relocation to find employment" were "clearly due to the intrinsic nature of oil and gas pipeline construction work rather than any choice or decision on the part of plaintiffs").

[315] *Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (disagreeing with district court and explaining that seasonal harvesting workers who worked temporary durations for employer "year after year" supported "permanency and duration of the relationship" representative of an employee-employer relationship); *see also Donovan v. Gillmor*, 535 F. Supp. 154, 162 (N.D. Ohio 1982) ("However temporary the relationship may be, it is nevertheless true that the relationship is permanent to the extent that the migrants work only for defendants during the season.").

[316] *Id.* at 1439.

[317] *Id.* at 1442.

[318] *Id.* at 1439.

[319] *Id.* at 1442.

several different companies during the course of a year."[320] While the rig welders' short duration of work and frequent relocation of work for Flint exhibited "characteristics generally typical of independent contractors[,]" the court determined that the cause of these work conditions mattered more to the worker classification.[321] In support of this conclusion, the Tenth Circuit explained that the "short duration of their employment relationships and their frequent relocation to find employment" are "clearly due to the intrinsic nature of oil and gas pipeline construction work rather than any choice or decision on part of" the rig welders.[322] The court articulated that, in these instances, the timing *itself* is of "little relevance in determining" whether rig welders were "employees or independent contractors."[323] Therefore, similar to the way a seasonal employee is an employee for a short period of time (the season), the Tenth Circuit concluded that a rig welder could be a Flint employee for a short period of time (the time it takes to build and operate the pipeline).

So too, here. When DBI won a bid to perform drywall and framing services for general contractors, it hired Disputed Workers, through a DBI Labor Broker, to perform labor and services for fixed periods of time, even if the exact amount of time was unknown. But the "fixed" nature of the jobs is due to the nature of the construction industry — not the choice of Disputed Workers. Several Disputed Workers stated that they worked as long as needed to complete the project prior to moving on to another DBI project or working for another company, and, as detailed above, many of the Disputed Workers did work exclusively for DBI for long periods of time (years).[324] DBI Labor Broker Montoya corroborated those statements, explaining that the work was temporary and when the project was done, the Disputed Workers would get sent to a different site or need to find a different project run by a different contractor.[325]

DBI has provided no contrary evidence, expressly denying any knowledge of "the time periods for which DBI's subcontractors employ their employees or engage independent contractors."[326]

Thus, the Division finds that, like the *Baker* rig welders, based on the overwhelming evidence in the record, even those Disputed Workers who worked for DBI during short, temporary, or fixed periods of time worked as DBI "employees" during such periods.

In sum, the Division concludes that DBI has not carried its burden to show the independent contractor exception applies.

Based on a full analysis of the independent business exception factors, the Division concludes that the Disputed Workers performed drywall labor and services for DBI as "employees," and, as a result, they are entitled to the full protections of all applicable wage and hour laws, including the CWA, HFWA, PHEW, and their implementing regulations.

---

[320] *Id.* at 1439.
[321] *Id.* at 1442.
[322] *Id.*
[323] *Id.; see* 29 CFR § 795.105(b)(3) (as codified by USDOL: "Where a lack of permanence is due to operational characteristics that are unique or intrinsic to particular businesses or industries and the workers they employ, this factor is not necessarily indicative of independent contractor status unless the worker is exercising their own independent business initiative.")
[324] Ermelindo Lemus (DLSS 609), Francisco Marquez (DLSS 663), Hector Lemus (DLSS 744), Jose Lemus (DLSS 820), Kelvin Lemus (DLSS 900), Limber Lemus (DLSS 953), Valeriano Chairez (DLSS 1072).
[325] App'x 9, DLSS 9810.
[326] Response to Notice of Incomplete Response, App'x 7, DBI 15521.

## C. The Evidence Is Representative of the Terms and Conditions of Employment for Disputed Workers at All DBI's Job Sites.

Based on the scope and consistency of the evidence, the Division finds that this evidence adequately represents the terms and conditions of employment for all Disputed Workers during the Covered Period, and that the findings of this Citation apply to all of these workers.

This Direct Investigation operates under a similar evidentiary framework as wage class or collective litigation. In such cases, "limited, representative discovery" is the usual method of proof and is considered to provide sufficient reliability and necessary economy of party and court resources,[327] and is particularly appropriate when the need for such evidence arises from an employer's failure to keep legally-required records.[328] In FLSA cases in particular, "the use of representative testimony to establish class-wide liability has long been accepted."[329] The weight of authority "overwhelmingly recognize[s] the propriety of using representative testimony to establish a pattern of violations that include similarly situated employees who did not testify."[330] When representative evidence, like a "representative or statistical sample[,]" is "a means to establish or defend against liability" and is reliable in proving or disproving the elements of a relevant cause of action, individuals and classes can rely on such representative evidence to establish either individual or class-wide liability.[331] "In many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability."[332]

---

[327] *Nelson v. Am. Std, Inc.*, Nos. 2:07-CV-10-TJW-CE, 2009 WL 4730166, at *3, 2009 U.S. Dist. Lexis 113448, at *8 (E.D. Tex. Dec. 4, 2009) (surveying case law and noting that "limiting discovery in a FLSA action to a relevant sample minimizes the burden...on the plaintiffs 'while affording the defendant a reasonable opportunity to explore, discover and establish an evidentiary basis for its defenses....The fundamental precept of statistics and sampling is that meaningful differences among class members can be determined from a sampl[e]...[if the] group of 'Discovery Plaintiffs' is a statistically acceptable representative sample of the entire group of opt-in Plaintiffs" (quoting *Smith v. Lowe's Home Ctrs.,* 236 F.R.D. 354, 356-58 (S.D. Ohio 2006)); *see also, e.g., Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 188, 192 (S.D.N.Y. 2014) ("'[I]t is well-established that the [plaintiff] may present the testimony of a representative sample of employees as part of his proof of the *prima facie* case under the FLSA.'" (quoting *Reich v. S. New England Tel. Corp*., 121 F.3d 58, 67 (2d Cir. 1997)).

[328] *See Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1307 (10th Cir. 2014) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ("jury could reasonably rely on representative evidence to determine class-wide liability because Tyson failed to record the time actually spent by its employees on pre- and post-shift activities"); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 371–72 (4th Cir. 2011)).

[329] *Monroe v. FTS USA, LLC*, 860 F.3d 389, 408 (6th Cir. 2017); *see Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (representative testimony from twelve employees was sufficient to establish a pattern of wage violations).

[330] *Monroe*, 860 F.3d at 408 (collecting cases). *Monroe* relied upon several authorities, *e.g., Garcia*, 770 F.3d at 1307 (quoting *Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 992 (9th Cir. 2006), in holding that "[t]he class action mechanism would be impotent" without drawing class-wide conclusions from representative proof); *Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("[I]t is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the [FLSA] prima facie case..."); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); *Brock v. Tony & Susan Alamo Found.*, 842 F.2d 1018, 1019–20 (8th Cir. 1988) ("[T]o compensate only those associates who chose or where chosen to testify is inadequate in light of the finding that other employees were improperly compensated."); *Ho Fat Seto*, 850 F.2d at 589 (holding, based on representative testimony, "[t]he twenty-three non-testifying employees established a prima facie case that they had worked unreported hours"); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985) (holding that it "would thwart the purposes of the sort of representational testimony clearly contemplated by *Mt. Clemens*" to require testimony of a pattern or practice to refer to all non-testifying employees); *Donovan v. Burger King Corp.*, 672 F.2d 221, 224–25 (1st Cir. 1982) (limiting testimony to six plaintiffs from six of defendant's sites "in light of the basic similarities between the individual restaurants"); *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (based on testimony from sixteen representative employees and a report on six employees that found "employees in this type of job consistently failed to report all the overtime hours worked," "the trial court might well have concluded that plaintiff had established a prima facie case that all thirty-seven employees had worked unreported hours").

[331] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55 (2016).

[332] *Id.* at 455 (quoting MAN. OF COMPLEX LITIG. § 11.493, p. 102 (4th ed. 2004)).

Yet, representative evidence "does not require … statistical principles to ensure representativity[,]" nor does it require the presentation of a statistical study.[333]

The Division finds the representative evidence in this case to be reliable, both over job sites, time (from January 1, 2018 to May 17, 2022), and certain DBI Labor Brokers.

First, the evidence is consistent over time. On September 12, 2023, DBI told the Division, "the information provided in DBI's original and supplemental responses regarding its business practices is still accurate."[334]

At each of the job sites examined in detail, DBI consistently established the terms and conditions of the Disputed Workers work: setting their hours, assigning tasks, supervising their work and providing feedback and quality control. The DBI Supervisors were consistent over time and job sites. The DBI Supervisors identified in 2020 — Ivan Hernandez-Marquez, Tony Garcia, Saul Cera, Julio Ortiz, Xavier Ortega, and Michael Connelly – appear on 2023 project lists that the Division obtained from DBI and some of the same supervisors were present at the DBI Site Visit — Tony Garcia, Saul Cera, and Julio Ortiz.[335]

Second, the evidence is consistent across job sites. DBI was unable to produce any evidence it treated the Disputed Workers differently at any of these 19 sites — even when the Division asserted that evidence it gathered was representative of how DBI treats Disputed Workers at sites from which the Division did not gather evidence beyond what DBI provided. The Division's November 15, 2023, Supplemental Notice of Evidence advised DBI:

> Evidence collected in this case indicates that all drywall workers at issue in this case[336] appear to have been subject to comparable terms and conditions in the performance of their work in terms of:
>
> - the manner and method of
>   - contracting,
>   - setting pay rates and work schedules,
>   - tracking and reporting work hours,
>   - receiving payment;
> - the nature of the work that such workers performed;
> - supervision or control of work performed;
> - training or instruction;
> - required uniforms;
> - provision of supplies and equipment (whether by the worker or others);
> - applicable workplace rules, including safety-related rules;
> - requirements for termination;

---

[333] *DeLuca v. Farmers Ins. Exch.*, No. 17-cv-00034-EDL, 2019 U.S. Dist. LEXIS 155308, at *16–18 (N.D. Cal. Sept. 11, 2019) (citing *Monroe*, 860 F.3d at 401) (quoting *Pierce v. Wyndham Vacation Resorts*, 922 F.3d 741, 748–49 (6th Cir. 2019)).
[334] App'x 9, DLSS 9990.
[335] App'x 9, DLSS 11037, 11050; DLSS 9965, 9995.
[336] The footnote in the original document reads:

> Please see the Division's Notice of Investigation (NOI), dated November 23, 2020, App'x 1; NOI Demand numbers 4 and 7 through 24 provide specific requests for information and documents relating to workers' terms and conditions of work. As in the NOI, 'workers' are defined herein as "any individual(s) (i.e., person(s)) who worked for, or performed labor or services for or on behalf of, DBI including any individuals it classified as either independent contractors or employees. Work is performed "for or on behalf of" DBI if your company benefited from or paid (directly or indirectly) for the work. "Workers," as used in this request (and in the NOI), includes all individuals performing work for or on behalf of DBI during the period covered by this investigation (January 1, 2018 to present), whether or not classified as employees of DBI, regardless of how you refer to these workers, and includes without limitation individuals you refer to as "independent contractors," "subcontractors," or "contractors"; and individuals (whether employees or otherwise) performing work or services on your behalf for any person or entity with whom you contract for drywall services.

- limitations on competition;
- employment benefits;
- workers' compensation coverage;
- liability insurance coverage;
- indicia or independent businesses, including business cards, offices, websites, office telephone numbers, employment of employees or subcontractors, and/or other clients; and
- any requirement to personally perform the work.

If you believe that any such workers were subject to different terms and conditions of employment in terms of the items described above, please designate these individuals in your response by providing each worker's name, and a specific description of how the individual worker's terms and conditions of employment were materially different. Please also produce any supporting documentation and/or evidence that you would like the Division to consider in this investigation, including any responses, documentation, and/or evidence relevant to the Worker Questionnaires described on page 1 of this Notice of Evidence.[337]

DBI declined to provide a response and thus provided no claim of variance in the terms and conditions of work for Disputed Workers.[338] DBI has thus conceded that such commonality existed, with full awareness that evidence indicated commonality across all Disputed Workers at all locations and times.

Third, the evidence is consistent across DBI Labor Brokers. The below job sites had the same conditions based on the time period and DBI Labor Brokers present. The Division primarily obtained evidence from three DBI Labor Brokers: Edgar Montoya, Millan, and Rodriguez. The record offers no basis for distinguishing the sites where those three brokers worked. Those sites, according to DBI (through December 2020),[339] are as follows.

DBI Labor Broker Montoya provided workers for:

| Dates | Project |
|---|---|
| March 2018 - June 2019 | Speer and Bannock #566 |
| August 2018 - May 2019 | Steamboat Clef #589 |
| November 2018 - June 2019 | Top Golf #590 |

DBI Labor Broker Millan provided workers for:[340]

| Dates | Project |
|---|---|
| November 2018 - November 2019 | Speer and Bannock #566 |
| October 2020 - November 2020 | XDEN2-Sunday #619 |
| May 2019 - July 2019 | Eben Ezer 2/3a #585 |
| January 2019 - December 2019 | Steamboat Clef #589 |
| March 2019 - August 2019 | Top Golf #590 |
| December 2018 - March 2019 | LGS Building 8 Expansion #593 |
| November 2018 - November 2019 | Modera CapHill #594 |
| August 2019 - November 2020 | XDEN1-Sunday #605 |
| October 2019 - February 2020 | Medical Center of Aurora Women's Center #607 |
| August 2019 - August 2020 | Longmont HS #609 |
| January 2020 - August 2020 | 6900 Layton/Bellview Station #611 |
| April 2020 - October 2020 | Eben Ezer 3b/4 #613 |
| April 2020 - November 2020 | Wray PK-12 #616 |

337 Supplemental Notice of Evidence, App'x 9.
338 App'x 9, DLSS 55700 (E-mail Response to Second Notice of Evidence).
339 App'x 4, DBI 15530.
340 App'x 4, DBI 15530.

| Dates | Project |
|---|---|
| November 2019 - November 2019 | Karis Park 70 #617 |
| June 2020 - October 2020 | XDEN2-Sunday #619 |
| March 2020 - July 2020 | WPS - Westminster Academy #620 |
| March 2020 - July 2020 | WPS - Fairview Elementary #622 |
| March 2020 - July 2020 | WPS - Early Childhood Center #623 |
| March 2020 - July 2020 | WPS - Scott Carpenter Bldlg. #624 |
| February 2020 - November 2020 | Lakewood Senior Living #625 |
| June 2020 - July 2020 | Bear Creek Elementary #626 |
| May 2019 - October 2019 | Bishop Elementary School #599 |

DBI Labor Broker Rodriguez provided workers for:[341]

| Dates | Project |
|---|---|
| March 2018 - February 2020 | Speer and Bannock #566 |
| June 2019 - November 2020 | XDEN1-Sunday #605 |
| June 2019 - December 2019 | Medical Center of Aurora Women’s Center #607 |
| October 2019 - May 2020 | Longmont HS #609 |
| January 2020 - July 2020 | 6900 Layton/Bellview Station #611 |
| November 2019 - July 2020 | Wray PK-12 #616 |
| November 2019 - unknown | Karis Park 70 #617 |
| June 2020 - November 2020 | XDEN2-Sunday #619 |
| February 2020 - April 2020 | WPS - Fairview Elementary #622 |
| February 2020 - April 2020 | WPS - Early Childhood Center #623 |
| February 2020 - April 2020 | WPS - Scott Carpenter Bldlg. #624 |
| May 2020 - August 2020 | Compass Montessori #627 |
| June 2019 - September 2019 | Denver Storage #595 |

The Division finds that *all* of the above work sites are substantially similar. The Division finds that the control of workers was substantially similar on all of the projects listed above. Accordingly, the Division concludes that the findings apply to other DBI Labor Brokers present on the above work sites.

In addition to the DBI Labor Brokers discussed above, the Division applies this finding to the workers of three additional DBI Labor Brokers: Manpower Services, New Era Drywall, and Pedro Stubbs Enterprises. This determination is based on the overlapping projects (but not limited to overlapping projects). Below is the list of projects, with overlapping projects indicated in bold.

[341] App’x 4, DBI 015530.

**New Era Drywall:**[342]

| Dates | Project |
|---|---|
| June 2018 - August 2019 | **Speer and Bannock #566** |
| July 2018 - December 2018 | Maddox Elementary #580 |
| October 2018 - July 2019 | **Eben Ezer 2/3a #585** |
| January 2019 - March 2019 | **Steamboat Clef #589** |
| May 2019 - November 2019 | **Medical Center of Aurora Women's Center #607** |
| April 2019 - September 2019 | **Denver Storage #595** |
| February 2019 - August 2019 | Bennett Elementary CLEF #596 |
| December 2018 - February 2019 | Superior Marketplace Stickley Core & Shell & Tenant #597 |
| June 2019 - July 2019 | Guardian Self Storage Aurora #601 |

**Pedro Stubbs Enterprises:**[343]

| Dates | Project |
|---|---|
| June 2020 - October 2020 | **Eben Ezer 3b/4 #613** |
| August 2020 - November 2020 | **Wray PK-12 #616** |
| March 2020 - June 2020 | **Lakewood Senior Living #625** |
| June 2020 - August 2020 | **Compass Montessori #627** |

**Manpower Services:**[344]

| Dates | Project |
|---|---|
| September 2019 - October 2019 | **Steamboat Clef #589** |
| September 2019 - November 2019 | **Medical Center of Aurora Women's Center #607** |
| November 2019 - April 2020 | **6900 Layton/Bellview Station #611** |
| February 2020 - unknown | **WPS - Early Childhood Center #623** |
| May 2019 - November 2019 | **Bishop Elementary School #599** |

Those projects significantly overlap those of other DBI Labor Brokers. Those matches are bolded in the project lists above. The record has no evidence work conditions were different, even where there was no overlap.

Therefore, the Division's finding extends to all jobs worked by DBI Labor Brokers: Manpower, New Era, and Pedro Stubbs, even when they did not directly overlap with DBI Labor Brokers Montoya, Millan, and Rodriguez. That is, the level of control extends to the worksites where New Era Drywall worked without overlap: Maddox Elementary, Bennett Elementary CLEF, Superior Marketplace Stickley Core & Shell & Tenant #597, and Guardian Self Storage Aurora #601.

This finding is also supported by the contracts signed by both Labor Brokers New Era and Pedro Stubbs that are identical in form to the other DBI Labor Brokers.

For example, the contracts for Speer and Bannock #566 are nearly identical for New Era and Zeta (Millan).[345] The Article 1 Scope of Work slightly differs with the New Era contract adding sign-in sheets, clean

[342] App'x 4, DBI 015530.
[343] App'x 4, DBI 015530.
[344] App'x 4, DBI 015530.
[345] Compare DBI 53155-53160 with DBI 55706-55711.

work area, and reporting all accidents.[346] Those slight differences are immaterial. The payment in Article 2 is nearly identical, and they are an identical form contract for Articles 3-22.

**DBI Labor Broker New Era:**

**Inclusions: Subcontract agree to furnish and pay for all labor and supervision necessary to do the following work:**

- *Provide labor, related personal tools, and safety equipment for framing of interior walls, exterior walls, ceilings. Soffits, blocking and backing, exterior sheathing and finishing of drywall*
  - *Safety at a minimum includes appropriate clothing, work boots, safety glasses, hard hats, hi-visibility clothing/safety vests, gloves, hearing protection, and fall protection including harnesses, lanyards, retractables.*
- *Training for subcontractors employees to include at a minimum: PAF Certifications; Scissor and Boom lift certifications; Use of Fall Protection. Training records to be provided. If subcontractor employees work on swing stage scaffolding, they must also be certified and experience for this work*
- *Each subcontractor employee shall have all required tools including but not limited to: "27 caliber shotgun, Pocket Laser, Cordless impact drill or drywall gun, stilts clamps, tape measure, speed square, string line etc.*
- *Experienced Journey men only for skilled trade, unless prior approval, that can meet/exceed expected levels of safety, quality and productions. Subcontractor agrees to replace subcontractor employees that are deemed to be unsatisfactory within 48 hours.*
- *Attend Job site orientation as required*
- *Follow all jobsite specific safety rules, Diversified Builders Safety Rules and OSHA laws as applicable*
- *Cell phone use by unauthorized employees is explicitly prohibited except at breaks and lunch.*
- *Age of all manpower supplied must be 18 or older.*
- *Weekly payments for 10 payment cycles, biweekly there after.*
- *Maintain a clean work area on throughout the day.*
- *Provide a sign in sheet to contractor for workers assigned to job on a weekly basis. Sign in sheet should contain typed names of all subcontractor employees assigned to the project.*
- *Any and all accidents or near misses shall be reported to contractor foreman immediately.*

An hourly rate of $___28______ for skilled trade work that is performed by employees of Subcontractor or its employees. Such rate is inclusive of all taxes and of all costs incurred by Subcontractor. In the event that hours in excess of 40 hours in a work week (overtime) are required due to project schedule, an hourly rate of $___13____ for skilled trade. Contractor shall be notified if overtime hours are required at least 24 hours prior to the overtime work taking place. [347]

---

[346] Compare DBI 53155-53160 with DBI 55706-55711. DBI did not retain the sign-in sheets from New Era, assuming that New Era provided them to DBI.
[347] App'x 4, DBI 53155-53160.

**DBI Labor Broker Zeta:**

**Inclusions: Subcontract agree to furnish and pay for all labor and supervision necessary to do the following work:**

- *Provide labor, related personal tools, and safety equipment for framing of interior walls, exterior walls, ceilings. Soffits, blocking and backing, hanging of drywall, exterior sheathing and finishing of drywall*
  - *Safety at a minimum includes appropriate clothing, work boots, safety glasses, hard hats, hi-visibility clothing/safety vests, gloves, hearing protection, and fall protection including harnesses, lanyards, retractables.*
- *Training for subcontractors employees to include at a minimum: PAF Certifications; Scissor and Boom lift certifications; Use of Fall Protection. Training records to be provided*
- *Each subcontractor employee shall have all required tools including but not limited to: "27 caliber shotgun, Pocket Laser, Cordless impact drill, stilts clamps, tape measure, speed square, string line etc.*
- *Experienced Journey men only for skilled trade, unless prior approval, that can meet/exceed expected levels of safety, quality and productions. Subcontractor agrees to replace subcontractor employees that are deemed to be unsatisfactory within 48 hours.*
- *Attend Job site orientation as required*
- *Follow all jobsite specific safety rules, Diversified Builders Safety Rules and OSHA laws as applicable*
- *Cell phone use by unauthorized employees is explicitly prohibited except at breaks and lunch.*
- *Age of all manpower supplied must be 18 or older.*
- *Weekly payments*

An hourly rate of $__28______ for skilled trade work that is performed by employees of Subcontractor or its employees. Such rate is inclusive of all taxes and of all costs incurred by Subcontractor. In the event that hours in excess of 40 hours in a work week (overtime) are required due to project schedule, an hourly rate of $__12.5____ for skilled trade. Contractor shall be notified if overtime hours are required at least 24 hours prior to the overtime work taking place. [348]

Importantly, these contracts are for *workers* to complete the primary work of DBI, as opposed to the contracts for *work*, meaning the same "primary work" analysis applies to the contracts with other contractors.

The Division finds that evidence establishing that the Disputed Workers are DBI "employees" is representative evidence of DBI's treatment of the Disputed Workers at all worksites during the Covered Period, supporting the finding in this Citation that all of these Disputed Workers were DBI employees. Therefore, the Division's finding applies to *all* DBI job sites for the full investigatory period, January 1, 2018, to May 17, 2022, and to *all* Disputed Workers supplied by DBI Labor Brokers Edgar Montoya, Manpower, Santiago Millan, New Era, Pedro Stubbs, and Rodriguez.[349]

**D. <u>Phase 1 Violations Found.</u>**

The Disputed Workers were and are DBI employees entitled to the protections of Colorado labor laws that DBI violated when it deprived these workers of correct legal employment status.

The Division concludes that DBI violated multiple provisions of four Colorado wage and hour statutes, and implementing regulations, with respect to its employees:

1) DBI failed to keep and produce pay statements to the Disputed Workers in violation of the Colorado Wage Act ("CWA"), C.R.S. sections 8-4-103(4) and (4.5);

2) DBI failed to provide notice of employee rights, including wage, paid sick leave, and public health whistleblower protections in violation of Minimum Wage Orders ("MWOs"), Colorado Overtime and Minimum Pay Standards ("COMPS") Orders, the Healthy Families and Workplaces Act

[348] App'x 4, DBI 55706-55711.
[349] This finding does not preclude a finding that other DBI Subcontractors are actually employees, such as JBII Constructions, after further investigation. Those contracts are distinct from the contracts at issue in this Citation because (1) they are for a fixed price and (2) they are potentially *not* to perform DBI's primary work. *See,* III.B.2, above.

("HFWA"), and the Public Health Emergency Whistleblower Act ("PHEW") to Disputed Workers and DBI's Employees;

3) DBI interfered with and failed to provide HFWA rights, including paid sick leave, and protections to the Disputed Workers; and

4) DBI failed to pay overtime premium pay to Disputed Workers.

DBI implicitly contends that it had no obligation to comply with these laws because the Disputed Workers were not DBI employees. As explained above, the evidence disproves this contention. Because the Division has found above that the Disputed Workers were DBI "employees" under the CWA, Colorado Minimum Wage Act ("CMWA"), HFWA, PHEW, and their implementing rules, the Division likewise finds that DBI *did* have an obligation to comply with those labor standards.

These three types of violations are directly related to DBI's misclassification of its employees as independent contractors. And, in turn, these three violations have obscured the resultant monetary harms to workers: for example, without pay statements, it is difficult to calculate how much overtime DBI failed to pay and, without notice of HFWA rights, it is difficult to calculate how much sick leave workers were owed. As a result, the Division is addressing these violations in two phases: the first phase addresses the notice-based violations and provides additional notice and evidence demands related to unpaid wages; the second phase will address those unpaid wage violations. This two-phase approach gives DBI clear notice of the Division's foundational findings and conclusions in Phase 1, while also giving it opportunity to gather additional records, now that the Division has found that it was the Disputed Workers' employer, to show the amount of wages it has paid and owes the Disputed Workers. The Division demands additional records and information from DBI for this purpose below.

### 1. DBI Failed to Provide and Retain Disputed Worker Pay Statements in Violation of C.R.S. § 8-4-103(4) and (4.5).

Pursuant to C.R.S. section 8-4-103(4):

> Every employer shall at least monthly, or at the time of each payment of wages or compensation, furnish to each employee an itemized pay statement in writing showing the following:
> (a) Gross wages earned;
> (b) All withholdings and deductions;
> (c) Net wages earned;
> (d) The inclusive dates of the pay period;
> (e) The name of the employee or the employee's social security number; and
> (f) The name and address of the employer.

Rule 12 of MWO #34 and 35, and Rule 7 of COMPS #36, 37, and 38, all have identical language on recordkeeping:

> Every employer shall keep at the place of employment, or at the employer's principal place of business in Colorado, a true and accurate record for each employee which contains the following information: (A) name, address, occupation, and date of hire of the employee; (B) date of birth, if the employee is under 18 years of age; (C) daily record of all hours worked; (D) record of credits claimed and of tips; and (E) regular rates of pay, gross wages earned, withholdings made, and net amounts paid each pay period.

Under C.R.S. section 8-4-103(4.5) and its implementing rules, employers must retain these records for "a period of at least three years after the wages or compensation were due" and make them "available for inspection by the division, and the employer shall provide copies of the records upon request by the division or the employee." If an employer fails to keep or produce such records, this same statute provides that the Division "may impose a

fine of up to two hundred fifty dollars per employee per month ... up to a maximum fine of seven thousand five hundred dollars."[350]

The Division initiated this investigation by sending a Notice of Investigation to DBI and notifying that it was under investigation for "[f]ailing to provide workers itemized pay statements,"[351] specifically directing DBI's attention to C.R.S. § 8-4-103, and hyperlinking the Colorado Wage Act.[352] The Division also ordered DBI to produce documents responsive to the following demand:

> Any and all pay statements issued to all workers who worked for, or performed labor or services for or on behalf of, Diversified Builders Incorporated d/b/a DBI from January 1, 2018, to the date of this Notice.

DBI responded to this request by stating, "Respondent objects to this request to the extent it seeks information that is not relevant to the investigation and is overly broad and unduly burdensome. Subject to, and without waiving all objections, responsive documents will be provided"[353] and producing pay statements for DBI Admitted Employees. DBI then "supplemented its production to include invoices from other entities that DBI has contracted with regarding work performed, and payments made, under those contracts during the requested time period."[354] DBI did not produce pay statements for Disputed Workers in either response. There are no pay statements for Disputed Workers in the record from DBI.

DBI's misclassification does not excuse its failure to maintain or produce pay statements and records for the Disputed Workers in violation of C.R.S. section 8-4-103(4) and (4.5), MWO Rule 12, and COMPS Rule 7.

The Division concludes that DBI violated its recordkeeping obligations when it did not maintain, retain, or produce pay statements for the Disputed Workers It also violated its recordkeeping obligations when it failed to maintain records of time worked by the Disputed Workers, as required by applicable rules.

DBI's recordkeeping violation is egregious because it *did* have time records, even after it knew it was under investigation for violations of recordkeeping requirements, it was previously under investigation for the same violations, and it freely contracted to maintain such records.

DBI was previously investigated by the U.S. Department of Labor for nearly identical practices: misclassifying workers and failing to maintain adequate records.[355] To resolve that investigation, DBI freely agreed that it would "maintain a record of all hours worked on a daily basis of all workers performing Drywall Install Services as DBI employees *or* ***pursuant to contract with DBI for hourly workers***, and maintain such time records for a period of not less than three (3) years."[356] DBI produced no records of hours worked by the Disputed Workers who worked pursuant to a contract with DBI for hourly workers. There is no evidence in that record that DBI changed its practices as result of its negotiated consent judgment with the U.S. Department of Labor.

More damning is that DBI *did* have records; it chose not to retain them *even after* the US Department of Labor investigation *and* the Division's Notice of Investigation.[357] In limited instances, DBI produced documents

---

350 C.R.S. § 8-4-103(4.5).
351 Notice of Investigation, Appx. 1, at 2.
352 *Id.*
353 App'x 2, DBI 2.
354 App'x 4, 15532-33.
355 App'x 9, DLSS 10720.
356 App'x 9, DLSS 10722.
357 Or, alternatively, DBI did retain those documents but willfully chose not to produce any such documents to the Division. The Division need not decide which is the case. It is also a violation to fail to produce those documents to the Division and that is an independent basis for a fine. C.R.S. § 8-4-104(4.5).

including hours worked by Disputed Workers, but those documents only existed through mistake — most were sign ins from Disputed Workers who accidentally signed in on DBI sign-in sheets rather than a DBI labor broker's.[358] That is, the Division was able to identify Disputed Workers when they signed in on the wrong sheet.

DBI kept the sign-in sheets long enough to use the timesheet for its own purposes, disputing invoices. DBI disputed invoices from Labor Brokers, correcting invoices with time units as small as a half-hour[359] — a correction that is only possible if DBI had records of time worked by Disputed Workers. Other invoices have direct references to time sheets for Disputed Workers, such as "Do you have any kind of sign in for Jesus, Jose, or Julio?? I don't"[360] and "paying for extra 8 hours will not match time cards. OK per Ron."[361]

Furthermore, DBI's obligation is to maintain *accurate* records. It did not. The records that do exist are inaccurate; the records understate, or omit entirely, overtime worked.

The Disputed Workers routinely worked later than sign-in sheets indicated. The late work is corroborated by an e-mail from General Contractor Milender White to DBI, noting that DBI "drywallers" were on site 5:40 PM on September 7, 2018. The record contains no sign-in sheets showing multiple DBI workers on that site after 5:40 PM. The Division was able to identify one week where a single DBI employee reported working from 12 PM to 8 PM.[362] But that work was performed in May 2019 by a single worker, not multiple drywallers without supervision as stated in the Milender White e-mail. Another time, the Division identified a DBI supervisor who signed out as late as 5:30 PM.[363] That too does not prove the records are accurate — Milender White's report was that there was *no* supervisor. The Division was, at this stage, unable to identify any specific Disputed Workers who worked on September 7, 2018, and therefore, does not include those performing the evening work when assessing penalties, even though there is adequate information to infer underpayment.

DBI and DBI labor brokers' **invoices** are inaccurate and undercount overtime — their invoices do not match the limited sign-in sheets that were produced.[364] DBI invoiced a general contractor for "14 men" working 8 hours of overtime each for a total of 112 hours on a *single* Saturday, December 15, 2018.[365] DBI's payroll records for the pay period ending December 15, 2018 show only 10 Admitted Employees working overtime on that project for a *total* of 56.5 hours for the *whole week*, less than half of the amount it billed to the general contractor. Only three Admitted Employees submitted time cards showing 8 hours worked on December 15.[366] Therefore, records should reflect eleven Disputed Workers receiving 8 hours of overtime for December 15.

The records do not. On invoices to DBI, Labor Broker Millan did not bill it for overtime that week;[367] Labor Broker Rodriguez billed 14 overtime hours for the *week*;[368] and Labor Broker New Era billed for 8 overtime hours on December 15. New Era's bill was for a laborer at a substantially lower rate than a drywaller. (Those 8 hours

---

[358] *See, e.g.*, App'x 4 DBI 52561, 52555, 52914, 52926, 52929, 52945, 54309, 54314, 54236.
[359] *See, e.g.,* App'x 4, 52417, 52604, 53526, 53184, 53220, 53238, 53526, 53793, 53836, 54100.
[360] App'x 4, DBI 53806.
[361] App'x 4, DBI 52729. DBI did not produce the timecards or sign-in sheet referenced. It is unclear why DBI was paying more hours than were shown on the invoice. Another invoice states "hourly report attached." App'x 4, DBI 54297.
[362] App'x 4, DBI 39561
[363] 2/26/19, App'x 4, DBI 37776
[364] The Division uses them to calculate the number of Disputed Workers for the purposes of fines because the invoices *understate* the number of hours worked.
[365] App'x 9, DLSS 2304. The invoice is for a single day. DBI submitted change orders for work performed on a daily basis on December 13, 14, 17 (2 hours of overtime for 10 men), 18 (2 hours of overtime for 10 men), and 19. App'x 9, DLSS 2302–03, 2374–80.
[366] App'x 4, DBI 35908–36.
[367] App'x 4, DBI 55831.
[368] App'x 4, DBI 53571.

should not be counted in DBI's invoice to the general contractor — the laborer rate is approximately half of the drywaller rate and DBI billed the higher rate.) Even including the 8 hours, that leaves over 40 hours of overtime unaccounted for that DBI billed to a general contractor but, according to DBI's records, it did not pay to its workers as overtime *and* that time worked does not exist on its sign-in sheets for December 15.[369]

Two of the Disputed Workers — Francisco Marquez and Eddie Campos — are identified as having worked on December 15.[370] This corroborates their worker packets claiming overtime on December 15, 2018, on the Speer and Bannock project.[371] DBI produced no evidence to contradict those claims. Additionally, the sign-in sheet from December 15, 2018 shows Francisco Marquez originally reporting that they worked 8-4:30, but later changing their entry to 8-3:30, suggesting that they may have been instructed to report lower hours on the sign-in sheet.[372]

On a different project, DBI billed 32 hours of overtime worked by 4 workers on March 9, 2019.[373] Per DBI sign-in sheets, only two of its Admitted Employees worked that week, each for only 5 hours of overtime.[374]

Accordingly, the Division concludes that DBI violated the recordkeeping of C.R.S. section 8-4-103(4) and (4.5), Rule 12 of MWO #34 and 35, and Rule 7 of COMPS #36, 37, and #38.

**2. DBI Failed to Provide Disputed Workers with Notice of Wage and Other Rights in Violation of MWOs, COMPS Orders, the WARNING Rules, HFWA, PHEW.**

DBI failed to provide adequate notice to employees of their rights to (1) paid sick leave under HFWA, C.R.S. sections 8-13.3-401 to 418; (2) protection from retaliation for reporting working conditions that create a health risk in a public health emergency under PHEW, C.R.S. sections 8-14.4-101 to 109; and (3) wage and hour protections under the MWOs #34 and #35 and COMPS Orders #36, #37, and #38.

***a. Applicable Notice and Posting Laws.***

Colorado employers must inform workers of their rights as to paid sick leave and public health emergencies. The Healthy Families and Workplaces Act (HFWA), C.R.S. §§ 8-13.3-401 et seq. (as of July 14, 2020), and the Public Health Emergency Whistleblower Law (PHEW), C.R.S. §§ 8-14.4-101 et seq. (as of July 11, 2020), as implemented by the Colorado Whistleblower, Anti-Retaliation, Non-Interference, and Notice-Giving Rules ("WARNING Rules"), 7 CCR 1103-11, include poster and notice requirements for employers.[375]

HFWA, at C.R.S. § 8-13.3-408(2), requires employers to provide notice to employees of their rights by:

> (a) supplying each employee with a written notice containing the information specified …; and
>
> (b) displaying a poster … created pursuant to subsection (3) … in a conspicuous and accessible location in each establishment where the employer's employees work ….

---

[369] App'x 4, DBI 35867–75. It is possible that DBI submitted incorrect change orders to the general contractor or maintained inaccurate records, but that is a violation of an its obligation to maintain *accurate* pay records. In addition, because DBI failed to maintain accurate pay records, the Division may draw an adverse inference that either the Disputed Workers or Admitted Employees worked overtime hours. DBI must come forward with evidence to rebut that inference. It has not.
[370] App'x 4, DBI 35896.
[371] App'x 8, DLSS 23, 138.
[372] *Id.*
[373] App'x 9, DLSS 8700.
[374] App'x 2, DBI 2749-2766.
[375] HFWA's "employer" definition incorporates C.R.S. § 8-4-101(6) in relevant part (C.R.S. § 8-13.3-402(5)); PHEW covers any FLSA-covered employer as well as "principals" employing five or more contractors (C.R.S. § 8-14.4-101(3)(a)).

PHEW provides that each employer "shall post notice of a worker's rights under [PHEW] … in a conspicuous location on the [employer's] premises."[376] These posting and notice requirements create a substantive right under both PHEW and HFWA for workers to receive notice of their rights and responsibilities, as required by these statutes and the WARNING Rules. The Division published a combined PHEW and HFWA poster on July 14, 2020. Thus, as of July 14, 2020, all Colorado employers (1) were required by PHEW and HFWA to post notice of worker rights under these statutes; and (2) had available to them the Division-promulgated poster.

Weeks later, the Division promulgated HFWA and PHEW poster rules in Rule 4 ("Notice and Posting Rights and Responsibilities") of the WARNING Rules.[377] WARNING Rules 4.1.2-4.1.3 provide that the required poster "shall be displayed in each establishment where employees or workers work, in a conspicuous location frequented by employees or workers where it may be easily read during the workday—such as in break rooms, on employee bulletin board, and/or adjacent to time clocks, department entrances, and/or facility entrances."[378] The only exception to this rule provided when physical posting is impractical due to the nature of the work site, the employer must distribute individual copies of the poster to employees and workers.[379] Employers may create their own poster with the required content in the WARNING Rules, or use the poster created by the Division.[380]

WARNING Rule 4.5 also provides that "[t]he poster and written notice rights and responsibilities of PHEW … [§]103, and of HFWA [§]408, have applied since each … took effect on July 11 … [and] 14, 2020, … and will be interpreted in conformity with these Rules." But the Division, acknowledging the difficulty of executing an immediate effective date for such duties, promulgated a "grace period" rule: "[e]mployers and principals will be deemed compliant if they executed required posting(s) and/or notice(s) within 30 days of the … statutory effective date."[381] The PHEW compliance grace period thus expired August 10, 2020; the HFWA grace period expired August 13, 2020. But the WARNING Rules did not take effect until September 21, 2020.

Even if posting and notice is made as required by statute and rule, an employer may be non-compliant if it negates the effectiveness of the notice provided. Importantly, an employer defeats the requisite notice — and thus, violates the notice requirements — when it misinforms employees concerning the same rights addressed in the required posters or notices and the laws they explain, thus undermining the required notice of those rights.[382] An employer may misinform employees by misrepresenting the nature of a right (e.g., qualifying reasons for sick leave), establishing a policy contrary to these rights (e.g., of denying rest breaks), or misleading an employee into believing these rights don't apply to them. By misclassifying its workers DBI misled them into believing they had no Colorado employee rights, negating any Colorado employee rights postings in the workplace for the Disputed Workers (even if DBI displayed the posters, which it did not).

---

[376] C.R.S. § 8-14.4-103(1).

[377] The Division published temporary or emergency WARNING Rules on September 21, 2020, in effect immediately upon publication. *See* WARNING Rules, 7 CCR 1103-11. The permanent version of these rules, effective January 1, 2021, contains an identical version of Rule 4.

[378] WARNING Rules 4.1.2–4.1.3 (2020).

[379] WARNING Rule 4.1.4.

[380] WARNING Rule 4.1.2.

[381] WARNING Rule 4.5.

[382] WARNING Rule 4.4 ("Employers or principals shall be deemed noncompliant if they attempt to minimize the effect of posters or notices required by statute or these Rules, such as by communicating positions contrary to, or discouraging the exercise of rights covered in, the required poster or notice."); *see also* National Labor Relations Board Compliance Manual, 10518.6 Side Notices ("The posting of a notice adjacent to a Board notice constitutes noncompliance with the posting provision if the side notice's language attempts to minimize the effect of the Board notice or where it suggests that respondent does not subscribe to any of the Board notice's statements."). This principle is equally applicable to COMPS notice.

Since the WARNING Rules first took effect, they have been amended three times, first on November 9, 2020, with an effective date of January 1, 2021,[383] then on January 11, 2022, with an effective date of March 2, 2022,[384] and then on November 10, 2022, with an effective date of January 1, 2023.[385] All three revised sets maintain the same substantive notice and posting requirements set forth in the inaugural 2020 WARNING Rules.

### *b. Demand to Produce Information of Notice and Posting and DBI's Response.*

On November 23, 2020, the Division issued the Notice of Investigation, which notified DBI that the scope of the investigation included whether DBI was in violation of, among other legal requirements, notice-of-rights requirements under each of HFWA, PHEW, COMPS, and the WARNING Rules, for each of which it was provided citations and hyperlinks as follows:[386]

> Violations Under Investigation
>
> The Division is investigating whether Diversified Builders Incorporated d/b/a DBI (hereinafter, "DBI" or "employer") committed any of the below-listed violations of the below-listed labor statutes and rules.
>
> (1) Classifying workers as "independent contractors," rather than as "employees," thereby depriving them of the rights of "employees" under Title 8 of the Colorado Revised Statutes.
>
> (2) Failing to pay all earned wages to workers, including but not limited to final wages due upon termination, wages for paid rest periods, and overtime wages.
>
> (3) Failing to provide workers itemized pay statements and notices of their rights required by laws and rules governing wage rights; paid sick days; and whistleblowing and personal protective equipment use during a public health emergency.
>
> The following are citations to key statutes and rules (with hyperlinks for reference where available), under which the Division is investigating the above-listed items.
>
> (A) The Colorado Wage Act, C.R.S. Title 8, Article 4, §§ 8-4-101 *et seq*. (2020), including but not limited to C.R.S. §§ 8-4-101(5) (the applicable definition of "employee"), 8-4-103(1) (the requirement to pay earned wages due and payable at regular pay periods), 8-4-109 (final pay requirements) and 8-4-103(4) (the requirement to provide itemized pay statements in writing to "employees"); and
>
> (B) The Healthy Family and Workplaces Act of 2020 ("HFWA," C.R.S. Title 8, Article 13.3, Part 4), and the Public Health Emergency Whistleblower Act of 2020 ("PHEW," C.R.S. Title 8, Article 14.4), including but not limited to the posting and notice of rights provisions in C.R.S. §§ 8-13.3-408 and 8-14.4-103, respectively, as well as the Colorado Whistleblower, Anti-Retaliation, Non-Interference, and Notice-Giving ("Colorado WARNING") Rules, 7 CCR 1103-11, promulgated under both HFWA and PHEW.
>
> (C) The annual Colorado Overtime and Minimum Pay Standards Order ("COMPS Order," formerly known as the Colorado Minimum Wage Order, "CMWO"), 7 CCR 1103-1, issued at least annually,[387] which details specific rights and responsibilities relevant to this investigation. All applicable Division Rules are available on the Division's website, www.coloradolaborlaw.gov.

---

[383] WARNING Rules (2021).
[384] WARNING Rules (2022).
[385] WARNING Rules (2023).
[386] Notice of Investigation, App'x. 1.
[387] Following is the version applicable each year relevant to this investigation: CMWO #34 (2018); CMWO #35 (2019); Amended CMWO #35 (1/1/2020 - 3/15/2020); COMPS Order #36 (3/16/20 - 12/31/20); and COMPS Order #37 (2021).

In addition, the Division demanded that DBI "[e]xplain in detail" how, and when, it has complied with its duties to notify employees of rights and responsibilities under each of several Colorado labor laws:

> Explain all means by which, during the covered period, posters were displayed, and/or notices of rights were provided, under: (A) CMWO Rule 21 (from 2018 through March 15, 2020) and COMPS Order Rule 7.4 (as of March 16, 2020); and (B) HFWA, PHEW, and Rule 4 of the Colorado WARNING Rules. Provide the dates that any and all such posters and/or notices were provided. Indicate the extent to which any aspects of the answers differ between any of the above-listed statutes or rules, or changed at any points during the covered period.[388]

In response to this Demand, DBI stated (emphasis added):

> Respondent posted and provided employees with all required notices and posters in the applicable time frame. These postings are maintained at the company office and on jobsites as necessary.[389]

It later supplemented its answer to state:

> [A]ll posters' references in Demand #25 were/are posted at DBI's office. Upon information and belief, these posters were displayed on the various effective dates and are reviewed and updated each December/January.[390]

DBI provided no further information about the required notice or posting. DBI offers no clarification of how it interpreted "as necessary," but the law is clear where it is necessary: at each job site (for HFWA/PHEW postings) and in an area frequented by Disputed Workers (COMPS postings).

Even construing DBI's response in the light most favorable to DBI, it shows at best, partial compliance: in its principal office and *some* job sites where it was deemed "necessary" by DBI. DBI failed to address (1) when it provided notice and (2) *how* it provided notice, including whether it provided *direct, individual notice* of HFWA rights to its Admitted Employees. Further, that DBI did not come forward with a more definitive answer and evidence to support it allows the Division to draw the inference and presume that compliant postings do not exist.[391]

#### c. *DBI Failed to Post Notices of Rights Required by HFWA, PHEW, and MWO/COMPS Orders*

HFWA, PHEW, and their implementing regulations, as well as the MWOs and COMPS Orders, all require employers to notify their employees of rights by displaying a poster detailing those rights in a conspicuous location

[388] Notice of Investigation, App'x. 1.
[389] Response to Notice of Investigation, App'x 2, DBI 1-9.
[390] Response to Notice of Incomplete Response, App'x 4, DBI 15541.
[391] *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632–33 (6th Cir. 2000) (explaining that "the general rule is that where relevant information … is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it") (internal quotations and citations omitted); *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 694 (5th Cir. 1970) ("Unquestionably the failure of a defendant in a civil case to testify or offer other evidence within his ability to produce and which would explain or rebut a case made by the other side, may, in a proper case, be considered as a circumstance against him and may raise a presumption that the evidence would not be favorable to his position.") (internal citations and quotations omitted); *BNSF Ry. Co. v. Bhd. of Maint. of Way Emps.*, 550 F.3d 418, 424 (5th Cir. 2008) (reasoning that "[t]he logic supporting the adverse inference rule is that a party fails to produce evidence in its control in order to conceal adverse facts."); *Adams v. Dep't of Transp., FAA*, 735 F.2d 488, 492 (Fed. Cir. 1984) (holding that "[o]nce agency had presented evidence of strike participation, it was not improper to draw an adverse inference from petitioners' refusal to testify or otherwise offer rebuttal evidence before the [Merit Systems Protection] Board" because it is proper to draw an adverse inference "in civil cases when a party is silent in the face of probative adverse evidence").

frequented by employees where it may be easily read during the workday. HFWA specifically requires posters be displaced "in each establishment where the employer's employees work …."[392] For HFWA and PHEW poster requirements, WARNING Rule 4.1.3(B) provides that the only exception to the posting requirement is if physical conditions of the work site make it "impractical" to post the notice. But in that case, the employer has an obligation to provide individual notice of such HFWA and PHEW rights to all employees within their first month of work.[393] The investigation confirmed that DBI failed to comply with these notice requirements in two ways.

Interviews of Disputed Workers show that the Disputed Workers did not see any postings. Disputed Worker Bautista explained that they did not remember seeing any COMPS or HFWA postings, even though they visited the DBI office on site.[394] Disputed Worker Bautista described the postings they did see, only "about like the safety of the place, bringing like the appropriate clothes, the hard hat, vest, and all that stuff, but I don't remember seeing any other notice." [395]

Disputed Worker Chairez also told the Division they did not remember any posters and that they visited the office only once over the months that they worked for DBI.[396]

Perhaps DBI (or the general contractor) did display the posters at the worksites where Disputed Workers Bautista and Chairez worked. However, their lack of knowledge of the posters demonstrates that DBI failed to comply with the requirement to display the posters in an area *frequented* by Covered Employees.

Given the concrete evidence that DBI did not make required postings in an area frequented by workers, the Division's site visit, DBI's admission that it did not make required postings at all worksites (only posting "as necessary"), the lack of clear or detailed information supporting DBI's claim that it provided notice (despite the order to provide the means and dates of such notice), and DBI's apparent general disregard of its notice duties, the Division finds that DBI did not display the requisite Colorado labor law posters during the Covered Period.

Finally, *even if* the Division were to find that DBI displayed the posters in an area frequented by the Disputed Workers – and the Division does not – that finding would be negated by the misclassification of workers who were misled to believe that they had no employee rights.

[392] C.R.S. § 8-13.3-408(2).
[393] 7 CCR 1103-11, WARNING Rule 4.1.3(B).
[394] App'x 8, DLSS 1168.
[395] App'x 8, DLSS 1168.
[396] App'x 8, DLSS 1220.

Accordingly, the Division concludes that DBI violated Rule 21 of MWO #34 (2018) MWO #35 (2019); Rule 7.4.1 of COMPS Orders #36 (2020), #37 (2021), and #38 (2022); and WARNING Rule 4.1.3.

| Requirement | Legal Authority | Employees Covered |
|---|---|---|
| Wage and Hour Posting | MWO #34, § 21 (2018)<br>MWO #35, § 21 (2019)<br>COMPS Order #36, R. 7.4.1 (2020)<br>COMPS Order #37, R. 7.4.1 (2021)<br>COMPS Order #38, R. 7.4.1 (2022) | Disputed Workers employed Jan. 1, 2018 to May 17, 2022 |
| PHEW Posting | C.R.S. § 8-14.4-103(1) | Disputed Workers employed Aug. 10, 2020[397] to May 17, 2022 |
| HFWA Posting | C.R.S. § 8-13.3-408(2)(b) | Disputed Workers employed Aug. 13, 2020 to May 17, 2022 |
| WARNING Posting | WARNING R. 4.1[398] | Disputed Workers employed September 21, 2020[399] to May 17, 2022 |

#### *d. DBI Failed to Provide Individual HFWA Notice Directly to the Covered Employees, Including the Disputed Workers.*

DBI was required to provide individual written notice of HFWA rights to each employee as of August 13, 2020. To that point, DBI was ordered to explain how both *posting* and *notice* were provided, including the dates and means by which they were provided.[400] DBI presumably would have access to this information for the direct notice in particular, as such notice would require printing and distributing or emailing a notice of HFWA rights to employees. And DBI was on notice that it was under investigation for "Failing to provide workers … notices of their rights required by laws and rules governing wage rights," including "paid sick days; and whistleblowing and personal protective equipment use during a public health emergency."[401] Yet, throughout the investigation, DBI has made no claim that it complied with the *individual* HFWA notice requirements — even when ordered to explain whether, when, and how it effected this notice — and has provided no evidence of the same.[402] DBI denies

[397] End of the 30-day grace period for PHEW notice following enactment on July 11, 2020.
[398] When the same action violates two provisions (*e.g.*, WARNING Rules and HFWA or PHEW), it amounts to two violations supporting separate fines.
[399] The effective date of the WARNING Rules.
[400] Appx. 1, Notice of Investigation, at 7 (Demand #25).
[401] *Id.* at 2.
[402] Appx. 1, Notice of Investigation, at 7 (Demand #25). DBI's failure to produce evidence substantiating its claim that it is in compliance with these legal notice requirements is substantive evidence that it is not compliant with these notice requirements. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds as stated in IBP, Inc. v. Alvarez,* 546 U.S. 21, 25–26 (2005) ("Due regard must be given to the fact that it is the employer who has the duty … to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy."); *He v. Home on 8th Corp.*, No. 09 CV 5630, 2014 U.S. Dist. LEXIS 114605, at *17–18 (S.D.N.Y. Aug. 13, 2014) (employer not entitled to tip credit due to not posting a required poster: "Defendant was unable to produce any poster—or even a picture of such a poster hanging …. Defendant's failure to produce any poster that he claims he hung before this lawsuit ... weighs in Plaintiffs' favor, especially because someone being sued for failing to comply with ... wage laws likely would have a strong incentive to preserve all documents relating to his compliance."); *Garcia v. Saigon Mkt. LLC*, No. 15 CV 9433(VSB), 2019 U.S. Dist. LEXIS 163259, at *25–29 (S.D.N.Y. Sept. 24, 2019) (same: "Defendants have failed to produce a copy or photograph of this poster, or any specific details regarding the time period ... the notice was posted or where precisely it was displayed …. [Defendant's] statement, which 'do[es] not provide any information as to what the poster[] said, apart from a verbatim recitation of [statute] requirements,' is thus insufficient…. Defendants are not entitled to … a tip credit against … wages.").

distributing *any* sort of handbook or policies to any of the Covered Workers — even including the Admitted Employees — and the record does not contain any written leave policy.[403]

The Division thus finds it is more likely than not that DBI failed to provide individual notice to the Covered Workers, including both the Disputed Workers and Admitted Employees, regarding their HFWA and WARNING rights in violation of the individual notice requirements of HFWA (C.R.S. § 8-13.3-408(2); WARNING Rule 4.2) in 2020, 2021, and 2022.

The Division finds that DBI violated the following notice requirements:

| Requirement | Legal Authority | Employees Covered |
|---|---|---|
| HFWA Individual Notice | C.R.S. § 8-13.3-408(2)(a) | All employed Aug. 13, 2020[404] to May 17, 2022 |
| WARNING Notice | WARNING R. 4.2 | All employed Sep. 21, 2020 to May 17, 2022 |

**3. DBI Failed to Provide HFWA Leave to the Covered Workers and Interfered with Their Rights.**

As of July 14, 2020, HFWA required "each employer in the state [of Colorado], regardless of size,"[405] to provide its employees with public health emergency leave ("PHEL") for reasons related to the ongoing COVID-19 pandemic, in accordance with the leave requirements of the federal Emergency Paid Sick Leave Act ("EPSLA").[406] Through December 31, 2020, Colorado employers were required to provide up to two weeks (a maximum of 80 hours) of paid leave for needs related to the COVID-19 PHE.[407] For leave related to the employee's personal needs, including having COVID-19 symptoms and seeking a medical diagnosis, or quarantine/isolation upon government agency order or healthcare provider advice, these hours were required to be paid at the employee's regular rate. For leave to take care of a family member in quarantine/isolation, or a child whose school or child care was unavailable due to the PHE, pay for these hours was required to be at least two-thirds the regular rate for leave.[408]

On September 21, 2020, the Division promulgated the WARNING Rules prohibiting "interference" with HFWA rights.[409] WARNING Rule 3.4.2(C) defined "interference with HFWA" as having "the same definition and scope as under the federal Family and Medical Leave Act statutory and rule provisions on interference, 29 U.S.C. § 2615(a)(1) and 29 C.F.R. § 825.220(b)–(d), except where any provisions of HFWA, PHEW, or [] [the WARNING] Rules expressly differ."[410] The Family and Medical Leave Act ("FMLA") provides:

---

403 App'x 4, DBI 15533–34.
404 End of the 30-day grace period for HFWA notice following enactment on July 14, 2020.
405 C.R.S. § 8-13.3-406(2). In 2020, HFWA expressly covered "each employer" and "all employees" but for three exemptions: (1) the "federal government" as an employer is HFWA-exempt (C.R.S. § 8-13.3-402(5)(b) (2020)); (2) employees "subject to the federal Railroad Unemployment Insurance Act" (C.R.S. § 8-13.3-402(4) (2020)); and (3) employers with under 16 employees are exempt until 2022 from the 48-hour general paid leave required as of 2021 for all other employers (C.R.S. § 8-13.3-403(1)(b)–(c) (2020)). The first and second exemptions still exist within the current version of HFWA. *See* C.R.S. §§ 8-13.3-402(4), (5)(b) (2022).
406 C.R.S. § 8-13.3-406(2) ("On and after the effective date of this section [July 14, 2020,] **through December 31, 2020, each employer in the state, regardless of size, shall provide paid sick leave in the amount and for the purposes provided in the federal "Emergency Paid Sick Leave Act"** in the "Families First Coronavirus Response Act," Pub. L. 116-127 (29 C.F.R. 826), **to each employee who is not covered** under the "Emergency Paid Sick Leave Act.") (Emphases added).
407 29 C.F.R. § 826.21.
408 *Id.* §§ 826.22 (rate), 926.20 (covered needs for leave).
409 7 CCR 1103-11, WARNING Rule 3.4.2 (2021).
410 7 CCR 1103-11, WARNING Rule 3.4.2(C) (2021).

(a) Interference with rights.

(1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under… [the FMLA].[411]

Effective March 2, 2022, the Division amended the WARNING Rules, defining "interference" as follows:

> "Interference" means any act (whether an affirmative act, an omission, or a statement) that, regardless of intent, interferes with any protected activity or any right under these Rules or any statute or rule to which these Rules apply, including any act that deters any protected activity. Examples of acts that may constitute interference include:
>
> (A) failing to authorize the exercise of a right, imposing stricter conditions upon exercising a right (e.g., as to documentation or notice) than the applicable statute or rule permits, or altering employment conditions, rules, or procedures to limit coverage;
>
> (B) failing to effectively provide a required notice or notification as to an employee's rights;
>
> (C) inducing or attempting to induce an employee, worker, whistleblower, key service provider, or other protected party to prospectively waive a right;
>
> (D) imposing consequences (whether or not employment-related) for or discouraging the exercise of any such right, such as by counting paid sick leave taken by an employee pursuant to HFWA as an absence that may lead to negative consequences;
>
> (E) "access interference" with an agricultural employee's rights to reasonable access (as defined by C.R.S. § 8-13.5-202 and the Agricultural Labor Conditions Rules, 7 CCR 1103-15, Rule 4) to visitors at employer-provided housing, to employee residence access and egress, to key service providers, or to required transportation; except an agricultural employer may apply generally applicable hazard or safety protocols to work site visitors.[412]

Beginning January 1, 2021, HFWA required Colorado employers to provide one hour of accrued leave per 30 hours worked, with a minimum "cap" of 48 hours,[413] for a broader range of health and safety needs.[414] This leave "begins to accrue … when employment with the employer begins and [employees] may use accrued paid sick leave as it is accrued."[415] During a qualifying PHE,[416] employers continued to be required to provide two weeks (up to 80 hours) of paid leave for PHE needs, similar to the 2020 federal and Colorado requirements, but for a broader range of purposes and with all PHE leave compensated at the employee's regular rate (rather than some hours compensated at ⅔ the regular rate under the EPSLA).[417] The requirement to provide supplemental PHE leave

---

411 29 U.S.C. § 2615(a)(1).

412 7 CCR 1103-11, WARNING Rule 2.11.3 (2022).

413 C.R.S. § 8-13.3-403(2)(a) ("Each employee earns at least one hour of paid sick leave for every thirty hours worked by the employee; except that an employee is not entitled under this section to earn or use more than forty-eight hours of paid sick leave each year, unless the employer selects a higher limit."); Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.1(A) (January 1, 2021 - April, 14, 2021) and Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.1(A) (Apr. 14, 2021 - Dec. 31, 2021).

414 C.R.S. § 8-13.3-404.

415 C.R.S. § 8-13.3-403(3)(a); Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.3(A) (January 1, 2021 - April, 14, 2021) and Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.3(A) (Apr. 14, 2021 - Dec. 31, 2021). ("Because an employee 'may use accrued paid sick leave as it is accrued,' C.R.S. § 8-13.3-403(3)(a), HFWA leave may be used immediately upon accrual, but an employer may, in the ordinary course of business and in good faith, verify employee hours within a month after work is performed and adjust accrued leave to correct any inaccuracy, provided that the employee is so notified in writing.").

416 Pursuant to C.R.S. 8-13.3-402(9), "'Public health emergency' includes varied pandemic, infectious disease, or other disaster emergencies declared by the Governor or a federal, state, or local health agency."

417 C.R.S. §§8-13.3-403(2)(a), 405(1)(a), 405(1)(b); Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.1(A) (January 1, 2021 - April, 14, 2021) and Wage Protection Rules, 7 CCR 1103-7, Rule 3.5.1(A) (Apr. 14, 2021 - Dec. 31, 2021).

continued until June 8, 2023, four weeks after all applicable COVID-19 PHE orders expired.[418] These same requirements are ensconced in Wage Protection Rule 3.5, enacted on January 1, 2021.

The Division propounded Demand #18 to assess DBI's compliance with HFWA leave. In Demand #18 to the Division's NOI, it required DBI to:

> Describe in detail, for all drywall or other construction workers on DBI projects: (A) all benefits they were eligible to receive from DBI, including but not limited to health insurance, paid vacation, sick pay, retirement benefits (for example, a 401(k)/IRA plan or a pension), bonuses, or others; and (B) all expenses that were reimbursed by DBI, including the approximate value of each.[419]

DBI responded: "DBI offers its employees paid sick leave in compliance with CO law and paid time off for supervisors and certain key employees."[420]

DBI did produce pay statements for Admitted Employees that reflect an accrual of "COPSL," presumably "Colorado Paid Sick Leave." Later, DBI does separately list "Paid Sick Leave" and "PTO" accrual. However, it appears DBI's unwritten HFWA policy may not be fully compliant because the accrued COPSL does not rollover each year. It is reset to 0 on January 1, showing first pay period accrual only.[421] Nevertheless, the Division makes no findings relating to DBI's compliance with HFWA and PHEW with respect to its Admitted Employees.

Regarding the Disputed Workers, Disputed Workers Ramirez, Quiñones, and Marroquin confirmed that they did not receive paid sick leave.[422] The Worker Packets all deny receiving paid sick leave.[423]

DBI admits it does not provide the Disputed Workers paid sick leave. But misclassification of employees does not immunize DBI from HFWA obligations it owes to those misclassified employees. Because the Division has determined that the Disputed Workers were and are DBI employees, the Disputed Workers were entitled to employee rights (paid sick leave) afforded by HFWA. By misclassifying the Disputed Workers, DBI interfered with and restrained the Disputed Workers from even attempting to exercise their HFWA rights, including accessing paid sick leave and public health emergency leave, because DBI, obliged to provide them with leave, failed to inform them of their right to leave, failed to authorize them to take paid sick leave, and failed to provide them any avenue for requesting HFWA leave from DBI. These failures also culminate into DBI's ultimate failure to provide *any* paid sick leave under *any* of the conditions required by HFWA and Wage Protection Rule 3.5.

In addition to the interference by failing to inform Covered Workers of their rights and provide paid sick leave, the record shows that DBI, in practice, interfered with leave for the Disputed Workers by terminating them if they did take leave and intimidating other Disputed Workers from taking leave. Disputed Worker Estrada told the

---

[418] "Public health emergency" includes varied pandemic, infectious disease, or other disaster emergencies declared by the Governor or a federal, state, or local health agency. C.R.S. 8-13.3-402(9). The federal COVID-19 PHE declaration ended May 11, 2023, so the right to PHEL lasted until June 8, 2023. For federal emergency orders, visit the Department of Health and Human Services. The state "disaster emergency" related to COVID-19, declared on March 11, 2020 (Exec. Order D 2020 003, Mar. 11, 2020), expired on April 27, 2023. For state PHE Orders and Major Disaster Declarations, see here.
[419] Notice of Investigation, App'x 1 at 6.
[420] Response to Notice of Incomplete Response, App'x 7, DBI 15520.
[421] *Compare* App'x 5, DBI 24755-DBI 24786 (December 23, 2021 pay statements) *with* DBI 24835-24866 (January 1, 2022 pay statements).
[422] App'x 9, DLSS 9303, 11013, 11039. That reset of accrued paid sick leave violates C.R.S. § 8-13.3-403(3)(b).
[423] App'x 8, Eddie Campos (DLSS 561), Eloy Rodriguez (DLSS 589), Ermelindo Lemus (DLSS 617), Francisco Jimenez (DLSS 644), Francisco Marquez (DLSS 671), Gonzalo Bautista (DLSS 714), Hector Lemus (DLSS 751), Jesus Ramirez (DLSS 775), Jose Lemus (DLSS 828), Jose Rodriguez (DLSS 856), Kelvin Lemus (DLSS 908), Leopoldo Leyva (DLSS 935), Limber Lemus (DLSS 961), Lorenzo Quiroz (DLSS 982), Martin Estrada (DLSS 1006), Pedro Martinez (DLSS 1059), Valeriano Chairez (DLSS 1079).

Division: "[w]ell, what I have seen and experienced is that when someone asks for permission [for sick leave], it is like replacing them, so if you ask permission the next day who knows if you still have your job."[424]

Accordingly, the Division finds that DBI interfered with the Covered Workers' HWFA rights under WARNING Rule 3.4.2 from July 14, 2020 to May 17, 2022; and the Division further finds that DBI failed to provide paid sick leave to the Disputed Workers in violation of HFWA, C.R.S. § 8-13.3-403 and 8-13.3-404, and Wage Protection Rule 3.5.

**4. Violations Arising from DBI's Failure to Pay Wages Owed to the Disputed Workers.**

Because the investigation spans from 2018 through 2023, five different versions[425] of the Division's Minimum Wage Order ("MWO") apply to the Covered Workers' claims for owed wages: (1) MWO # 34 covers 2018; (2) MWO #35 covers 2019 to March 15, 2020; (3) COMPS Order #36 covers March 16, 2020 to December 31, 2020; (4) COMPS Order #37 covers the entire 2021 year; and (5) COMPS Order #38 covers January 1, 2022 through December 31, 2023.[426] Because the Division has determined that the Covered Workers were DBI "employees" under all five versions and DBI meets the definition of "employer" in all five versions, each version of the order imposed legal obligations on DBI with respect to paying wages to Covered Workers for each respective time period.

Relevant to the investigation, MWO #34, MWO #35, COMPS Order #36, #37, and #38 maintain the same overtime provisions requiring an employer to pay its employee 1.5 times their regular rate for hours worked in excess of the greater of 40 hours per workweek, 12 hours per workday, or 12 consecutive work hours. MWO #34 and #35 each identically state in Section 4:

> **Overtime Rate**: employees shall be paid time and one-half of the regular rate of pay for any work in excess of: (1) forty (40) hours per workweek; (2) twelve (12) hours per workday, or (3) twelve (12) consecutive hours without regard to the starting and ending time of the workday (excluding duty free meal periods), whichever calculation results in the greater payment of wages. Hours worked in two or more workweeks shall not be averaged for computation of overtime. Performance of work in two or more positions at different pay rates for the same employer shall be computed at the overtime rate based on the regular rate of pay for the position in which the overtime occurs, or at a weighted average of the rates for each position, as provided in the Fair Labor Standards Act.[427]

COMPS Orders #36, #37, and #38 each maintain a version of Rule 4.1.1 that similarly states:

---

[424] App'x 8, DLSS 1101.

[425] Each version of the MWO or COMPS is codified at 7 CCR 1103-1 and publicly available on the Division's website.

[426] The sole relevant difference between these five orders is that while the COMPS Orders #36, 37, and 38 cover "all employers and employees for work performed within Colorado" with certain exemptions not pertinent to the Covered Workers (*see* Rule 2 in each order), MWOs #34 and #35 covered only four industries: (1) Retail and Service, (2) Commercial Support Service, (3) Food and Beverage, and (4) Health and Medical. *See* 7 CCR 1103-1 MWO #34, § 1 (2017); 7 CCR 1103-1 MWO #35, § 1 (2018); 7 CCR 1103-1 Amend. MWO #35, § 1 (2020). MWOs #34 and #35 defined "Commercial Support Service" to include "any business or enterprise engaged directly or indirectly in providing services to other commercial firms through the use of service employees who perform duties such as: … building or plant maintenance …." *See* 7 CCR 1103-1 MWO #34, § 2(B) (2017); 7 CCR 1103-1 MWO #35, § 2(B) (2018); 7 CCR 1103-1 Amend. MWO #35, § 2(B) (2020). The employer states that its business is a "drywall and metal stud framing company" who provides those services to general contractors. Response to Notice of Incomplete Response, App'x 7, DBI 15517 (Demand #8). Therefore, because the employer's "services" satisfy the definitions of "Commercial Support Service," MWOs #34 and #35 apply to the employer's payment of wages to Covered Workers from 2017 to March 16, 2020.

[427] *See* 7 CCR 1103-1 MWO #34, § 4 (2018); 7 CCR 1103-1 MWO #35, § 4 (2019); 7 CCR 1103-1 Amend. MWO #35, § 4 (2020).

> Employees shall be paid time and one-half of the regular rate of pay for any work in excess of any of the following …:
> (A) 40 hours per workweek;
> (B) 12 hours per workday; or
> (C) 12 consecutive hours without regard to the start and end time of the workday.[428]

For employees paid on an hourly basis without other types of compensation (e.g., bonuses or commissions), the "regular rate of pay" for purposes of calculating overtime is the hourly rate.[429] For employees paid a piece rate (i.e., paid for each unit completed), the "regular rate" is the total piece rate compensation for the workweek divided by the total hours worked.[430]

Given that the Division's Phase 1 Determination makes clear that the Covered Workers are employees of DBI, the Division also concludes that DBI owes the Covered Workers any unpaid wages, including overtime wages, as prescribed by MWOs #34 and #35 and COMPS Orders #36, #37, and #38.

The information obtained by the Division indicates that the Disputed Workers worked over forty hours per week and did not receive overtime premium pay. The Division identifies a total of **47 Disputed Workers** who worked overtime without receiving premium pay.

Some Disputed Workers told the Division they worked more than forty hours per week. The Division identifies **8 Disputed Workers** who directly told the Division that they worked more than forty hours in a single week: Eloy Roriguez, Gonzalo Bautista, Jesus Ramirez, Jose Rodriguez, Leopoldo Leyva, Lorenzo Quiroz, Valeriano Chairez, and Martin Estrada.[431]

From DBI's records, the Division was able to identify **2 Disputed Workers** who worked over 40 hours in a workweek on sign-in sheets produced by DBI: Victor J Loya and Everardo Tercero.[432]

Next, the Division identifies **19 Disputed Workers** who appear on an invoice for performing overtime, showing them working 40 hours and additional hours. Even if there is skepticism about the accuracy of the invoices (and there is), DBI would (and did) object if it believed an invoice *overbills* it. DBI did, correct invoices it identified as overbilling based on sign-in sheets, in units as small as 1/2 hour.[433] DBI did not correct the invoices that identify specific workers performing overtime.[434] As a result, the Division finds that invoices reflect a *minimum* amount of overtime worked by Disputed Workers; there is likely more overtime worked by Disputed Workers than appears

---

[428] *See* 7 CCR 1103-1 COMPS Order #38, Rule 4.1.1 (2023); *see also* 7 CCR 1103-1 COMPS Order #36, Rule 4.1.1 (2020); 7 CCR 1103-1 COMPS Order #37, Rule 4.1.1 (2021).

[429] *See* 7 CCR 1103-1 COMPS Order #38, Rule 1.8 (2023); *see also* 7 CCR 1103-1 COMPS Order #36, Rule 1.8 (2020); 7 CCR 1103-1 COMPS Order #37, Rule 1.8 (2021); 7 CCR 1103-1 MWO #34, § 2 (2018); 7 CCR 1103-1 MWO #35, § 2 (2019); 7 CCR 1103-1 Amend. MWO #35, § 2 (2020).

[430] 7 CCR 1103-1 COMPS Order #38, Rule 1.1 (2023) ("If pay is on a piece-rate, salary, commission, or other non-hourly basis, any overtime compensation is based on an hourly regular rate calculated from the employee's pay."); 7 CCR 1103-1 COMPS Order #36, Rule 1.1 (2020) (same); 7 CCR 1103-1 COMPS Order #37, Rule 1.1 (2021) (same); 7 CCR 1103-1 MWO #34, § 2 (2018) (defining "regular rate" as "the regular rate of pay actually paid to employees for a standard, non-overtime workweek"); 7 CCR 1103-1 MWO #35, § 2 (2019) (same); 7 CCR 1103-1 Amend. MWO #35, § 2 (2020) (same); *see also* 29 C.F.R. § 778.111(a) (defining regular rate of pay for piecework as the total earnings for that workweek for all time worked and from all sources divided by the hours worked).

[431] After submitting Worker Packets to the Division, Emerlindo Lemus, Hector Lemus, Jose Lemus, Kelvin Lemus, and Limber Lemus received payment from DBI Labor Broker Millan. It is unclear that those Disputed Workers received payment in full or that the payment was for overtime premium pay (i.e., it might have been work expenses), so the Division excludes their claims to reach a conservative estimate of workers not receiving overtime premium pay. App'x 9, DLSS 9656-57.

[432] DBI 49093-94, DBI 52585.8.

[433] App'x 4, DBI 53166, 53184.

[434] App'x 4, DBI 52567, 53202, 53226, 53229, 53235.

on the invoices.[435] The following individuals are identified on invoices for overtime, and therefore, the Division finds they worked overtime in that workweek.

| Name | Date of Invoice | Citation to Invoice |
|---|---|---|
| Ninrrod Ascencio | 5/20/19 | DBI 53202 |
| Mario Valdez | 5/20/19 | DBI 53202 |
| Dublas Quinones | 5/20/19 | DBI 53202 |
| Edson Marroquin | 5/20/19 | DBI 53202 |
| Josue Ledezma | 5/20/19 | DBI 53202 |
| Albert Rodriguez | 5/20/19 | DBI 53202 |
| Luis C Vargas | 5/20/19 | DBI 53202 |
| Jose Torres | 5/20/19 | DBI 53202 |
| Cesar Flores | 3/25/19 | DBI 53226 |
| Jose Martinez | 3/25/19 | DBI 53226 |
| Erith Baquiz | 3/25/19 | DBI 53226 |
| Carlos Castrejon | 3/18/19 | DBI 53229 |
| Guillermo Armendariz | 3/18/19 | DBI 53229 |
| Ismael Garcia | 3/4/19 | DBI 53235 |
| Jerlin Torres | 3/4/19 | DBI 53235 |
| Jose Martinez | 3/4/19 | DBI 53235 |
| Alex Arias | 10/22/20 | DBI 52567 |
| Andres Robles | 7/29/19 | DBI 52026 |
| Jesus Paez | 7/29/19 | DBI 52026 |

Next, the Division identifies an additional **18 Disputed Workers** based on a reasonable inference that when a sign-in sheet identifies a Disputed Worker as working on Saturday or Sunday, the Disputed Worker performed overtime in that workweek. The inference, proof of work on Saturday and Sunday, is reasonable.[436]

Under normal circumstances, it is insufficient to prove overtime by proving that a worker worked on a Saturday or Sunday. However, these are not normal circumstances. DBI failed to maintain the records necessary to determine the hours worked in any given week and its records that do exist are inaccurate as described below. DBI cannot now benefit from the lack of records. Accordingly, the Division is entitled to make reasonable inferences unless that inference is rebutted by specific evidence from DBI, such as full sign-in sheets for a specific workweek.[437] The record does not contain specific evidence rebutting these inferences.

Some of the Disputed Workers consistently told the Division that, when they worked overtime, they did so by working eight hours per day, six days per week. That is, while the workers may not have worked overtime in all workweeks, when they did work overtime, it was often on Saturdays and Sundays.[438]

This inference is supported by DBI's records. DBI frequently billed a general contractor for overtime hours whenever work was performed on a Saturday or Sunday.[439] It sent an e-mail to a general contractor noting that it

---

[435] That is, there may be *more* overtime than is reflected on the invoices.
[436] The Division excludes Saturday work following a weekday holiday, such as the Saturday following Labor Day.
[437] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) ("The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result [may] be only approximate.")
[438] App'x 8, DLSS 551, 579, 593, 607, 634, 661, 725, 742, 768, 818, 865, 898, 925, 951, 972, 1069, 1139.
[439] *See, e.g.,* DLSS 2635 and DLSS 007144.

had been paying an overtime fee for weekend work for months in the first half of 2019.[440] Some of the identified Disputed Workers performed Saturday and Sunday work during that time period or immediately after.

Specifically, both Eddie Campos and Francisco Marquez appear on sign-in sheets for Saturdays, and told the Division they worked overtime on Saturdays. Therefore, the Division extends the inference to all demonstrated weekend overtime from any Disputed Workers, who DBI has not contested are similarly situated.

Based on DBI's records and the information from Disputed Workers, the Division makes the reasonable inference that the workers consistently worked five days per week, any time worked on Saturday or Sunday was likely overtime. Importantly, in this Citation, the Division is not determining a total amount of owed overtime to a specific worker.[441] Rather, the Division is identifying specific instances of underpayment in any amount. That means, based on weekend work, the Division is inferring that the Disputed Workers worked 40.01 hours in a given week, rather than inferring 48 hours (6 days of work at 8 hours) or more. The Division identifies the following Disputed Workers who appear on a weekend sign-in sheet.

| Name | Date of Sign In | Citation to Sign-in Sheet |
|---|---|---|
| Eddie Campos | 12/15/18 | DBI 35896 |
| Francisco Marquez | 6/15/19 | DBI 40378 |
| Salvador Gomez | 6/22/19 | DBI 40535 |
| Carlos Reyes | 6/1/19 | DBI 40060 |
| Erasimo Garcia | 10/26/19 | DBI 42915 |
| Antonio Molinar | 10/26/19 | DBI 42915 |
| Francisco Jimenez | 10/26/19 | DBI 42915 |
| Pedro Hernandez | 10/26/19 | DBI 42915 |
| Salcedo Gomez | 11/23/19 | DBI 43496 |
| Edgar Herrera | 4/19/20 | DBI 46328 |
| Carlos Flores | 4/19/20 | DBI 46328 |
| Jose Quinnones | 7/25/20 | DBI 48794 |
| Luis Duran | 7/18/20 | DBI 48611 |
| Israel Ledezma | 7/18/20 | DBI 48611 |
| Reydecel Ledezma | 7/18/20 | DBI 48611 |
| Raymond Reyes | 7/18/20 | DBI 48611 |
| Jose Cruz | 7/18/20 | DBI 48611 |
| Carlos Reyes Jr | 11/7/20 | DBI 50808 |

The Division emphasizes these inferences are conservative and likely result in an undercounting of Disputed Workers who performed overtime. For example, the Division's methodology does not include Disputed Workers who worked overtime by working five shifts longer than eight hours in a week because there are rarely, if any, records that show sign-ins by Disputed Workers for at least four days in a workweek.

Because the Division concludes that DBI was required to pay an overtime premium to 47 Disputed Workers, the Division must next determine whether DBI failed to pay that overtime. The Division concludes that it did.

First, the Disputed Workers consistently report that they did not receive overtime premium pay.

---

440 App'x 9, DLSS 4391

441 In Phase 2 of the investigation, the Division will provide a more detailed accounting of total wages owed by the employer. In addition to the overtime claimed by Disputed Workers, the Division will analyze and decide whether the Disputed Workers and Covered Workers are entitled to pay they earned by arriving 15 minutes early. *See* App'x 8, DLSS 1190.

Disputed Worker Marquez told the Division, “when we worked overtime —and sometimes we worked overtime on Saturdays— they wouldn’t pay us, the contractor wouldn’t pay the hours at time and a half, like it’s supposed to be by federal law, you know? They only paid us regular hours.”[442]

Disputed Worker Quiroz told the Division the same as Disputed Worker Marquez: “Sometimes we went to work on Saturdays... I am not saying that we went every Saturday, but sometimes we went on Saturdays, and he would pay us at the regular rate.”[443]

Disputed Worker Chairez told the Division, “there was never overtime, since it was by piecework.”[444] That is not a valid reason. DBI is obligated to pay overtime even if a worker has agreed to be paid by piecerate. When asked if he was paid for overtime, Disputed Worker Bautista told the Division simply, “No.[445]

The Packets state that the Disputed Workers did not receive pay at time-and-a-half:

- Eddie Campos: “D.B.I. and Santiago don’t pay time and a half.”[446]
- Eloy Rodriguez: “D.B.I. does not pay overtime.”[447]
- Ermelindo Lemus: “We worked by the hour and they didn’t pay overtime.”[448]
- Fransisco Jimenez: “D.B.I. and Santiago don’t pay time and a half.”[449]
- Francisco Marquez: “D.B.I. and Z Contracting - don’t pay overtime.”[450]
- Hector Lemus: “They pay by the unit. They don’t pay overtime.”[451]
- Jesus Ramirez: “Santiago Millan doesn’t pay overtime.”[452]
- Jose Rodriguez: “D.B.I. do not pay overtime.”[453]
- Jose Lemus: “We work by the hour and we are not get paid overtime.”[454]
- Leopoldo Leyva: “They do not pay overtime.”[455]
- Limber Lemus: “D.B.I. and Santiago don’t pay time and a half.”[456]
- Lorenzo Quiroz: “Subcontractors do not pay overtime, D.B.I. Santiago Millan”[457]

---

[442] App’x 8, DLSS 001139.
[443] App’x 8, DLSS 1203.
[444] App’x 8, DLSS 1223.
[445] App’x 8, DLSS 1158.
[446] App’x 8, DLSS 561, 568.
[447] App’x 8, DLSS 589.
[448] App’x 8, DLSS 617.
[449] App’x 8, DLSS 644.
[450] App’x 8, DLSS 671.
[451] App’x 8, DLSS 752.
[452] App’x 8, DLSS 775.
[453] App’x 8, DLSS 856, 865.
[454] App’x 8, DLSS 828 (grammatical error in original).
[455] App’x 8, DLSS 935, 941.
[456] App’x 8, DLSS 961.
[457] App’x 8, DLSS 982.

- Martin Estrada: "We work by the hour and we are not get paid overtime."[458]

There are no records that show the identified Disputed Workers did receive overtime premium pay and, importantly, that they received overtime premium pay for the specific hours identified above. Given the lack of contradicting evidence, the Division finds that the Disputed Workers did not receive overtime premium pay.

The Division concludes that DBI owes unpaid overtime wages to both Disputed Workers Marquez and Campos, as well as the other identified Disputed Workers. Therefore, the Division finds that DBI failed to compensate these Disputed Workers for all time worked in violation of MWO #34, MWO #35, COMPS Order #36, COMPS Order #37, COMPS Order #38, and C.R.S. §§ 8-4-103(1)(a) and -109, in amounts to be determined in Phase 2 of this investigation.

## III. REMEDIES FOR VIOLATIONS

### A. <u>Overview: Phase 1 Determination as to Systemic Violations.</u>

This determination does not conclude and resolve this investigation. This is a "Phase 1 determination" — limited to findings of certain, mostly systemic violations (detailed above), and remedies for those violations (detailed below). This determination will be followed by "Phase 2" proceedings to assess fines for violations found herein as to employees hired after DBI's production of its employee roster if ongoing violations are found, and to address individual employee remedies, and any other violations that may be found. Following are the Phase 1 remedies the Division finds warranted: fines authorized by law for such violations (detailed in Part (B) below); compliance orders (Part (C)); and follow-up information and document demands (Part (D)).

Throughout subsection (B) below, to calculate fines for DBI's systemic violations, the Division was required to determine the number of employees impacted during various time periods. In misclassifying the Disputed Workers, DBI failed to produce adequate records for the Disputed Workers that it should have maintained and provided to the Division. Not only were these documents DBI was required to retain by Colorado law, DBI voluntarily agreed that it would retain such records in a consent judgment with the USDOL.[459]

On some occasions, DBI received an hourly worker report with invoices.[460] DBI did not produce those documents, either because it actively discarded them (while keeping the invoices, a signed lien waiver, and a copy of the payment) or knowingly chose to withhold the documents from the Division. The Division need not decide why; either reason is a violation of Colorado law and allows the Division to make reasonable inferences (estimates) to calculate fines, unless DBI provides evidence that refutes the reasonableness of the inferences.[461]

These records would have enabled the Division to determine how many Disputed Workers were DBI employees, and when each Disputed Worker worked as a DBI employee. Accordingly, the Division must rely on other evidence to draw a reasonable inference of the approximate time periods during which each Disputed Worker

---

[458] App'x 8, DLSS 1006 (grammatical error in original).
[459] App'x 9, DLSS 10722.
[460] *See, e.g.,* App'x 4, DBI 52001 (invoice referencing hourly report, but no attachment) and 052920 (hourly report provided because the hourly report was the invoice).
[461] Under circumstances where the law required an employer to maintain records, the keeping of which would have rebutted inferences derived from evidence produced by an employee, but the employer failed to do so, courts may rely on the reasonable inferences drawn from the employee's evidence to support the approximation of damages or the extent of liability arising from the employer's underlying violations. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946) ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11 (c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances.").

worked as a DBI employee to calculate fines and damages arising out of DBI violations of Colorado law. This section explains the sources and methodology the Division used to determine the number of impacted DBI employees during the time periods relevant to violations found.

To determine the number of Disputed Workers employed during the time period relevant to each violation, the Division calculated a number of Disputed Workers per week. The Division relied on documents provided by DBI, contracts, invoices, and payments for work performed by the DBI Labor Brokers.

From November 30, 2018 to November 27, 2020, DBI produced invoices that billed DBI for the number of hours worked by Disputed Workers each week. A limited number of invoices have either timesheets attached or names of Disputed Workers, allowing the Division to determine a number of Disputed Workers that week. When the actual number is available, Division calculations use that number. Some invoices bill for overtime hours; the Division excluded those hours from its calculations.[462] The total hours billed for the week are divided by 40 to estimate the number of Disputed Workers that week. For example, if a DBI Labor Broker invoiced 1080 hours for one week, the Division divides 1080 hours by 40 hours, and estimates 27 Disputed Workers for that week.

The Division rounds up when the estimated number is fractional because the hours above 40 require an additional worker. It rounds for the total of each DBI Labor Broker because there is unlikely to be overlap between the Disputed Worker of different DBI Labor Brokers. Fundamentally, 3.5 Disputed Workers are actually 4 Disputed Workers, with at least one of them working less than 40 hours per week.

The Division's calculations from November 30, 2018 to November 27, 2020 are Attachment A.

The Division validated its method by comparing its estimate to the limited instances where the actual number of Disputed Workers was available. The Division was able to determine the actual number of workers for 47 invoices from DBI Labor Brokers New Era and Pedro Stubbs.

Fifteen of the estimates match the actual workers. Only two overestimate the number of workers — both by a single worker — and the remaining thirty underestimate the number of workers, twelve of which are by a single worker. These comparisons are Attachment B. Based on these comparisons, the Division finds that this methodology is reasonable.

From December 4, 2020, to May 17, 2022, DBI only produced actual payments and no invoices or contracts. Accordingly, the Division must calculate both the hourly rate and number of Disputed Workers.

To calculate the number of hours, the Division must first determine the hourly rate billed by the labor brokers (as opposed to the hourly rate of the Disputed Workers). To calculate the hourly rate, the Division calculated an increase in an equivalent ratio to the increase in worker wages. The wages reported in the Worker Packets are an average of $24.00[463] The Disputed Workers interviewed by the Division during its site visit stated they earned $28.00 and $29.00 per hour, or an average of $28.50. That increase is 18.75%. The Division verified its calculations by using the federal Bureau of Labor Statistics's Consumer Price Index information for Colorado to calculate the rate of inflation over the same period of time.[464] According to the CPI, inflation from December 2018 to June 2022 was 17.85% or $28.28. The CPI adjusted rate is slightly lower. The Division treats the CPI calculation as verification

[462] The Division believes the billed overtime hours are substantially less than the overtime hours worked. The Division methodology is validated when excluding overtime hours stated on the invoices, as shown on Attachment B.
[463] This calculation excludes workers compensated on a piece rate basis.
[464] The data is available on the BLS website at https://data.bls.gov/pdq/SurveyOutputServlet?data_tool=dropmap&series_id=CUURS48BSA0,CUUSS48BSA0.

of its estimate, rather than a basis for its estimate. The Division uses the data specific to DBI, an 18.75% increase to $28.50, and specific to business (as opposed to the *consumer* price index).

The Division then applies an 18.75% increase to the 2018-2020 average contract rate of $32.00, yielding a $38.00 adjusted contract rate. The Division again verifies this increase through inflation, resulting in a slightly lower number of $37.71 based on inflation as measured by CPI inflation for Colorado of 17.85%. Again, the Division elects to use the rate specific to DBI for the purposes of its calculations. Summarizing the calculations:

| Worker Hourly Rate Calculation | Contract Hourly Rate Calculation |
|---|---|
| 2018-2020 Average Worker Hourly Wage: $24.00 | 2018-2020 Average Contract Hourly Rate: $32.00 |
| Proportional Increase: 18.75% | Proportional Increase: 18.75% |
| Site Visit Average Worker Hourly Wage: $28.50 | Calculated Contract Rate: $38.00 |

Then, because the allegations here involve overtime, the Division divides the estimated hours by 42.5 hours, or 8 hours of overtime per month, to estimate the number of workers. That is, the Division divides the invoice amount by the estimated hourly rate ($38.17.00) and divides that number by 42.5 hours. When performing both calculations, the Division again rounds up — .3 of a worker is 1 additional worker.

The Division's calculations from December 4, 2020, to May 17, 2022, are Attachment C.

**B. Fines and Penalties: $1,055,900.00 in Total.**[465]

**1. $547,500 for Pay Statement Violations of C.R.S. § 8-4-103(4) and (4.5).**

Pursuant to C.R.S. § 8-4-103(4.5), the Division may fine an employer $250.00 "per employee per month," up to $7,500.00, for failure to keep or produce pay statements to the Division.

To assess this fine, the Division must calculate the number of Disputed Workers per month, rather than per week. Because there is likely overlap between the Disputed Workers each week, the Division uses one week each month to assess the fine. To select the week each month, the Division uses its estimates of Disputed Workers per week and selects the week of each month with the highest number of Disputed Workers and uses that peak number of Disputed Workers to assess fines on a monthly basis ("Disputed Worker Months").

Attachment D calculates the total number of Disputed Workers each week for all of the DBI Labor Brokers from November 30, 2018 to November 27, 2020. Column 'C' reflects the highest number of workers for each month — the Disputed Worker Months.

Applying this methodology, the Division finds that DBI failed to maintain pay statements for 1630 Disputed Worker Months, as shown on Column 'C' of Attachment D, and calculates a total fine of $407,500.00 based on $250.00 per Disputed Worker Month from November 30, 2018 to November 27, 2020, as shown in Column 'D' on Attachment D.

The Division applies the same methodology to calculate the number of Disputed Workers per month from December 4, 2020 to May 17, 2022 and determine the Disputed Worker Months. Applying this methodology, the Division finds that DBI failed to maintain pay statements for 560 Disputed Worker Months, as shown on Column

[465] Some statutory provisions use the term "fines" (*e.g.*, C.R.S. § 8-13.3-408), while others use "penalties" (*e.g.*, C.R.S. §§ 8-1-117(2), 140), to describe the same: A monetary imposition, payable to the state, for violating a duty imposed by law — as distinguished from unpaid wages or exemplary damages payable to employees. The terms are therefore interchangeable here.

'C' of Attachment E, and calculates a total fine of $140,000.00 based on $250.00 per Disputed Worker Month from December 1, 2020 to May 17, 2022, as shown in Column 'D' on Attachment E.

**In total, the Division assesses a fine of $547,500 for pay statement violations covering the Investigatory Period.**

**2. $156,900 for Violations of Notice and Posting Responsibilities under MWOs #34 and 35, COMPS Orders #36 #37, and #38, HFWA, and PHEW.**

***a. $93,600.00 for Violations of Posting Responsibilities of MWOs and COMPS Orders.***

As detailed in the prior sections, the Division finds that DBI violated posting requirements of MWO #34, MWO #35, COMPS Order #36, COMPS Order #37, and COMPS Order #38. Violations of promulgated, in-effect rules subject an employer to penalties under C.R.S. § 8-1-140. Specifically, C.R.S. § 8-1-140(2) provides:

> [A]ny employer, employee, or any other person [who] fails, refuses, or neglects to perform any duty lawfully enjoined … by the [Division] or fails, neglects, or refuses to obey any lawful order made by the [Division] …, for each such violation … shall pay a penalty of not less than one hundred dollars for each day such violation, failure, neglect, or refusal continues.

Penalties under § 8-1-140 apply to violations of duties mandated by Division-promulgated rules — *i.e.*, to any failure (a) "to perform **any duty** lawfully enjoined within the time prescribed by the director" or (b) "to obey any lawful **order** made by the director" (§ 140(2)), which includes "any decision, **rule, regulation, requirement,** or standard promulgated by the director" (C.R.S. § 8-1-101(11), emphases added).[466]

By failing to comply with MWO #34 and 35 and COMPS Orders #36,37, and 38, DBI violated Division orders, and thus is subject to fines of at least $100.00 per day, per worker, for each violation. Because each Division-ordered notice required different information in 2018, 2019, 2020, 2021, and 2022 — and the Division published different posters each year — failure to execute a notice and posting requirement is a separate violation for each year.

The Division increases the fine from the base fine of $100.00 to $200.00 for 2018-20 and $400.00 for 2021-22. DBI's failure to provide adequate notice of rights under COMPS is worse than a baseline offense because the violations in this Citation — failure to pay and failure to retain records — are violations under COMPS that are specifically addressed on the posters. The purpose of the posters are to inform workers of their rights: their right to overtime premium pay; their right to paid sick leave; and their right to know how their pay was calculated. Workers are only able to assert their rights if they know their rights. Workers knowing their rights is an essential part of ensuring employer compliance with Colorado labor law, particularly with respect to ongoing and systemic violations, such as those in this Citation. Most compliance orders are issued by the Division because an employee filed a claim with the Division or reported potential violations to the Division, meaning reports from workers is an essential agreement for effective enforcement of Colorado labor law.

The fine in 2021-22 is further increased because the violations occurred after DBI received Notice of this Investigation. Even though it was on notice of the potential violations, DBI did not take the simplest of precautions to ensure the Disputed Workers were notified of their rights.

---

[466] C.R.S. § 8-1-101 (defining "order" to include both "special orders" (specific to a case, workplace, etc.) and "general orders" (a statewide requirement by rule): "(9) 'General order' means an order of the director applying generally throughout the state to all persons, employments, or places of employment.... All other orders of the director shall be considered special orders.…. (11) 'Order' means any decision, rule, regulation, requirement, or standard promulgated by the director.").

Even though the Division is empowered to fine on a daily basis, the Division exercises its discretion to issue fines on an annual basis, relying on the same methodology to calculate the Disputed Worker per week as calculating pay statements.[467] The Division then selects the highest single week for each applicable year. Those peak workers per year are shown in Column 'C' on both Attachment A and C.

The time periods and number of affected employees are as follows:

| Year | Violation | Number of Disputed Workers | Fine Per Disputed Worker | Total Fine |
|---|---|---|---|---|
| 2018 | MWO #34, § 21 (2018); Posting | 89 | $200.00 | $17,800.00 |
| 2019 | MWO #35, § 21 (2019); Posting | 97 | $200.00 | $19,400.00 |
| 2020 | MWO #35, § 21; or COMPS Order #36, Rule 7.4.1; Posting | 109 | $200.00 | $22,000.00 |
| 2021 | COMPS Order #37, Rule 7.4.1; Posting | 59 | $400.00 | $23,600.00 |
| 2022 | COMPS Order #38, Rule 7.4.1; Posting | 27 | $400.00 | $10,800.00 |
| | | | **Total:** | **$93,600.00** |

**Therefore, the Division assesses a total fine for COMPS posting violations of $93,600.00.**

***b. $63,300.00 for Violations of Notice Responsibilities Under PHEW, HFWA, and WARNING Rule 4.***

In addition to COMPS and MWO posting violations, DBI violated HFWA notice and posting and PHEW posting requirements in 2020-2022. As detailed above, the Colorado WARNING Rules execute the HFWA and PHEW statutory mandates for this Division to implement and enforce various provisions of HFWA and PHEW, including by detailing how employers can and must execute their notice and posting requirements under both laws, which is covered in WARNING Rule 4, "Notice and Posting Rights and Responsibilities." By failing to execute its HFWA written notice, HFWA posting, and PHEW posting responsibilities DBI committed, as to each employee, violations of WARNING Rules 4.1 and 4.4 as to HFWA and PHEW posting, and Rule 4.2 for 2020.[468] Each of these violations incurs $100.00 daily, per-employee fines under C.R.S. § 8-1-140(2).

DBI's failure to effect notice and posting incurred both fines under C.R.S. § 8-1-140(2) for failure to comply with the WARNING Rules, and under the $100.00 fine provisions in PHEW and HFWA themselves:[469]

- PHEW authorizes $100.00 per employee minimum fines for interference with rights, by incorporating C.R.S. § 8-1-140, which (as detailed above) provides that "for each such violation, such employer … shall pay a penalty of not less than one hundred dollars."[470]
- HFWA authorizes a "fine not to exceed one hundred dollars" when an employer "willfully violates subsection (2)(a) [written notice duties]" or "willfully violates subsection (2)(b) [posting duties]"[471];

[467] As noted above, C.R.S. § 8-1-140(2) authorizes penalties "for each day" the violation "continues;" the Division believes that on the facts of this case, making the $100.00 per-employee penalty *daily* would make total penalties unnecessarily high.
[468] Because the HFWA and PHEW notice required different information in 2020 and 2021 — and the Division published different posters each year — failure to execute notice and posting is a separate violation each year. In particular, the HFWA poster information was markedly different in 2020 than 2021; a 2020 poster could not inform employees of their 2021 rights.
[469] When the same action violates two provisions (*e.g.*, WARNING Rules and HFWA or PHEW), it amounts to two violations supporting separate fines.
[470] C.R.S. § 8-14.4-105 ("Enforcement by the division - rules. … (3) In an investigation of alleged [employer] retaliation or interference with worker rights, if an investigation yields a determination that: (a) a violation has occurred, the division may … impose **fines pursuant to section 8-1-140(2)**; (b) rights of multiple workers have been violated, **the violation as to each worker is a separate violation for purposes of fines, penalties,** or other remedies….") (emphases added).
[471] C.R.S. § 8-13.3-408(4)(a)–(b).

and if an investigation of such interference with rights "yields a determination that … rights of multiple employees have been violated, the violation as to each employee is a separate violation for purposes of fines [or] penalties."[472]

Because they cover overlapping subject matter, the Division is not applying these HFWA and PHEW fines *in addition to* the C.R.S. § 8-1-140 penalties for Colorado WARNING Rules violations.[473]

To determine the number of Disputed Workers per year, the Division uses the same methodology as above to calculate the highest week of Disputed Workers per week used for COMPS notice violations. The Division then selects the highest single week for each applicable time period.

The period covered by HFWA (since August 10, 2020) and PHEW (since August 13, 2020) is slightly longer than that covered by the WARNING Rules (since September 21, 2020).[474] But the same number of peak Disputed Worker Months (67) were employed during the period covered by all three laws, the week of October 2, 2020, and thus HFWA, PHEW, and WARNING Rules notice and posting fines overlap completely for the Disputed Workers.

To determine the number of Admitted Employees between September 21, 2020 and November 23, 2020, the Division relies on DBI's Employee List.[475] The list shows 147 total employees. The Division filtered out all terminations that occurred prior to September 21, 2020, resulting in 58 Admitted Employees who were employed for the relevant time period and did not receive individual notice of their rights. To determine the number of Admitted Employees between January 1, 2021 and May 17, 2022, the Division applies the same methodology to the July 12, 2022 employee list, resulting in the same 58 Admitted Employees for the relevant time periods.[476]

This fine amount is based on the *minimum* per-violation fine of $100.00, on an *annual* basis. Again, the Division exercises its discretion to fine on an annual basis, though it could fine on a daily basis.[477]

The Division assesses the posting fine as to only Disputed Workers because (1) DBI led those workers to believe they did not have the rights in the notice and (2) when the Division conducted its visit to a DBI work site, the posting was in a location that may be frequented by DBI employees,[478] but not by Disputed Workers.

---

[472] C.R.S. § 8-13.3-407(5)(a).
[473] The statutory fines provide an independent and alternate basis for the fines issued by the Division in this section.
[474] HFWA took effect immediately upon being signed into law on July 14, 2020, and this Division had the combined HFWA/PHEW poster and notice available online by that day. But the Division acknowledged the difficulty of executing an immediate effective date for such duties by promulgating a rule that although "[t]he poster and written notice rights and responsibilities of PHEW … and of HFWA … have applied since each statute took effect … , [e]mployers and principals will be deemed compliant if they executed required posting(s) and/or notice(s) within 30 days of the … statutory effective date." (Colorado WARNING Rule 4.5, 7 CCR 1103-11.) Thirty days from the HFWA effective date was August 13, 2020. That rule applies its 30-day grace period to only poster and notice duties, but as a matter of discretion, this determination will apply it also to fines for the core HFWA duties to provide leave without interference. Thus, per-employee fines for HFWA/PHEW poster and notice duties, and for HFWA leave and interference duties, apply the number of employees since August 13, 2020.
[475] App'x 2, DBI 10.
[476] App'x 5, DBI Employee List (July 12, 2022).
[477] As noted above, C.R.S. § 8-1-140(2) authorizes penalties "for each day" the violation "continues;" the Division believes that on the facts of this case, making the $100.00 per-employee penalty *daily* would make total penalties unnecessarily high.
[478] The record is unclear.

The Division applies each violation for each employee for each year as follows:

| Year | Violation | Fine Amount per Employee | Number of Undisputed Employees | Number of Disputed Workers | Total Fine |
|---|---|---|---|---|---|
| 2020 | C.R.S. § 8-14.4-103(1); PHEW Posting | $100.00 | N/A | 67 | $6,700.00 |
| 2020 | C.R.S. § 8-13.3-408(2)(a); HFWA Individual Notice | $100.00 | 58 | 67 | $12,500.00 |
| 2020 | C.R.S. § 8-13.3-408(2)(b); HFWA Posting | $100.00 | N/A | 67 | $6,700.00 |
| 2021 | C.R.S. § 8-14.4-103(1); PHEW Posting | $100.00 | N/A | 59 | $5,900.00 |
| 2021 | C.R.S. § 8-13.3-408(2)(a); HFWA Individual Notice | $100.00 | 58 | 59 | $11,700.00 |
| 2021 | C.R.S. § 8-13.3-408(2)(b); HFWA Posting | $100.00 | N/A | 59 | $5,900.00 |
| 2022 | C.R.S. § 8-14.4-103(1); PHEW Posting | $100.00 | N/A | 27 | $2,700.00 |
| 2022 | C.R.S. § 8-13.3-408(2)(a); HFWA Individual Notice | $100.00 | 58 | 27 | $8,500.00 |
| 2022 | C.R.S. § 8-13.3-408(2)(b); HFWA Posting | $100.00 | N/A | 27 | $2,700.00 |
| | | | | **Total:** | **$63,300.00** |

This fine amount applies the *minimum* per-violation fine of $100.00 and only one fine per employee per year, rather than daily fines for WARNING Rule violations, using the fines that include Admitted Employees.[479] **The total fine for 2020-2022 HFWA, PHEW, and WARNING Rule notice and posting violations is $63,300.00.**

HFWA fines require a finding of willfulness, unlike the PHEW fines and the C.R.S. § 8-1-140 penalties for Colorado WARNING Rules violations. The evidence amply establishes that DBI's violations of its HFWA notice and posting responsibilities were willful. "Willful," in Articles within C.R.S. Title 8 that this Division enforces or administers, has the same meaning as under the federal Fair Labor Standards employer Act, as used and defined in 29 U.S.C § 255(a) and 29 C.F.R. § 578.3(c)."[480] Under that definition,

> a violation … shall be deemed to be 'willful' … where the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements of the Act. All of the facts and circumstances surrounding the violation shall be taken into account.… [C]onduct shall be deemed to be in reckless disregard ... , among other situations, if the employer should have inquired further into whether its conduct was in compliance ... and failed to make adequate further inquiry.[481]

Where an employer disregards the possibility that it may be violating a statute even though the employer has notice of a statute's obligations, yet takes no affirmative steps to assure compliance, it evinces willfulness with

[479] As noted above, C.R.S. § 8-1-140(2) authorizes penalties "for each day" the violation "continues;" the Division believes that on the facts of this case, making the $100.00 per-employee penalty *daily* would make total penalties unnecessarily high.
[480] Colorado WARNING Rules, 7 CCR 1103-11, Rule 2.13.
[481] 29 C.F.R. § 578.3(c), *quoted in*, Statement of Basis, Purpose, Statutory Authority, & Findings: Colorado WARNING Rules, 7 CCR 1103-11, p.3 n.16 (Sept. 21, 2020) (adoption as temporary or emergency rules), *and* Statement of Basis, Purpose, Statutory Authority, & Findings: Colorado WARNING Rules, 7 CCR 1103-11, p.3 n.16 (Nov. 9, 2020) (as permanent rules).

respect to those violations.[482] When an employer has notice of a statute and it "could easily have inquired into" the meaning of relevant terms or the steps necessary to comply with obligations set forth in that statute, an employer's subsequent failure to clarify its obligations and assure compliance "may more properly be characterized as attempts to evade compliance, or to minimize the actions necessary to achieve compliance."[483]

The evidence amply establishes that DBI's violations of its HFWA notice and posting responsibilities were willful. DBI violated a law of which it clearly knew, given its own statements that it displayed HFWA posters at its principal office and jobsites "as necessary." Indeed, by admitting to its knowledge of the HFWA posters, DBI either knew, or should have known, that no such exception existed for failing to display HFWA posters at all locations. Further, those same HFWA posters make clear that employers must also provide *individual*, written notice to employees — another obligation for which DBI was aware but failed to discharge. Moreover, DBI has provided no evidence of compliance with its written notice and distribution responsibilities under HFWA in 2020, nor has it, to date, proven that it remedied its failure to provide individual HFWA notice to employees.[484]

Accordingly, the Division finds that DBI willfully violated HFWA with respect to its individual written notice requirement (C.R.S. § 8-13.3-408(2)(a)) and its posting requirement (C.R.S. § 8-13.3-408(2)(b)).

**3. $69,500.00 for Violations of HFWA, the Wage Protection Rules, and the Colorado WARNING Rules as to HFWA Interference and Complete Failure to Provide HFWA-Required Leave.**

As detailed above, DBI failed to provide required paid leave by misclassifying its employees as independent contractors. That failure generated two categories of violations. First, *unpaid wages:* DBI failed to pay wages due to employees taking leave for health and safety needs — violations that Phase 2 will address.

Second, *denying and deterring leave:* As explained in above in Section II.D.3, the nature of DBI's HFWA notice and posting violations and misclassification of the Disputed Workers substantiate a *separate* WARNING Rule violation — HFWA interference as defined under the 2020 WARNING Rule 3.4.2(C) and current WARNING Rule 2.11.3. DBI's utter failure to provide leave similarly violated HFWA and the Wage Protection Rules implementing HFWA's leave requirements. Violations of promulgated, in-effect rules subject an employer to C.R.S. § 8-1-140(2) fines. Further, C.R.S. § 8-13.3-407(5)(a) provides:

> If an investigation of employer retaliation or interference with employee rights yields a determination that:
>
> (a) Rights of multiple employees have been violated, the violation as to each employee is a separate violation for purposes of fines, penalties, or other remedies[.]

Thus, both C.R.S. § 8-1-140(2) and HFWA authorize the Division to impose a minimum fine of $100.00 per worker, per day, for its failure to provide, and misleading employees as to their rights to, paid sick leave.

The Division exercises its discretion to fine DBI on a yearly, rather than daily, basis, using the same methodology as the notice and posting violations. However, $100.00 is an insufficient penalty for violations that

---

[482] *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908–09 (9th Cir. 2003) (affirming finding of willful violation under the FLSA), *aff'd on other grounds*, 546 U.S. 21 (2005).
[483] *Id.*; *see Reich v. Waldbaum, Inc.*, 52 F.3d 35, 41 (2d Cir. 1995) (determining that employer "acted in reckless disregard of its [FLSA] obligations"); *e.g.*, *Herman v. Hector I. Nieves Transat*, 91 F. Supp. 2d 435, 443 (D.P.R. 2000) (holding violation willful: "lack of good faith in their failure … is demonstrated by their continuing, unsuccessful — if not frivolous — excuses for not complying with the Act, … an independent contractor defense, and … a section 13(b)(1) defense.").
[484] Evidence of willfulness includes when an employer violated another labor law too, especially a reasonably related law like two wage laws enacted and enforced by the same jurisdiction. *Pedreyra v. Cornell Prescription Pharmacies*, 465 F. Supp. 936, 949 (D. Colo. 1979) (prior FLSA minimum wage violation was evidence supporting finding of willfulness of federal Equal Pay Act violation, because it "should have alerted defendant that it should scrutinize its wage policies").

actually deny paid sick leave. HFWA sets a $100.00 penalty for failing to display a *poster*, or to give *written notification*, of HFWA rights and responsibilities. Those poster and written notice requirements are important, but not as important as the end to which they are a means: actually providing paid leave. If, when an employer actually denies the paid leave that the poster aims to protect, the Division imposed a fine no greater than the $100.00-per-violation poster penalty, then the Division would be under-enforcing its statutory mandate of "jurisdiction over the enforcement" of HFWA, and in particular to "exercise all powers granted under article 1 of this title 8 to enforce" HFWA[485] — which "powers under Article 1" include imposition of C.R.S. § 8-1-140 penalties for violations of Division-promulgated rules.

Here, DBI's conduct went beyond garden-variety failure to provide HFWA leave, and thus warrants a higher fine, for several reasons. First, the Disputed Workers received no paid sick leave *at all*. This is materially worse than cases where employees do not receive HFWA-compliant leave because of inadequate amounts, too-narrow reasons for use, or disciplinary consequences. Here, the Disputed Workers received no paid leave, and thus had to work or lose income whenever the need for leave arose. These workers were thus fully stripped of their rights under HFWA, and all other laws designed to protect employees. While DBI obtained *all* the benefits from controlling and directing the Disputed Workers as if they were employees, the Disputed Workers received *none* of the protections and benefits of HFWA or other Colorado labor laws.

Second, DBI misled employees as to the fundamental nature of their employment relationship, preventing them from knowing they even *had* the rights of employees. This worked a more profound deprivation of rights than merely failing to provide HFWA leave, or even failing to provide notice of HFWA rights.

Third, because DBI misclassified the Disputed Workers and failed to create, distribute, and retain required records and documentation pertaining to HFWA-related leave for them, the Division is unable to ascertain the full scope of the workers impacted, or how these workers were impacted. Where employers keep the records required by law, workers may at least be identified and contacted to determine the impact of an employer's HFWA violation. In this case, DBI's failure to keep required records, or to receive requests for sick leave, the Division cannot determine how many workers were impacted, or how, meaning that the full scope of the violation and corresponding fine may be much larger than the Division can determine and assess.

Finally, DBI's failure to provide leave *at all* violated essentially every provision of HFWA and the Wage Protection Rules relating to HFWA leave. An employer cannot escape a fine for providing leave *illegally* — e.g. imposing impermissible disciplinary consequences — by not providing leave *at all*. Thus, the employer's failure to provide leave constitutes a violation of both the affirmative requirements *and* the prohibitions of the HFWA and its implementing rules. Section 8-1-140(2) fines are assessed on a *per-violation* basis, which would result in dozens of fines for violation of each of many requirements and prohibitions in HFWA (each resulting in a WARNING Rule 3.4.2 or 2.11.3 violation) and the Wage Protection Rules.

Based on these considerations, the Division finds that the appropriate § 8-1-140(2) fine for DBI's rule violations that denied and interfered with paid leave rights is **$500.00 per employee per year**, not the $100.00 *minimum* penalty (under § 8-1-140) that would be no greater than a poster violation penalty. This penalty amount is based on the considerations detailed above and an estimate of the monetary harm to the Disputed Workers denied paid leave. This amount is also a reflection of DBI's ill-gotten gain — by denying paid leave, it received the benefit of workers' labor when it was required to pay workers *without* receiving that labor.

[485] C.R.S. § 8-13.3-411(1); *see also* § 8-13.3-410, 411(2) (further elaborating Division's HFWA enforcement authority).

Available data confirm the common-sense conclusion that the vast majority of workers take multiple days of paid leave in any year.[486] In this case, the Division cannot determine with precision the total number of workers deprived of leave, or how much leave they would have taken, because DBI did not keep records required by the CWA and HFWA. While DBI's underlying illegal conduct would justify a high-end assumption of the amount of paid leave each worker would have taken, the Division assumes a more conservative estimate of ten hours of leave for each worker --- slightly more than one day. In the Worker Packets, the Disputed Workers reported an average workday of over 8 hours and the Division finds that average wages are approximately $25.00 per hour during the time period HFWA leave was required (September 2020 to May 2022). Thus, ten hours of labor was valued at approximately $250.00 (10.00 x 25). The Division deems appropriate a fine equal to two times the value of DBI's ill-gotten gain — i.e., a fine of $500.00 per Disputed Worker, twice the $250.00 conservative value of the labor DBI received by unlawfully denying paid leave. This amount is in keeping with prior fines for denial of paid leave in other D.I. cases,[487] and with similar or larger fines for less egregious violations authorized or required by Division statutes.[488]

Because DBI's legal responsibilities were to *each* employee, the penalty for "each such violation" (§ 140(2)) is $500.00 per employee per year, for each duty violated. The Division uses the same number of Disputed Workers per applicable time period as for HFWA and PHEW notice. The calculation of these fines is as follows:

| Year | Violation | Dates | Number of Disputed Workers | Fine Amount per Disputed Worker | Total Fine |
|---|---|---|---|---|---|
| 2020 | HFWA Interference | Sept. 21 - Dec. 31, 2020 | 53 | $500.00 | $26,500.00 |
| 2021 | HFWA Interference | Jan. 1 - Dec. 31, 2021 | 59 | $500.00 | $29,500.00 |
| 2022 | HFWA Interference | Jan. 1 -May 17, 2022 | 27 | $500.00 | $13,500.00 |
| | | | | **Total:** | **$69,500.00** |

The Division assesses a total **$69,500.00** in **§ 8-1-140 penalties for each WARNING and Wage Protection Rule violation.** The Division notes that this fine is supported by and each of the dozens of violations of these rules, and operates as a fine assessed concurrently for each of those violations.

**4. $282,000.00 for Failure to Pay Wages**

Pursuant to C.R.S. § 8-4-113(1)(a), the Division is authorized to issue a fine of up to $50.00 per day when an employer fails to pay an employee:

> If a case against an employer is enforced pursuant to section 8-4-111, any employer who without good faith legal justification fails to pay the wages of each of his or her employees shall forfeit to the people of the state of Colorado a fine in an amount determined by the director or hearing officer but no more than the

[486] Bureau of Labor Statistics (BLS), *Access to and Use of Leave—2017-2018 Data from the American Time Use Survey (August 29, 2019)*, Table 4; John Elfein, *Number of sick days taken in the past 12 months from work or school/university among adults in the U.S. from 2020 to 2022*, Statistia (Aug. 26, 2022), (among respondents (79% of surveyed), reporting a weighted average of about three days of sick leave per year).

[487] E.g., $200.00 per employee in cases where an employer provided *at least some* leave and acknowledged employee status. *See* *Southwest Airlines Co.*, DLSS DI Case #22-0013 (Hearing Officer Decis. No. 22-063, Dec. 23, 2022), aff'g fines ordered in DI Citation (Mar. 18, 2022); *Center at Rock Creek, LLC*, DLSS DI Case #20-0036 (DI Citation, Aug. 11, 2021).

[488] E.g., $500.00-10,000.00 per job for failure to include compensation and benefits in a job posting or notify current employees of a promotional opportunity (C.R.S. § 8-5-203(4)); $250.00 per employee per month for failure to keep or produce pay statements (C.R.S. § 8-4-103(4.5)); $50.00 per day per employee for each day wages are due and not paid without good faith legal justification, until wages are paid (C.R.S. § 8-4-113(1)(a)); $250.00 for failure to respond to a wage complaint (C.R.S. § 8-4-113(1)(b)); $200.00-1,000.00 for discriminating against an employee for participating in a wage board (C.R.S. § 8-6-115); $250.00 per violation for any CWA violation by a field labor contractor (C.R.S. § 8-4-119(1)).

sum of fifty dollars per day for each such failure to pay each employee, commencing from the date that such wages first became due and payable.[489]

The Division finds that DBI failed to pay 47 Disputed Workers premium pay when they worked overtime.[490] The overtime premium became due and payable each work week, with the most recent workweek with an identified failure to pay on October 22, 2020.[491]

As detailed in this Citation, DBI did not have a good faith justification for its failure to pay overtime to these workers — it misclassified the Disputed Workers with after a prior investigation for the same scheme and its violations were systematic and egregious. DBI knew what it was doing.

The Division is authorized to assess fines of at least $60,000.00 per failure to pay. The most recent failure to pay overtime premium identified by the Division was October 22, 2020. Over *1200 days* have elapsed since DBI's failure to pay. Applying a fine of $50.00 per day would result in a total fine of $60,000.00, but the Division exercises its discretion to limit the fine to *just 10%* of the maximum penalty that it is empowered to assign.

Therefore, the Division assesses a fine of $6,000.00 for each failure to pay. The $6,000.00 fine rate is based on a $50.00 per day fine for 120 days. Applying the $6,000.00 fine to 47 Disputed Workers, yields **a fine of $282,000.00** under C.R.S. § 8-4-113.

**5. Total Fines.**

Accordingly, **the Division orders total fines of $1,055,900.00 for all violations**, as detailed in the preceding sections: $547,500.00 for failure to keep and produce pay statements; $93,460.00 for COMPS and MWO notice violations; $63,300.00 for HFWA and PHEW notice and posting fines; $69,500.00 for failure to provide HFWA leave; and $282,000.00 for failure to pay wages.

### C. Compliance Orders.

To redress the above-detailed ongoing violations of labor statutes and rules (the "Violations"), and to effectuate compliance **within seven weeks of this determination**, unless a different time frame is noted below, the employer is ordered to:

1. **Correctly classify all workers** who are the employer's employees, specifically included the Disputed Workers as found in this Citation, including by:
   a. **reviewing** the classification status of all workers performing drywall and/or framing under the standard of employer set forth in this determination; and
   b. **re-classifying** as "employees" all who meet the CWA "employee" definition who had not been considered or treated as "employees" by the employer.
2. **Provide the rights and protections required by Colorado law** to all current employees who qualify as an "employee" under the CWA:
   a. **Pay wages earned**, including but not limited to final wages, overtime pay, and the minimum wage, in the time and manner provided in C.R.S. § 8-4-103(1)(a), C.R.S. § 8-4-109(1), and COMPS Order #38 and future iterations.

[489] C.R.S. § 8-4-113.
[490] Section III.D.(4), above.
[491] *Id.*

b. **Track and record time worked** for *all drywall or framing work* performed, including work performed by a subcontractor or pursuant to an hourly contract to provide labor and retain these records as required by COMPS Rule 7.

c. **Keep and provide pay statements** in accordance with C.R.S. § 8-4-103(4) and (4.5).

d. **Provide paid and unpaid rest periods**, and pay wages owed for paid rest periods previously not provided, in accord with COMPS Order Rule 5.

e. **Notify all current employees in writing (whether on paper or electronically)**:

   1. of HFWA paid leave rights and responsibilities, through the written posting and notice distribution to each employee required by C.R.S. § 8-13.3-408 and Colorado WARNING Rules 4.1-4.4; and

   2. of wage and hour rights and responsibilities, through the written posting distribution of the COMPS poster to each employee required by COMPS Order Rule 7.4.2.

f. **Provide leave as required by HFWA**, including by:

   i. providing pay for leave taken for all HFWA-qualifying conditions since July 14, 2020, as required by HFWA, the Wage Protection Rules, and the Colorado WARNING Rules (collectively, "HFWA and applicable Rules");

   ii. providing the amount of leave required by HFWA since July 14, 2020, as required by HFWA and applicable Rules; and

   iii. ensuring that leave is provided in accordance with the notice, documentation, and anti-retaliation/interference limitations and requirements of HFWA and applicable Rules.

3. **Rescind all policies and practices contrary to any portion of these Compliance Orders**, and modify or replace them with policies and practices compliant with these Orders.

4. **Notify all current and former employees in writing (whether on paper or electronically)**:

   a. of all rescissions of, and all modified or replacement versions of, policies and practices;

   b. that they have been employees of the employer during the Covered Period, and are entitled to employee rights and protections including the applicable Denver or Colorado minimum wage, overtime, and rest and meal breaks;

   c. that they have been entitled to paid leave for any HFWA-qualifying leave taken at any point since July 14, 2020, to the earlier of the date of this Citation or the employee's separation;

   d. that they are entitled to retroactive pay for any HFWA-qualifying leave taken since July 14, 2020, for which they were not correctly compensated.; and

   e. that they may file a complaint with the Division for violations of any of these rights.

5. Provide a copy of this Citation (1) to all employers of the employer, and (2) to all workers (whether or not previously classified by the employer as "employees" or "independent contractors") who have performed drywall or framing for the employer or for a project for which the employer has billed or been paid.

6. Refrain, effective *immediately* (not in seven weeks), from retaliating or otherwise undertaking action against any employees or other persons for any actual or perceived protected activities including but not limited to participating, cooperating, or assisting, in any manner, in any investigation proceeding, or hearing, as to any rights within the scope of this investigation, the statutes and regulations cited herein, or C.R.S. Title 8, Article 4.

7. *Effective immediately,* before authorizing or permitting any individual or entity to perform drywall or framing work for the Employer's benefit as an independent contractor, the Employer must:

1. Analyze whether the party is a bona fide independent contractor and whether the Employer has obligations as an employer of the bona fide independent contractor's workers. The Employer shall submit a written brief with this analysis to the Division.
2. Submit information and proof of the subcontractor's compliance with Colorado labor law, by either a certification that the subcontractor does not have employees or is otherwise exempt from Colorado labor laws or by providing, to the Division:
    1. The HFWA-compliant policy, including how paid sick leave has been provided and communicated to employees, including all leave policies and communications, and a detailed description of the amounts, conditions, and permitted uses of sick leave provided
    2. The posting and notice provisions of the COMPS Order and HFWA/PHEW including:
        1. where the posters are posted (provide addresses as well as a description of the location(s) detailing employee access to the location(s));
        2. when the posters were posted (provide date(s)); and
        3. photographic evidence of posting.
    3. When the COMPS Order or poster was added to the employee handbook, and how this handbook was provided to employees. Response must include a copy of the handbook.
    4. How and when individual written notice of HFWA/PHEW rights was provided to employees.
    5. How the subcontract is tracking time worked and ensuring correct payment for all employees and any applicable policies, including minimum wage and overtime.

These deadlines do not excuse any violations before that deadline; they may still be deemed unlawful.

**D. <u>Information and Document Demands.</u>**

DBI is demanded and ordered to confirm their effectuation of the above Compliance Orders, and to facilitate further Division investigation and enforcement to remedy and prevent continuation or recurrence of the employer's violations, by 14 days after their deadline to execute the Compliance Orders, by providing the Division the following documentation and information. In answering, all "Notices, Instructions, and Guidelines Applicable" to the information and document demands in the November 23, 2020, Notice of Investigation in this matter apply and are incorporated by reference into these information and document demands.

1. The employer shall produce, on the enclosed Attachment H blank form (or on a document the employer creates with the same content), a detailed explanation of how each measure in the Compliance Order has been effectuated, including but not limited to the following matters:
    a. The process by which the employer reviewed worker classifications, a list of any misclassifications found, and any actions to remedy such misclassifications.
    b. How paid sick leave has been provided and communicated to employees, including all leave policies and communications, and a detailed description of the amounts, conditions, and permitted uses of sick leave provided.
    c. Any changes to rest and meal periods for employees, including how these changes were implemented, communicated to employees, and documented through distributed policies.
    d. Identification of the employer's workweek, defined as any consecutive seven-day period starting with the same calendar day and hour each week. A workweek is a fixed and recurring period of 168 hours, consisting of seven consecutive 24-hour periods.
    e. Identification of the employer's workday, defined as a consecutive 24 hour period.

f. A description of how the employer is tracking time worked and ensuring correct payment for all employees including ensuring:

   i. for all piece rate employees, the payment of at least minimum wage per hour for all hours worked;

   ii. payment of the applicable minimum wage; and

   iii. payment of overtime premium for all hours worked in excess of 40 hours per workweek, 12 hours per workday, or 12 consecutive hours without regard to the starting and ending time of the workday (excluding duty free meal periods), whichever calculation results in the greater payment of wages.

g. Information regarding the posting of the COMPS Order and HFWA/PHEW posters including:

   i. where the posters are posted (provide addresses as well as a description of the location(s) detailing employee access to the location(s));

   ii. when the posters were posted (provide date(s)); and

   iii. photographic evidence of posting.

h. When the COMPS Order or poster was added to the employee handbook, and how this handbook was provided to employees. Response must include a copy of the handbook.

i. How and when individual written notice of HFWA/PHEW rights was provided to employees.

The above explanation must be signed and verified under penalty of perjury by DBI per C.R.S. § 8-1-114. The signature and verification must indicate the capacity in which the individual signs, and must be by either: (i) the chief executive officer of the employer (ii) an owner of 50% or more of the employer; or (iii) another employer official with authority to make binding statements and commitments on behalf of the employer.

2. DBI shall produce copies of all documents constituting or confirming their effectuation of all compliance measures described above, including but not limited to:

   a. all policies and practices drafted and implemented pursuant to the Compliance Orders;

   b. all communications to or from employees as to policies and practices pursuant to the Compliance Orders;

   c. the most recent available pay statement for all workers performing, since the date of this Citation, drywall and/or framing work similar to that of the Covered Workers; and

   d. notification to all employees, whether in writing or electronically:

      i. of HFWA paid leave rights and responsibilities, through the written posting and notice distribution to each employee required by C.R.S. § 8-13.3-408 and WARNING Rules 4;

      ii. of PHEW rights, through the posting required by C.R.S. § 8-14.4-103(1) and WARNING Rule 4; and

      iii. of wage and hour rights and responsibilities, through the inclusion of the COMPS Order or poster in employee handbooks, manuals, or policies per COMPS Order Rule 7.4.2.

3. DBI shall produce the following information, on the enclosed Attachment H blank form (or on a document the employer creates with the same content):

   a. a list of all real estate owned in whole or in part by the employer, including the address; nature of ownership (wholly owned, jointly owned with percent ownership, etc.); estimated value of the property; and the amount and holder of any outstanding debts secured by the property, including mortgages and lines of credit;

   b. a list of all vehicles owned in whole or in part by the employer, including the make, model, and year of the vehicle; nature of ownership (wholly owned, jointly owned with percent ownership, etc.); estimated

value; and the amount and holder of any outstanding debts secured by the property, including purchase loans;

c. a list of all other physical property owned in whole or in part by the employer, purchased for or with a current estimated value of $1,000.00 or more, including a description of the property; nature of ownership (wholly owned, jointly owned with percent ownership, etc.); estimated value; and the amount and holder of any outstanding debts secured by the property;

d. a list of all ownership interest held by the employer in any business enterprise other than the employer, including all partnerships, corporations, or LLCs, including the name of the enterprise, if any; a description of the enterprise (services performed, products sold, etc.); nature of ownership (wholly owned, jointly owned with percent ownership, etc.); annual gross receipts and expenses for the enterprise for each year from 2019 to the present; a description and estimated value of all property owned by the enterprise; and the amount and holder of any outstanding debts owed by the enterprise;

e. a list of all financial institutions, including banks, savings and loan associations, credit unions, and brokerage houses, where the employer is named on an account or has signature authority, including the name, address, and telephone number of the institution; the account number; the current balance of each account; and account statements for the three most recent months;

f. a list of every person or entity that owes money to the employer in excess of $500.00, including the name, address, and phone number of the debtor; the amount owed; the terms of repayment, including the amount and dates payments are due; and the reason the moneys are owed;

g. a list of all employment and contracts providing income to the employer from January 1, 2022, to the present, including the parties to the contract; a description of the contract (work or services to be performed, time period, etc.); all income the contract has generated from January 1, 2022, to the present; and income the contract is expected to generate in the future;

h. a list of all general contractors for which either employer has had contracts, or has performed, procured labor for, or billed or been paid for, drywall or framing, since January 1, 2022, including the name of the contractor; the date of initial contracting; whether the contract is ongoing; and receipts to date from the contractor;

i. a list of all property with an estimated value of $5,000 or more, including ownership interest in any real property, funds or accounts containing funds, or business entities, transferred by the employer since November 23, 2020, including the name, address, and phone number of the transferee; a description of the property; the estimated value of the property; and the reason for the transfer; and

j. all bankruptcy proceedings initiated by the employer from November 23, 2020, to the present.

**E. <u>Notice of Possible Consequences for Non-Compliance.</u>**

Violation of any of the above orders or demands may result in the following.

(1) <u>Fines for non-compliance</u>. The remedy failures for non-compliance, the Division may issue fines under authority, including but not limited to C.R.S. §§ 8-1-117, -140 (non-compliance with Division demands or orders), fines provisions of the violated statutes, and/or rules pursuant to those or other applicable statutes;

(2) <u>Asset freezing or seizure or other collections enforcement</u>. To remedy failures to pay as ordered, the Division may freeze and seize assets any liable party owns or is owed, through Division orders and notices to the party, to other persons or entities with the party's assets (e.g., banks), and to anyone who owes the party money or other assets (e.g., customers, suppliers, business partners). Non-compliance may also yield additional fines on the party, and additional information demands to the party or others (e.g., individuals or businesses with knowledge of the party's assets). Enforcement efforts may ensue during any appeals, absent an order limiting such efforts;

(3) Additional information demands and compliance orders. To redress any Violations that may continue or recur, and/or any Violations of Division demands or orders, the Division may issue further information demands and compliance orders; and

(4) Additional document and information demands. To remedy non-compliance, including failures to pay fines, the Division may issue demands for further documents or information pertinent to the Division's collection efforts or the Violations, including but not limited to a C.R.S. § 8-1-120 demand for live testimony answering questions under oath by one or more managers, officers, and/or owners of the employer selected by the Division.

**F. Notice of Expanded Investigation**

The Division expands the temporal scope of this investigation time period through June 6, 2024. The investigatory time period, sometimes referred to in Division documents as the "Covered Period," is now January 1, 2018 to June 6, 2024. The expanded time period applies to the same violations identified in the original NOI:

(1) Classifying workers as "independent contractors," rather than as "employees," thereby depriving them of the rights of "employees" under Title 8 of the Colorado Revised Statutes.

(2) Failing to pay all earned wages to workers, including but not limited to final wages due upon termination, wages for paid rest periods, and overtime wages.

(3) Failing to provide workers itemized pay statements and notices of their rights required by laws and rules governing wage rights; paid sick days; and whistleblowing and personal protective equipment use during a public health emergency.

Because the Division is expanding the scope of the investigation, DBI must update its responses to the demands in the NOI (App'x 1) within 14 days after their deadline to execute the Compliance Order.

## IV. CONCLUSION

For the above reasons: **The Division concludes that the Employer, DBI, violated Colorado labor law, and is hereby ORDERED to:**

**(A)** **pay all outstanding sums**, as detailed in the Notice of Assessment attached as Attachment G,

**(B)** **effectuate the Compliance Orders**, as detailed and pursuant to the timeframes above,

**(C)** **provide responses to the Information and Document Demands**, as detailed and pursuant to the timeframes above, and

**(D)** **provide responses to the Division Notice of Investigation** for the expanded investigatory period.

## V. APPEAL RIGHTS

If you disagree with this determination, you may appeal it. Pursuant to the Direct Investigation Rules at 7 CCR 1103-8, Rule 6, the employer has 35 calendar days from the date the determination was issued to request an appeal hearing with the Division. To obtain a copy of the Direct Investigation Appeal Hearing Request Form and related instructions: go online (go to https://cdle.colorado.gov/wage-claim-appeal-faqs); ask us to send you a copy (email cdle_di_appeals@state.co.us or call 303.318.8442); or pick up a copy in-person (633 17th Street in Denver, 2nd floor). You may also be able to file an appeal through our online portal (the Appeal FAQs webpage has information on whether and how you can file your appeal through the portal). Whichever method you choose, it is your responsibility to meet the deadline. If no hearing request is received within 35 calendar days, this is the final decision of the Colorado Department of Labor and Employment.

If you believe any documents or information the Division has provided to you, including this Citation and any prior or accompanying documents, contain "[t]rade secrets, privileged information, [or] confidential commercial, financial, geological, or geophysical data" (C.R.S. § 24-72-204(3)(a)(IV)), you must designate each specific item you believe qualifies within twenty (20) days of the receipt of the document or information. Please provide a detailed written explanation along with any further documentation demonstrating that the identified information contained in the final decision is a trade secret, proprietary, or privileged.[492] If you do not designate this Citation within 20 calendar days, or if the Division determines that it does not qualify under C.R.S. § 24-72-204(3)(a)(IV), the Division will treat this determination as a public record pursuant to the Colorado Open records Act, C.R.S. § 24-72-201 et seq., and may publish the Citation on its website. If you choose to designate this Citation or other documents as trade secret or otherwise confidential, the Division will review your response, and alert you of the final decision. If you have any questions about what constitutes a trade secret or proprietary or privileged information under Colorado law, please contact a private attorney.

Dated this 6th day of June, 2024

**Division of Labor Standards and Statistics**
**Colorado Department of Labor and Employment**

Served on the parties named herein, to e-mail addresses provided by each party, on June , 2024

[492] C.R.S. § 7-74-102(4) defines a trade secret as:

> the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, address, or telephone numbers, or other information relating to any business or profession which is secret and of value. **To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.**

(Emphasis added). The Director will apply the following factors to determine if the information is a trade secret:

> (1) the extent to which the information is known outside the business; (2) the extent to which the information is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the saving effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*See Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1251–52 (D. Colo. 2001).